# Arnold & Porter

Jeffrey L. Handwerker
+ 1 202.942.6103 Direct
Jeffrey.Handwerker@arnoldporter.com

November 25, 2019

**VIA EMAIL AND FEDERAL EXPRESS**

Stewart W. Kameen
Senior Counsel, Industry Guidance Branch
Office of Counsel to the Inspector General
U.S. Department of Health and Human Services
Room 5227, Cohen Building
330 Independence Ave, S.W.
Washington, DC 20201

>        Re:    Pfizer Inc.
>               Advisory Opinion Request No. R1225

Dear Mr. Kameen:

   I am writing with respect to Advisory Opinion Request No. R.1225.  As we have explained in our prior letters and telephone calls, time is of the essence for patients with transthyretin amyloid cardiomyopathy ("ATTR-CM").  For every month that patients do not receive treatment, they experience the debilitating effects of the disease and reductions in quality of life.  Prescriptions for Vyndaqel® (tafamidis meglumine) and Vyndamax™ (tafamidis) (collectively, "tafamidis" or the "Medications") steadily have increased since the Medications were approved in May.  Without copay assistance, however, access to the Medications has become an urgent problem for patients who rely on the Medicare prescription drug benefit.  Therefore, we request that OIG respond quickly to Requester's proposed Copay Assistance Program so that Medicare beneficiaries with limited financial means can access and benefit from these important, life-extending Medications.

   The dispositive issues presented by our request are matters of statutory interpretation that are amenable to expedited resolution: (i) does the Copay Assistance Program meet the statutory exemption to the definition of remuneration for copay waivers, and (ii) would the Copay Assistance Program influence the prescription of the Medications.  These are purely legal questions that require OIG to apply the statute as written to the facts as presented.  We believe that the Program as proposed meets the terms of the statutory exception, and we respectfully request that OIG issue an opinion as quickly as possible.[1]  To the extent OIG has any concerns that the Requester's proposed

---

[1] As a reminder, Requestor filed its initial request in June, in anticipation that Medicare beneficiaries would face access challenges to the Medications due to the Medicare Part D benefit design.  Requestor refiled its request in August to remove one element of the request.  In our November 12, 2019 letter, Requestor

**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Ave., NW | Washington, DC  20001-3743 | www.arnoldporter.com

CONFIDENTIAL AND FOIA EXEMPT
CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION
US 167081378v21

# Arnold&Porter

Stewart W. Kameen
November 25, 2019
Page 2

program might not fit within the waiver exception, Requestor asks to meet with OIG to discuss how Requestor might address those concerns.

If OIG wants more time to deliberate on Requester's proposed Copay Assistance Program, we propose that OIG endorse in the interim a limited pilot of the program. Under the pilot, Requestor would provide copay assistance to eligible Medicare beneficiaries who have been receiving the Medications under Requestor's Phase 3, long-term extension safety study (the "Study"), which we describe in more detail below. Requestor intends to conclude the Study by March 31, 2020, at which time the participants remaining in the Study will be required to access the Medications in the commercial market through their insurance coverage, if any.

Notably, the same eligibility criteria for the Copay Assistance Program, as described in our initial request and our November 12, 2019 letter, would apply to the pilot patient population. The proposed pilot would allow patients who have been treated with the Medications for months or longer to continue their therapy upon the conclusion of the Study. The pilot also would allow Requestor to operationalize the Copay Assistance Program with a small patient population to ensure that Requestor's processes and work-flows operate effectively before Requestor makes the program available to all eligible Medicare beneficiaries.

As we explain in more detail below, Requestor initiated the Study in early 2016 to continue to evaluate the safety of tafamidis in ATTR-CM patients who completed 30 months of treatment with tafamidis in Requestor's pivotal Transthyretin Amyloid Cardiomyopathy Clinical Trial ("ATTR-ACT"),[2] and to continue to provide access to tafamidis to patients who participated in ATTR-ACT pending approval by the Food and Drug Administration ("FDA"). This continued access was vitally important for patients who benefited from tafamidis during the pivotal trial because there were—and still are—no other available drug therapies for this debilitating and fatal disease. In 2018, Requestor expanded the Study to include an expanded access cohort (commonly referred to as "compassionate use") to enable early access to these breakthrough medications to ATTR-CM patients who had not participated in ATTR-ACT. Both the original study

---

responded to OIG's questions about the Copay Assistance Program and other aspects of how Requestor provides assistance to patients who are prescribed the Medications.
[2] ATTR-ACT was a 30-month, Phase 3, double-blind, placebo-controlled, randomized, parallel-group trial designed to evaluate the efficacy, safety and tolerability of oral dosing of tafamidis meglumine 20 mg or 80 mg in comparison to placebo in participants diagnosed with transthyretin cardiomyopathy and heart failure. Please refer to our August 26, 2019 letter, pp. 7-9, for a detailed description of ATTR-ACT and its findings.

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**
US 167081378v21

# Arnold&Porter

Stewart W. Kameen
November 25, 2019
Page 3

protocol and the 2018 amendment were initiated consistently with FDA regulations[3] and in furtherance of strong public policy considerations supporting compassionate use programs.[4] Moreover, Requestor included safety data from the Study as part of its application for approval of the Medications.

Requestor believes that the proposed pilot does not implicate the anti-kickback statute ("AKS") and the beneficiary inducement statute ("BIS"). As with the full Copay Assistance Program, the proposed pilot falls within the exceptions to the AKS and the BIS for copay waivers. Moreover, the copay assistance provided through the pilot would not constitute an "inducement" for purposes of the AKS or BIS because (i) patients eligible for the pilot have been taking the Medications to treat their ATTR-CM pursuant to the Study, and in all cases the patients started therapy under physician supervision before FDA approval (*i.e.*, before Requestor marketed Medications to healthcare providers or patients in the U.S.); and (ii) there are no alternative FDA-approved pharmacological therapies to treat ATTR-CM. Even if OIG believes that the pilot would implicate the AKS or the BIS, the pilot presents a low risk of fraud and abuse and warrants a favorable exercise of OIG's enforcement discretion.

Below we describe the proposed pilot in more detail and explain why it does not implicate the AKS or the BIS and why it presents a low risk of fraud and abuse. If OIG believes that it needs additional time to evaluate Requestor's Advisory Opinion Request within the timeframe necessary to accommodate the end of the Study (March 31, 2020), then we request that OIG confirm in writing, if possible by early February, that Requestor can move forward with the pilot, in light of Study participants' urgent need to access the Medications to remain on their current therapy and the low risk of fraud and abuse with respect to this patient population.

As previously noted, we would welcome the opportunity to work with OIG to address any remaining concerns regarding the Copay Assistance Program so that all financially-needy Medicare beneficiaries can affordably access their Medications.

---

[3] FDA regulations provide that when a manufacturer amends a protocol submitted under an existing Investigational New Drug (IND) program to add an expanded access program, expanded access may begin after FDA receives notice of the change in protocol, provided that the protocol has been approved by the relevant independent review board. 21 C.F.R. § 312.305(d)(2); 21 C.F.R. § 312.30.

[4] FDA, Guidance for Industry, *Expanded Access to Investigational Drugs for Treatment Use -- Questions and Answers* (Updated October 2017), *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/expanded-access-investigational-drugs-treatment-use-questions-and-answers ("FDA has a long history of facilitating expanded access to investigational drugs for treatment use for patients with serious or immediately life- threatening diseases or conditions who lack therapeutic alternatives.").

CONFIDENTIAL AND FOIA EXEMPT
CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION
US 167081378v21

# Arnold & Porter

Stewart W. Kameen
November 25, 2019
Page 4

Requestor would like to meet in person or by telephone at your convenience to facilitate this process.

## I.     RELEVANT BACKGROUND

### A.     Study Participants

Requestor designed the Study as a Phase 3, open-label, long-term extension safety study designed to obtain additional safety data for tafamidis and to provide continued access to tafamidis to participants of ATTR-ACT. Requestor submitted the original Study protocol to FDA on March 31, 2016, more than three years before FDA-approval of the Medications. The Study was authorized by FDA regulations and guidance. The Study has been monitored by an independent data monitoring committee and has had ongoing independent review board ("IRB") oversight at each investigator site. Requestor intends to conclude the Study as early as March 31, 2020.

Study participants fall into two cohorts: Cohort A and Cohort B. Cohort A consists of participants who completed 30 months of treatment with tafamidis in ATTR-ACT. Cohort A participant enrollment occurred from June 13, 2016 through February 7, 2018. Cohort A included 252 participants in the United States, across 20 investigator sites.

ATTR-ACT demonstrated a favorable benefit-to-risk profile for tafamidis. In light of this positive outcome, and in the absence of alternative FDA-approved pharmacologic therapies for ATTR-CM, Requestor decided to expand the Study to include an expanded access cohort to provide ATTR-CM patients access to tafamidis, prior to FDA approval. In its pre-NDA meeting with FDA in July 2018, Requestor provided an overview of its planned expanded access cohort, and FDA confirmed its agreement with Requestor's plans. Consequently, later in July 2018, Requestor amended the Study protocol to include an additional cohort of ATTR-CM patients who did not participate in ATTR-ACT ("Cohort B"). The IRB at each investigator site approved the protocol amendment, and Requestor submitted the protocol amendment to FDA.

The expanded access cohort was implemented in accordance with FDA's expanded access regulations and guidance, which FDA designed to facilitate early access to investigational drugs for treatment use for patients with serious or immediately life-

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**

# Arnold&Porter

Stewart W. Kameen
November 25, 2019
Page 5

threatening diseases who lack therapeutic alternatives.[5]  Enrolled patients receive
tafamidis free of charge, as is customary for expanded access programs.  The investigator
sites enrolled participants into Cohort B from August 16, 2018 through May 6, 2019 (the
date that FDA approved the Medications).  Cohort B included 677 participants in the
United States.  Requestor has been collecting safety data from Cohort B participants,
including safety data on the 61 mg formulation, which was not studied in ATTR-ACT,
and Requestor includes that data in its safety updates to FDA.  Requestor included the
safety data on the 61 mg formulation in Requestor's final regulatory submission for
approval of the Medications.

Following FDA approval of the Medications, and consistent with the Study
protocol, clinical trial investigators have been transitioning off of the Study participants
that have access to commercial supply under their insurance benefits.  Requestor has
received information from the investigator sites that many of these patients—whom the
physicians would like to continue on tafamidis due to the clinical efficacy—are unable to
afford their coinsurance obligations under their Medicare Part D benefit.  Consequently,
some of these patients have enrolled in a Phase 3, placebo-controlled, clinical trial for a
drug of another manufacturer that is being studied for the treatment of ATTR-CM.  As a
placebo-controlled trial, some of these patients likely have been randomized to the
control group and, therefore, are receiving no medication to treat their ATTR-CM.  Other
former Study participants have been prescribed Onpattro® (patisiran) or Tegsedi™
(inotersen), for off-label use, as these two drugs are approved only for amyloid
transthyretin polyneuropathy ("ATTR-PN"), and not for ATTR-CM.[6]  Other patients
have had to forego therapy for their ATTR-CM altogether.

### B.    Copay Assistance Program Pilot

1.    Pilot Program Design

Requestor believes that it would be appropriate and consistent with good medical
care to make the need-based Copay Assistance Program available to all eligible current
and former participants of Cohorts A and B through a pilot.  As described in our prior

---

[5] *See,* 21 C.F.R. part 312, subpart I; *see, also,* FDA, Guidance for Industry, *Expanded Access to Investigational Drugs for Treatment Use -- Questions and Answers.*
[6] As we noted in our original request, these two drugs have list prices of $450,000, which is significantly higher than Requestor's price for the Medications.  Nevertheless, because these drugs are covered under Medicare Part B, patients can use Medigap insurance to offset their coinsurance obligations.  When ATTR-CM patients use these products off-label, the government incurs higher costs than if these patients were to continue to use the Medications.  In addition, because they have not been studied in patients with ATTR-CM, it is an open question as to whether these medications are safe and effective for these patients.

CONFIDENTIAL AND FOIA EXEMPT
CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION
US 167081378v21

# Arnold&Porter

Stewart W. Kameen
November 25, 2019
Page 6

letters, Requestor would provide financial assistance directly to eligible Medicare Part D beneficiaries in these patient cohorts to help them pay the true out-of-pocket (TrOOP) costs associated with the Medications, including costs during the Part D deductible phase, the initial coverage phase, coverage gap, and catastrophic phase.  Eligible patients enrolled in the pilot would be required to pay $35 per month at the point of sale, after which Requestor would pay 100% of each enrolled Medicare Part D beneficiary's monthly deductible or coinsurance amounts for the Medications.  There would be no maximum annual benefit.

Patients enrolled in the pilot would be able to access the copay assistance from any of the specialty pharmacies within the Requestor's defined pharmacy network for the Medications.  Requestor would engage a copay program administration vendor to administer certain aspects of the pilot.  Those activities are the same activities described in our November 12, 2019 letter.

Requestor would not conduct any proactive outreach to study participants regarding the pilot.  In addition, Requestor would not offer assistance under the pilot as part of any advertisement for the Medications.  Instead, Requestor would provide information about the pilot only to Study investigators who have already prescribed the Medications for the Cohort A and B participants who may be eligible to participate in the pilot.  Requestor would instruct investigators that Medicare beneficiaries who were Cohort A and B participants—including patients who had participated in the Study and previously transitioned to commercial product—should contact Requestor's patient support hub ("VyndaLink" or the "Hub") for information about how to enroll in the pilot program.  Requestor also would work with investigator sites to verify that patients who contact the Hub to enroll in the pilot were Cohort A or B participants.[7]

Field-based personnel would not be permitted to communicate with investigator sites, physicians, patients or any other third parties about the pilot.  Requestor would train field personnel to respond to any unsolicited questions about financial support for Medicare beneficiaries generally, or the pilot specifically, by directing patients to contact the Hub to learn about potential financial assistance options.  Neither Requestor's website for the Medications nor the VyndaLink website would include any information about the pilot.

Requestor respectfully requests that OIG confirm whether Requestor can move forward with the pilot by early February 2020 so that it can launch the pilot on April 1,

---

[7] Requestor will develop a process for confirming patient eligibility in a manner that is fully consistent with the patient privacy information contained in the Privacy Supplement to the Informed Consent document signed by each study participant.

CONFIDENTIAL AND FOIA EXEMPT
CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION
US 167081378v21

# Arnold&Porter

Stewart W. Kameen
November 25, 2019
Page 7

2020, or earlier.[8]  Requestor would require patients to re-enroll annually to allow the Hub
to verify continued eligibility.  Requestor would continue to operate the pilot for as long
as patients remain eligible to participate.

Medicare beneficiaries who were participants in Cohort A or Cohort B and who
are enrolled in Requestor's free drug program at the time Requestor launches the pilot
would remain in the free drug program for the remainder of the calendar year, consistent
with the free drug program's terms and conditions and OIG guidance regarding
manufacturer-sponsored patient assistance programs operating outside of Medicare Part
D.[9]  All Medicare beneficiaries who enroll in the free drug program must re-enroll for the
free drug program for each following calendar year.  Patients who are eligible for the
pilot could enroll in the pilot program in future years, even if they did not enroll during
the initial enrollment period.

As with the full Copay Assistance Program, Requestor would not routinely
provide copay assistance to all patients prescribed the Medications.  Rather, Requestor,
through its Hub, would conduct an individualized, case-by-case eligibility determination
in a uniform and consistent manner to ensure that patients from Cohorts A and B meet the
program requirements before they receive assistance through the pilot.

2.   Patient Eligibility

To be eligible to participate in the pilot, a patient would need to meet the
following eligibility criteria:

- The patient was, at any point in time, a participant in Cohort A or Cohort B of the
Study;

- The patient is enrolled in Medicare Part D and has coverage for the Medications
through his or her Medicare Part D plan;

- The patient is a U.S. resident;

- The patient's household income is between 300% and 800% of the federal
poverty level ("FPL"); and

- The Medication is prescribed for the treatment of ATTR-CM.

---

[8] As noted earlier, Requester would encourage OIG to render an opinion on the full Copay Assistance
Program, not only on the pilot, on this timeline.
[9] See OIG Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70
Fed. Reg. 70623, 70627 (November 22, 2005).

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**
US 167081378v21

# Arnold&Porter

Stewart W. Kameen
November 25, 2019
Page 8

### 3. Patient Enrollment Process

The VyndaLink Hub would provide information about the pilot to Medicare patients from Cohort A and B who contact the Hub about financial assistance options, evaluate patients' eligibility for the pilot, and enroll eligible patients in the pilot. Specifically, as part of the verification process, the Hub would:

- Verify that the patient was a participant in Cohort A or Cohort B;[10]

- Verify that the patient's treating physician has prescribed a Medication for ATTR-CM;

- Conduct a benefits investigation to confirm the patient has Medicare coverage for the Medications;[11] and

- Verify that the patient meets the income requirements via a credit check (if the patient consents) or a review of income documentation.[12]

## II.   LEGAL ANALYSIS

### A.   The Pilot Does Not Implicate the AKS or the BIS

   *1.   The Proposed Copay Assistance Program Does Not Constitute Prohibited "Remuneration," Because it Falls into the Statutory Exception Permitting Copay Waivers.*

As we already have explained regarding the Copay Assistance Program, the proposed pilot would not constitute prohibited "remuneration" because it meets each of the three prongs of the copay waiver exception to the BIS.[13]   Requestor would provide

---

[10] Requestor will work with the Hub vendor to develop a robust verification process prior to implementing the pilot.  That process will limit access to study participants' personally identifiable information to personnel who require the information to operate the pilot.

[11] As a reminder, patients with commercial insurance are eligible to participate in Requestor's existing copay assistance program.

[12] Acceptable forms of income documentation include, but are not limited to: tax returns; pay stubs or W-2s; tax forms related to retirement income (e.g., certain 1099 Forms showing social security or retirement income); pension or bank statements; copies of social security checks, pension checks or railroad retirement checks; or unemployment statements.  Patients who have no income or no documented income will be allowed to mail/fax a signed letter from their prescriber, social worker, or advocate stating their need for assistance.  Patient letters are not accepted.

[13] *See* 42 U.S.C. § 1320a-7a(i)(6)(A); 42 C.F.R. § 1003.110 ("The waiver of coinsurance and deductible amounts by a person, if the waiver is not offered as part of any advertisement or solicitation; the person does not routinely waive coinsurance or deductible amounts; and the person waives coinsurance

# Arnold&Porter

Stewart W. Kameen
November 25, 2019
Page 9

financial assistance to eligible patients by waiving copays and assisting with the payment
of Medicare Part D coinsurance and deductibles.  Requestor would not offer financial
assistance as part of any advertisement to solicit prescriptions for the Medications.[14]
Rather, Requestor would offer copay and coinsurance assistance only to patients properly
diagnosed with ATTR-CM who started taking the Medications months or even years ago
as part of the Study.  The copay waivers also would not be "routine," and would instead
be granted on a case-by-case basis upon a documented demonstration of financial need
based on patient income levels.

OIG has approved other copay assistance programs similar to those Requestor
now proposes when offered by hospitals and other service providers.[15]  As described in
our August 26, 2019, advisory opinion request and our November 12, 2019 letter, OIG's
position that pharmaceutical manufacturers generally are ineligible to take advantage of
the copay waiver exception is not supported by the statutory text.  The statutory
exemption by its terms applies to copay waivers by any "person," a term the OIG has
repeatedly found in many other contexts to *include* drug manufacturers.[16]  If
pharmaceutical manufacturers are "persons" pursuant to some provisions of the AKS and
the BIS, then they are "persons" for purposes of the copay waiver provision as well.
Thus, a copay waiver under the circumstances presented in Requestor's Advisory
Opinion Request does not violate the AKS or the BIS by their own plain terms.

Moreover, OIG's concerns about improper incentives and influence do not apply
to the pilot, which would provide financial assistance only to patients diagnosed with
ATTR-CM who have been taking the Medications through their Study participation, and
in many cases, after transitioning out of the Study, and for whom there is no alternative
FDA-approved treatment.

---

and deductible amounts after determining in good faith that the individual is in financial need or failure by
the person to collect coinsurance or deductible amounts after making reasonable collection efforts.").
[14] As described above, Requestor would provide information about the pilot only to Study investigators.
Such communications, describing financial assistance to eligible Study participants who have been taking
tafamidis since before FDA-approval of the Medications, does not constitute the type of "advertising" that
the BIS discourages, which is directed at communications that could influence a physician's prescribing
decision.
[15] *See* Advisory Opinion No. 17-02, at 6-7 (July 7, 2017).  OIG has similarly approved a need-based copay
waiver program for a corporation that provided emergency-only ambulance services.  *See* Advisory
Opinion No. 12-16, at 4-5 (Nov. 5, 2012).
[16] *See* footnote 2 in our November 12, 2019 letter for a description of advisory opinions in which OIG has
recognized that pharmaceutical companies are "persons" under the AKS and the BIS.

CONFIDENTIAL AND FOIA EXEMPT
CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION
US 167081378v21

# Arnold&Porter

Stewart W. Kameen
November 25, 2019
Page 10

> 2. *Copay Assistance Would Not "Induce" the Selection of the Medications as an ATTR-CM Treatment.*

The financial assistance that Requestor would provide to former Study participants through the proposed pilot would not "induce" physicians to prescribe or patients to use the Medications, an essential element of both the AKS and the BIS.[17]

Eligible patients have been using the Medications under physician supervision for months and in many cases years, both while such patients participated in the Study and, for some patients, after such patients transitioned off of the Study. Participants in Cohort A first started therapy as participants in ATTR-ACT (some of these patients started therapy as early as 2013). The Study is monitored by an independent data monitoring committee and overseen at each participating investigator site by an IRB. Requestor developed the Study solely to (i) collect additional safety information regarding use of tafamidis in ATTR-CM patients, and (ii) enable participants of the pivotal clinical trial to continue to access tafamidis pending FDA approval of the Medications. This continued access was critical for patients who experienced a clinical benefit from tafamidis, due to the lack of any alternative pharmacotherapy for ATTR-CM. Requestor submitted the study protocol, and each subsequent amendment, to FDA.

Participants in Cohort B first started therapy, prior to FDA approval of the Medications, as part of an expanded access cohort that Requestor structured and initiated in accordance with FDA regulations and guidance permitting expanded access to investigational drugs for patients with life-threatening conditions who lack therapeutic alternatives. Requestor amended the Study protocol to include additional patients to meet a significant unmet medical need for ATTR-CM patients. Requestor described the early access cohort to FDA at the pre-NDA meeting in July 2018 and subsequently submitted the protocol amendment to FDA. The IRB at each investigator site approved the protocol amendment, and the investigators have been collecting and reporting safety information regarding the Cohort B participants.[18]

---

[17] The AKS prohibits offering or paying "remuneration" "to any person *to induce* such person to purchase … any good … for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(B) (emphasis added). Similarly, the BIS prohibits "offer[ing] to or transfer[ing] remuneration to any individual eligible for [Medicare, Medicaid or certain other federally funded State health care programs] … that such person knows or should know is likely *to influence* such individual to order or receive from a particular provider, practitioner, or supplier any item or service for which payment may be made, in whole or in part," under federal health care programs. 42 U.S.C. § 1320a-7a(a)(5) (emphasis added).

[18] At around this time, Requestor developed a new formulation of tafamidis, a 61 mg formulation. The FDA Division of Cardiovascular and Renal Products requested that Requestor collect and report patient

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**
US 167081378v21

**Arnold&Porter**

Stewart W. Kameen
November 25, 2019
Page 11

Moreover, Requestor's purposes for initiating and expanding the Study were to collect additional safety data related to tafamidis and to provide Study participants access to tafamidis in the absence of any alternative pharmacologic therapy for these patients. These purposes are consistent with FDA's policy goals related to patient safety and expanded access. Requestor did not establish or expand the Study to seed the market for the Medications upon approval. The Medications are FDA-designated "breakthrough therapies," the only FDA-approved medicines for treatment of ATTR-CM, and the only treatment proven to reduce mortality and slow decline in quality of life for patients with this deadly disease. Requestor included safety data from the Study as part of its application for approval of the Medications. These factors distinguish the Study from the types of clinical trials about which OIG previously has raised concerns, such as clinical trials related to items for which effective, well-established treatments already are available.[19] Similarly, the Study is distinguishable from problematic seeding arrangements, because there are no clinical barriers that would prevent patients from switching to an alternative treatment, if one were to become available.

The patients remaining in the Study from both Cohort A and Cohort B and the patients from each cohort who have transitioned to commercial product pursuant to a prescription presumably have continued to take the Medications because they experience a clinical benefit from doing so. For patients who have transitioned out of the Study and have continued to receive the Medications by prescription, their physicians have made the independent, clinical decision that the Medications are medically necessary. Simply put, patients without continued, affordable access to these important Medications will be left to gamble on unapproved alternatives that may not be in the best clinical interest of these patients—such as enrolling in a trial where they will be assigned either an investigational drug or placebo, or taking a medication that has not been approved for ATTR-CM. Requestor has received numerous reports that Medicare patients currently are faced with this Hobson's choice.

In these circumstances—where the physician decided to treat the patient with tafamidis in the absence of any copay assistance for Medicare beneficiaries and there is no alternative FDA-approved therapy—the pilot will not improperly induce or influence use of the Medications or taint physician's decisions. Rather, the pilot will facilitate a

---

exposure data for this new formulation. Some of the patients in the Study received the 61 mg formulation. Requestor included this data in its report to FDA approximately one month prior to approval of the Medications. The amended Study became an important vehicle for collecting this data, which was included in the final regulatory submission for approval of the Medications.
[19] *See, e.g.,* OIG Adv. Op. No. 02-16 (December 23, 2002).

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**
US 167081378v21

# Arnold&Porter

Stewart W. Kameen
November 25, 2019
Page 12

patient's continued access to the Medications and thus will promote continuity of care. For these reasons, the pilot does not implicate the AKS or the BIS.

### B. Even if the Pilot Implicates the AKS or the BIS, Enforcement Discretion is Warranted Under the OIG's Prudential Factors

Even if OIG concludes that the pilot implicates the AKS or the BIS, the application of OIG's prudential factors provides a clear case for the exercise of enforcement discretion in this case.[20]

First, as explained above, the pilot would not interfere with clinical decision-making. The pilot would make copay assistance available only to Study participants who already are taking the Medications for an on-label indication. The Medications are FDA-designated "breakthrough therapies," the only FDA-approved medicines for treatment of ATTR-CM, and the only treatment proven to reduce mortality and slow decline in quality of life for patients with this deadly disease. Patients in Cohort A started therapy through their participation in the ATTR-ACT pivotal study and continued their therapy under the Study. Patients in Cohort B were added to the Study pursuant to an expanded access cohort. Both the original Study and the expanded access cohort were designed to allow ATTR-CM patients to receive access to tafamidis in the absence of alternative drug therapies for ATTR-CM, consistent with FDA regulations regarding expanded access, and to allow Requestor to collect additional safety data regarding tafamidis treatment.

Second, the pilot would not cause inappropriate or unnecessary expenditures by federal health care programs. The pilot involves a limited population of ATTR-CM patients who already are taking the Medications. The Medications are far less expensive than a heart transplant or dual heart and liver transplant, the only disease-altering treatment currently available to patients with ATTR-CM. They also are less expensive than Onpattro or Tegsedi, when prescribed off-label for ATTR-CM patients. Medicare expenditures associated with the Medications would be appropriate and necessary to allow patients to continue to benefit from a life-extending, breakthrough treatment for a debilitating and fatal condition.

---

[20] When assessing potential risk of fraud or abuse, OIG appears most concerned with arrangements that have the potential to: (1) interfere with clinical decision-making; (2) increase costs to federal health care programs; (3) increase the risk of overutilization or inappropriate utilization; (4) raise patient safety or quality of care concerns; (5) limit patient freedom of choice; and (6) result in unfair competition. *See* 68 Fed. Reg. at 23734; *see also, e.g.*, OIG Adv. Op. No. 98-07, at 5 (June 11, 1998).

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**
US 167081378v21

# Arnold&Porter

Stewart W. Kameen
November 25, 2019
Page 13

Third, the pilot facilitates appropriate utilization and would not cause overutilization or inappropriate utilization of the Medications. Patients eligible for the pilot are taking the Medications for an on-label indication at the recommendation of their physicians and no alternative on-label pharmacological therapy exists for ATTR-CM. Thus, the pilot would ensure only that patients already taking the Medications continue to have access to therapy and would not induce unwarranted prescriptions.

Fourth, the pilot promotes patient safety and quality of care by facilitating continuity of care. As the only FDA-approved treatment, the Medications are the best and only treatment available to them. Moreover, patients eligible for the pilot already are receiving clinical benefits from the Medications as evidenced by their continued desire, in consultation with their physicians, to continue on therapy. Without copay assistance from the pilot, some Study patients will be forced to discontinue an effective therapy, risking their health and safety. Some patients may enroll in a clinical trial where they will take an investigative drug or placebo, while others may take a medication indicated for ATTR-PN, and not ATTR-CM. In short, denying Requestor's proposed pilot program could harm many patients.

Finally, the pilot should not have any adverse impact on competition. Copay assistance would make it possible for all eligible Cohort A and Cohort B patients to continue to use the Medications without regard to ability to pay, expanding patient freedom of choice. Physicians would remain free, at any time, to enroll patients in clinical trials for other investigational drugs for the treatment of ATTR-CM. Because there are no other FDA-approved treatments for ATTR-CM, these patients would not be locked in to using the Medications because of financial incentives. Should FDA approve other medications for ATTR-CM in the future, we do not believe there would be clinical barriers to patients switching to such medications.

\*       \*       \*

Requestor is committed both to (i) helping to ensure that ATTR-CM patients can access the important clinical benefits of the Medications regardless of their ability to pay, and (ii) complying with the AKS and the BIS. ATTR-CM is a progressive and fatal disease, and each day that passes without affordable access to the Medications harms Medicare patients.

We believe that OIG has the information it needs to address the issues of statutory interpretation raised by the Copay Assistance Program, and urge OIG to issue an advisory opinion regarding the program as soon as possible, and if possible by early February. If OIG believes that it cannot issue an opinion within the timeframe necessary

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**
US 167081378v21

**Arnold & Porter**

Stewart W. Kameen
November 25, 2019
Page 14

to accommodate the end of the Study (March 31, 2020), Requestor asks that OIG provide written confirmation that Requestor may move forward with the pilot—which does not implicate the AKS or the BIS, has very low risk of fraud or abuse, and would be limited to a small patient population already on the Medications.

Attached please find a certification by Paul Levesque, Global President, Rare Disease Business Unit, attesting that the information provided in this letter is true and correct and represents a complete description of the facts regarding the proposed pilot.[21]

Please do not hesitate to contact me if you have any questions or require additional information.  As noted above, Requestor would like to schedule a live meeting, or a teleconference, with you and Susan Edwards as soon as practical to discuss the proposed pilot and the Advisory Opinion Request as a whole and to facilitate a solution for Medicare patients who unable to access the Medications.  We appreciate the OIG's prompt consideration of this request and look forward to working with you on this matter.

Sincerely,

Jeffrey L. Handwerker

---

[21] The certifier for our initial request and our November 12, 2019 letter, Richard Nolan Townsend, North American Regional President, Rare Disease Business Unit, will be leaving the company at the end of the year.  Therefore, his supervisor, Paul Levesque, is certifying to the facts set forth in this letter.

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**
US 167081378v21

**Signed Certification of Requestor**

With knowledge of the penalties for false statements provided by 18 U.S.C. § 1001 and with knowledge that this request for an advisory opinion is being submitted to the Department of Health and Human Services, I certify that all of the information provided in this letter is true and correct, to the best of my knowledge and belief.

Dated:  November 25, 2019

Pfizer Inc.

Paul Levesque
Global President,
Rare Disease Business Unit

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**
US 167081378v21

**CONFIDENTIAL & FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**

# Solutions to Mitigate Out-of-Pocket Costs for Tafamidis for Medicare Beneficiaries

March 30, 2020

PFE000084

# What We Hope to Achieve

- **Our aim is to improve patient access to tafamidis.**

  - Under Medicare Part D's benefit structure, out-of-pocket copay and coinsurance costs for rare disease medications, like tafamidis, are prohibitive for most patients.

  - Reduction of patient out-of-pocket costs is critical to allow patients to access this important therapy.

  - Patient access is an important issue for Pfizer and is vital to patients.

- **We want to engage in a dialogue with OIG about potential solutions to reduce patient out-of-pocket costs for tafamidis.**

  - Explain why our proposed solutions are compliant with the Anti-Kickback Statute ("AKS") and Beneficiary Inducement Statute ("BIS").

  - Discuss the prudential factors and policy considerations that warrant a favorable opinion by OIG on Pfizer's proposed programs.

  - Explore modified solutions that will enable patient access to tafamidis consistent with the AKS and BIS.

PFE000085

# Background:  ATTR-CM and Tafamidis

- ATTR-CM is a rare, fatal cardiac condition that is estimated to affect about 100,000-150,000 Americans, the majority of whom are elderly Medicare beneficiaries.

- Without treatment, patients afflicted with this condition experience progressive heart failure, with a life expectancy of 2 to 3.5 years from diagnosis.

- ATTR-CM can be definitively, objectively diagnosed.

- Tafamidis is the only FDA-approved pharmacological treatment for ATTR-CM; in a pivotal trial, it decreased mortality by 30% and CV-related hospitalizations by 32%.







PFE000086

# Part D Benefit Design Affordability Challenges

- **While the Part D program provides critical insurance coverage for medicines for Medicare beneficiaries, the cost-sharing structure established in 2003 is no longer providing the protection needed by some of the most vulnerable Medicare beneficiaries.**
  - One of the biggest challenges for many Medicare beneficiaries is the lack of an annual out-of-pocket cap and the high monthly cost-sharing.
- **Medicines like tafamidis weren't contemplated when the Part D cost-sharing structure was established in 2003.**
- **Under Medicare Part D's benefit structure, out-of-pocket costs for tafamidis are prohibitive for most patients.**
  - A patient must pay ~$13,000 in annual out-of-pocket expenditures for tafamidis, based on the cost sharing requirements of the various phases of the Part D benefit (i.e., deductible, initial coverage limit, coverage gap and catastrophic).
  - The first script alone could be ~$3,100.
- **Copay support programs provided by manufacturers are available to most patients covered by commercial plans, which helps them afford their medicines.**
  - Even when commercial plans use copay accumulator programs, 30% make exceptions for rare disease drugs like tafamidis (Zitter Health 2019).
- **Data shows nearly 1/3 of all Part D prescriptions are abandoned (*i.e.,* patients do not fill the first script) if cost-sharing exceeds $250 (Amundsen Consulting 2017).**
- **While Pfizer currently offers generous free drug through its patient assistance program, the program cannot be extended to all Medicare beneficiaries who are unable to afford the out-of-pocket cost of this orphan medicine.**

PFE000087

# Part D Benefit Design Creates Affordability Challenges for Patients with Standard Part D Benefit Design



### 2020 Defined Standard Benefit Design
(for non-Low Income Subsidy Beneficiaries)

| | Deductible ($435) | Initial Coverage Limit ($4020 total drug spend) | Coverage Gap ($6350 TrOOP) | Catastrophic |
|---|---|---|---|---|
| | Deductible Patient Pays 100% | Patient Copays/Coinsurance e.g., $45/$90 or 25%<br>Plan Liability 75% | Patient Coverage Gap OOP 25%<br>Pharma Discount 70%<br>Plan Liability 5% | Patient OOP 5%<br>Federal Reinsurance 80%<br>Plan Liability 15% |
| Patient OOP | $435 | $1,005 | $1,300 | $10,780 | $13,520 |

- Patient Out-of-Pocket (OOP) costs for Tafamidis could be ~$3,100 for the first prescription and over $13,000 for the year.
- High OOP costs are significant driver of poor medication adherence including primary medication adherence (1st prescription) and overall adherence.
- The non-fill rate for the first tafamidis prescription for beneficiaries with Standard Part D Benefit is significant.

PFE000088

# Unequal Patient Access Under Medicare Part D Benefit Structure

- Under the Medicare Part D benefit structure, patient access to tafamidis depends on a beneficiary's socio-economic status.

  – Tafamidis is accessible primarily to (i) the very wealthy, (ii) the poorest who qualify for LIS, and (iii) those patients with commercial insurance.

  – Low- to middle-income Medicare participants are shut out because they cannot afford the copay and coinsurance.



| Low Income Subsidy | Lower-to-middle Income Patients* | Wealthy |

* Some patients with lower to middle income do qualify for the Pfizer Patient Assistance Program, which has an income eligibility limit of 500% FPL.

PFE000089

# Pfizer's Proposed Programs

**Pfizer has proposed two programs to help Medicare patients afford tafamidis.**

| Direct Copay Assistance for financially qualified ATTR-CM patients | Independent Charity Patient Assistance Program ("ICPAP") |
|---|---|

- Offer copay assistance directly to eligible Medicare Part D beneficiaries to help cover annual out-of-pocket deductible and coinsurance costs for the medications.

- Eligible patients must:

    (1) be prescribed tafamidis for an on-label (approved) indication, that is, ATTR-CM;

    (2) be U.S. residents; and

    (3) demonstrate satisfaction of program criteria for financial need

- No advertisement or solicitations of the program.

- Complex process for patients, where funds open and close, leading to uncertainty and access delays, which can impact efficacy and treatment options.

- Because there is low risk of inducement with this critical orphan medicine for a rare disease, Pfizer should be able to provide direct copay assistance to eligible patients with a prescription.

- Alternatively, companies with rare orphan medicines should be able to communicate with ICPAPs and help ensure targeted funds exist to provide support directly to patients.

- There are ICPAPs with funds covering Amyloidosis (covering ~23 to 57 medications per fund), which is much broader than patients with ATTR-CM.

PFE000090

# Proposed Programs Improve Public Health and Safety

- The proposed programs would enable eligible ATTR-CM patients to access the only approved medication for their disease.

  – Copay assistance for these patients supports, rather than interferes with, clinical decision-making by allowing physicians to prescribe tafamidis based on medical need.

- Without copay assistance, many ATTR-CM patients who do not qualify for Pfizer's free drug program face difficult decisions, including whether to forego treatment.

- For patients who cannot afford the out-of-pocket cost, physicians may be incentivized to prescribe drugs that are not proven safe and effective for ATTR-CM (e.g., Onpattro®) because the Part B benefit design under which they are reimbursed makes them more affordable for patients.

PFE000091

# Proposed Programs Do Not Impose Unwarranted Costs on Medicare

- Tafamidis is less expensive than approved and unapproved therapeutic alternatives.

  – Heart and liver transplant is significantly more expensive.

  – Onpattro is priced significantly higher (2x the list price of tafamidis).

  – Because Onpattro is covered under Medicare Part B, patients may use supplemental insurance (e.g., Medigap) to cover their out-of-pocket costs.

- Tafamidis has been proven to reduce CV-related hospitalizations, which helps avoid costs and is particularly important during the COVID-19 pandemic.

PFE000092

# OIG Has Left Pfizer and Patients With Few Options

- Congress enacted a special process by which an entity can seek an advisory opinion that its proposed conduct would not violate the AKS or BIS.

- OIG has declined to provide the required advice on the statutory analysis for either of Pfizer's proposed programs.

  - OIG will not give any opinion on the ICPAP program.

  - As to direct copay assistance, the proposed advisory opinion will state only that it <u>may</u> implicate the AKS/BIS, but will not explain whether it violates those statutes and why.

- In light of Pfizer's CIA and existing OIG guidance, Pfizer has not moved forward with the proposed programs, even though Pfizer believes the programs are legal and critical for patient care.

PFE000093

# Legal Analysis:  Pfizer's Proposed Programs Do Not Violate the AKS or BIS

- Pfizer understands the government's view that copay assistance to government beneficiaries poses a risk of fraud and abuse by improperly skewing physician and patient decision-making.

- Tafamidis is different, in that it: (1) is the sole FDA-approved pharmaceutical treatment for (2) a rare, progressive, and fatal disease, (3) a condition that is objectively diagnosed.

- Facilitating access to the sole approved medicine for a fatal condition that is objectively diagnosed does not corruptly "influence" or "induce" physician or patient medical decisions.

  – The AKS/BIS prohibit improper influence that distorts medical decision-making; the law does not prohibit activities that facilitate access to appropriate and necessary medical treatments independently of the choice of therapy.

  – OIG recognizes this when it favors charitable assistance to facilitate access.

- Copay waivers and ICPAP funding are not "remuneration" under the AKS and BIS.

PFE000094

## Legal Analysis:  Restriction of the Proposed Programs Raises Serious Constitutional Concerns

- **The First Amendment Protects Charitable Donations and Communications.**

  – OIG guidance significantly limits manufacturers' communications with independent charities; such restrictions on speech pose significant First Amendment concerns.

  – OIG may not restrict communications with independent charities through policies that are not narrowly tailored to a compelling interest.

  – OIG may not single out manufacturers for restrictions on communications with charities that are not applicable to other organizations.

- **OIG's Restrictions Raise Significant Equal Protection Concerns.**

  – The proposed programs seek to provide access for low- to middle-income beneficiaries, who are unable to financially access tafamidis under Medicare Part D's benefit structure.

  – OIG's interpretation would irrationally restrict government insurance benefits for a critical medication to beneficiaries at the lowest or highest socio-economic statuses.

PFE000095

## Pfizer Wants to Engage with OIG to Develop Solutions to Patient Affordability for Tafamidis

- Direct Copay Assistance

- ICPAP solutions directly for ATTR-CM patients

- Pfizer is open to working with OIG to support patient access / affordability challenges while maintaining compliance





     CONFIDENTIAL & FOIA EXEMPT

PFE000096

# Arnold & Porter

**Jeffrey L. Handwerker**
+1 202.942.6103 Direct
Jeffrey.Handwerker@arnoldporter.com

March 27, 2020

**VIA E-MAIL**

Stewart Kameen
Senior Counsel, Industry Guidance Branch
Office of Counsel to the Inspector General
U.S. Department of Health and Human Services
Room 5527, Cohen Building
330 Independence Ave, S.W.
Washington, DC 20201

   Re: Pfizer Inc.
     <u>Advisory Opinion Request No. R1225</u>

Dear Mr. Kameen:

  Pfizer Inc. ("Requestor") appreciates the opportunity to meet with you and your colleagues on March 30, 2020 to discuss advisory opinion number R1225. Our goal for this meeting is to engage in a constructive dialogue about our proposals and to work collaboratively with you to find a mutually agreeable mechanism to ensure that patients who are appropriately prescribed tafamidis to treat their ATTR-CM can access their medication.

  As explained in our request for an advisory opinion, tafamidis is the only FDA-approved pharmacological treatment for ATTR-CM, and is clinically shown to reduce mortality and cardiovascular related hospitalizations for those suffering from this fatal, debilitating disease. At present, three out of four categories of patients who are diagnosed with ATTR-CM have access to tafamidis: (i) Medicare beneficiaries who are sufficiently impoverished to qualify for the Part D Low Income Subsidy Program, (ii) Medicare beneficiaries who are sufficiently wealthy to afford the Part D copay requirements, and (iii) commercially insured patients who can benefit from Requestor's existing copay assistance program. Only moderate income Part D beneficiaries who cannot afford their copay obligations under the benefit structure are unable to access this breakthrough therapy. The proposed copay assistance program (the "Program") is intended to address this disparity and to ensure that moderate income Part D beneficiaries are not denied equal access to tafamidis due to financial limitations unrelated to their appropriate medical treatment. OIG's own statements reflect that it shares a concern for ensuring Medicare beneficiaries have access to proper care. The purpose of the meeting is to seek a common understanding of how we can best achieve that common goal.

CONFIDENTIAL AND FOIA EXEMPT
CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION US 167605427v3 **PFE000097**

# Arnold&Porter

Stewart Kameen
March 27, 2020
Page 2

For reasons expressed in our advisory opinion request, we believe that OIG is incorrect both in its conclusion that the Program implicates the Anti-Kickback Statute ("AKS") and in its assessment that the Program raises more than minimal risks of fraud and abuse.  In our view, the AKS does not prohibit programs designed to ensure that moderate income Part D beneficiaries have equal access to the same quality of life enhancing and extending medication as other, similarly situated patients. Nonetheless, we are very willing to discuss alternatives or modifications to the Program that you feel would further reduce any risk of fraud or abuse and more clearly distinguish this unique situation. To facilitate our discussion, we set out our views on these issues below.

## A.  The Program Does Not Implicate the AKS

During our call late last year, OIG stated its view that the Program "may implicate" the AKS.  For reasons stated in our request, we believe that the Program, as a matter of law, does not implicate the AKS.  To recap briefly:

1. <u>The Program is not intended to induce prescriptions</u>.

The AKS prohibits only payments received "in return for" or made "to induce" the purchase, prescription, or recommendation of items or services payable under a federal health care program. 42 U.S.C. § 1320a-7b(b)(1), (2).  The courts of appeals, including the Circuits most relevant here (the Second, where Requestor is located, and the First, where most patient assistance related AKS enforcement takes place), have construed the AKS as limited to attempts to "*improperly influence* decisions on the provision of" federally funded health care.  *Guilfoile v. Shields*, 913 F.3d 178, 192–93 (1st Cir. 2019).  In *United States v. Krikheli*, the Second Circuit noted that the hallmark of a prohibited kickback is that the remuneration be "offered or paid as a quid pro quo," meaning it was "made to induce [action] in a quid pro quo transaction."  461 F. App'x 7, 10–11 (2d Cir. 2012).  This focus on the "improper" influence of kickbacks in corrupting medical decision-making is consistent with how the Supreme Court has construed analogous criminal statutes. Significantly, to avoid unconstitutional vagueness in the honest services fraud statute, the Court limited it to acts of bribery and kickbacks precisely because those crimes have established, defined meanings under federal statutes.  The Court specifically quoted 41 U.S.C. § 8701(2), which defines a "kickback" as a thing of value given "*for the purpose of improperly obtaining* or rewarding favorable treatment."  *Skilling v. US*, 561 U.S. 358 (2010) (citing also 18 U.S.C. § 666(a)(2) ("*corruptly* gives … anything of value … with intent to influence or reward") and 18 U.S.C. § 201(b) (same)).  Consistent with this precedent, the defining element of a kickback under the AKS is that it be given with the intent to corrupt the provision of federally funded medical services.

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**

# Arnold&Porter

Stewart Kameen
March 27, 2020
Page 3

In the specific circumstances of tafamidis, copay assistance does not corruptly or improperly "induce" a doctor to prescribe, or a patient to purchase, tafamidis; rather, it eliminates a financial obstacle that otherwise would prevent a patient from filling a prescription that is medically appropriate and would be filled but for the patient's personal financial circumstances. For the patients in question, neither the prescription nor the purchase is "improperly" influenced by the availability of financial assistance. The physician's treatment decision is driven by an objective ATTR-CM diagnosis and the fact that tafamidis is the only FDA-approved pharmacological treatment (with the only non-pharmacological treatment—heart and liver transplant—being both far more expensive and potentially ineffective). Likewise, the patient's decision to fill the prescription is driven by the fact that ATTR-CM is a fatal, debilitating disease and that tafamidis is clinically shown to reduce mortality and cardiovascular related hospitalizations.

2.   The copay assistance does not constitute "remuneration."

In our earlier discussion, OIG stated its view that the Program does not qualify for the exception from the statutory definition of "remuneration" that excludes copay waivers that promote access to individuals in financial need. Respectfully, Requestor disagrees. The AKS does not include a definition of "remuneration," and Requestor believes that a court would apply the rule of construction that presumes the same term in related statutes has the same meaning.

Requestor further believes that these arguments have particular force in connection with Requestor's proposed charitable assistance program, which OIG declined to consider in light of current government enforcement actions. In the context of charitable contributions, the statutory arguments above would carry even further weight with a court, which would be obligated to avoid a statutory construction that would raise significant First Amendment or other constitutional concerns.

3.   It is legal error for OIG to refuse an advisory opinion request for activity that falls outside the ambit of the AKS.

OIG is required by law to issue an advisory opinion, when requested, on the question of "whether an activity or proposed activity constitutes grounds for the imposition of civil or criminal sanctions. . ." As discussed above, we respectfully submit that OIG is incorrect in its determination that the Program "may implicate the AKS," both because the Program is not intended to induce prescriptions, and because copay assistance as proposed for the Program is excluded from the statutory element of "remuneration." Under these circumstances, OIG is required by law to advise that the Program does not "constitute grounds for the imposition of civil or criminal sanctions."

CONFIDENTIAL AND FOIA EXEMPT
CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION

# Arnold&Porter

Stewart Kameen
March 27, 2020
Page 4

We understand that OIG's typical practice when considering requests for advisory opinions is not to assess the intent underlying the proposed program. While we understand that approach in contexts in which the possibility of inducement is plain, this case presents the opposite situation. As noted earlier, inducement within the meaning of the AKS occurs only when remuneration is offered as a quid-pro-quo, and under the terms of the Program, there is and can be no quid-pro-quo. In the absence of either inducement or remuneration (or in this case, both), it is legal error for OIG to advise that the Program violates, or may violate, the AKS.

## B.  The Proposed Program Poses Little or No Risk of Fraud or Abuse

Even if you do not agree with Requestor on these legal points, in the unique circumstances of tafamidis, copay assistance presents a low risk of fraud or abuse. As you know, OIG's enforcement efforts focus on potentially fraudulent or abusive practices that could create risks to federal health care programs or their beneficiaries. In assessing the potential risk, OIG has focused on arrangements that have the potential to:

1) Interfere with clinical decision-making;
2) Increase costs to federal health care programs;
3) Increase the risk of overutilization or inappropriate utilization;
4) Raise patient safety or quality of care concerns;
5) Limit patient freedom of choice; and
6) Result in unfair competition.

*See* OIG, Compliance Program Guidance for Pharmaceutical Manufacturers 68 Fed. Reg. 23731, 23734 (May 5, 2003); *see also, e.g.,* OIG Adv. Op. No. 98-07, at 5 (June 11, 1998). These "prudential factors" support a finding that the Program presents low risk of fraud and abuse.

First, tafamidis is the only FDA-approved treatment for ATTR-CM and offers strong clinical value for patients facing this complex and deadly disease. Copay assistance supports, rather than interferes with, clinical decision-making by allowing physicians to prescribe tafamidis on the basis of medical need rather than a patient's ability to pay.

Second, copay assistance to facilitate access to tafamidis does not inappropriately increase federal health care program costs and could produce costs savings. Tafamidis is significantly less expensive than treatment alternatives and potentially avoids unnecessary hospitalizations.

Third, the Program would not cause overutilization or inappropriate utilization. To the contrary, because tafamidis is the only FDA-approved medicine for an objectively

CONFIDENTIAL AND FOIA EXEMPT
CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION

# Arnold&Porter

Stewart Kameen
March 27, 2020
Page 5

diagnosed condition, copay assistance would not induce unwarranted prescriptions, but instead would help ensure that appropriate patients have access to therapy regardless of their ability to pay.

Fourth, the Program would improve patient safety and quality of care by promoting access to a life-extending and safe therapy—the best and only treatment available for most patients with ATTR-CM.

Fifth, the Program would expand patient freedom of choice by making it possible for all eligible patients to use tafamidis without regard to the ability to pay. The lack of alternatives eliminates the concerns that patients could be locked into a particular product because of financial incentives.

Finally, because there are no other FDA-approved medicine to treat ATTR-CM, copay assistance would have no adverse impact on competition.

Thus, in the particular circumstances presented here, copay assistance enhances access to the only FDA-approved medicine for patients otherwise unable to afford it without any of the risks of fraud or abuse that might arise in the context of other therapies.

To the extent that you do not feel that Requestor's current proposal provides adequate assurances against any risk of fraud or abuse, we welcome the opportunity to discuss with you at the March 30 meeting modifications or alternatives to the Program, including any way that the Program could be more precisely tailored to the unique circumstances of tafamidis that distinguish it from other, potentially more problematic, copay programs.

We look forward to a productive and collaborative conversation, which we hope will lead to a good outcome for patients whose doctors have deemed tafamidis the appropriate treatment option for them.

Sincerely,

Jeffrey L. Handwerker

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**

# Arnold & Porter

**Jeffrey L. Handwerker**
+1 202.942.6103 Direct
Jeffrey.Handwerker@arnoldporter.com

April 8, 2020

**VIA E-MAIL**

Stewart Kameen
Senior Counsel, Industry Guidance Branch
Office of Counsel to the Inspector General
U.S. Department of Health and Human Services
Room 5527, Cohen Building
330 Independence Ave, S.W.
Washington, DC 20201

> Re: Pfizer Inc. ("Requestor")
> Advisory Opinion Request No. R1225

Dear Mr. Kameen:

I am writing in follow-up to our telephonic meeting on March 30, 2020. We greatly appreciated the opportunity to speak with you and your colleagues to discuss an issue that is very important to ATTR-CM patients. We particularly appreciate your willingness to consider that Vyndaqel® and Vyndamax™ (the "Medications") present highly unique facts and circumstances and our views as to why Requestor's proposed copay assistance programs would not implicate the Anti-Kickback Statute ("AKS") or the Beneficiary Inducement Statute ("BIS"). While we believe that the proposed copay assistance programs do not corruptly "induce" prescriptions within the meaning of the AKS, we would be very amenable to working with OIG to fine-tune our proposal in a way that would make OIG comfortable issuing a favorable advisory opinion focused on the low risk of fraud and abuse presented by the arrangements.

As we explained during our call, Requestor designed its proposed copay assistance programs (the "Programs") to help facilitate medically appropriate access to the only available therapy for the treatment of ATTR-CM. Requestor seeks to eliminate a serious financial obstacle that currently prevents many Medicare beneficiaries from filling medically appropriate prescriptions. The patient affordability issue may be particularly acute during the current economic downturn. Requestor has no intention of interfering with the underlying clinical decision-making or promoting over-utilization of the Medications. To the contrary, due to the unique features of the Medications and the ATTR-CM patient population, and the operational safeguards that Requestor proposes to incorporate, the Programs would not constitute prohibited remuneration under either the AKS or the BIS, and the Programs would not: (i) skew clinical decisions, (ii) increase

---

**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Ave, NW | Washington, DC 20001-3743 | **www.arnoldporter.com**

CONFIDENTIAL AND FOIA EXEMPT
CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION

# Arnold&Porter

Stewart Kameen
**April 8, 2020**
Page 2

unwarranted costs to Federal healthcare programs, (iii) lead to overutilization of the Medications, (iv) compromise patient safety, or (v) result in unfair competition.

The purpose of this letter is to provide additional responses to the important questions that you and your colleague Robert DeConti raised towards the end of our call, and to reiterate the key points that support a narrowly-tailored, positive advisory opinion related to the Programs.

## A.    Responses to OIG's Questions

1. Is Requestor's position that copay assistance in certain circumstances is not an inducement, but rather is just facilitating patient access?

Yes, when copay assistance does not improperly skew a physician's prescribing decision and does not cause the physician to prescribe a medication for reasons other than clinical benefits and patient safety, there is no improper inducement for purposes of the AKS or the BIS.  Physicians currently prescribe the Medications for their ATTR-CM patients, including Medicare beneficiaries, because the Medications are safe and effective and are the only approved medications available for these patients.  Treatment with the Medications has proven to decrease mortality by 30% and cardiovascular-related hospitalizations by 32%.

There is no question that some physicians may consider drug costs and a patient's out-of-pocket burden when making prescribing judgments.  Indeed, we have heard that some physicians have prescribed off-label a drug that is not approved to treat ATTR-CM— and that costs the Medicare program considerably more than the Medications—because that other drug is covered under Medicare Part B, for which Medigap insurance is available to reduce the patient's out-of-pocket expenses.  However, offering co-pay assistance to help eligible patients afford a clinically-appropriate medication, when such medication is the only approved medication for the disease and the principal reason that patients would not fill their prescriptions is their inability to pay their out-of-pocket costs, does not improperly induce the underlying prescribing decisions.  As we explained during our call, the AKS and the BIS require a "corrupt" purpose in order for the "inducement" prong to be satisfied.  As several courts have held, "inducement" generally lies only when an arrangement is a *quid pro quo* for a prescription.[1]  In the current circumstances, explained in response to question 2 below, there is no corrupt purpose.

---

[1] *See, e.g., Skilling v. United States*, 561 U.S. 358 (2010); *United States v. Krikheli*, 461 F. App'x 7 (2d Cir. 2012); *Guilfoile v. Shields*, 913 F.3d 178 (1st Cir. 2019).  We note that a district court in California also recently characterized the relevant question under the AKS as whether there was a "*quid pro quo*" for doctors to prescribe the medication, which requires a "concrete effect on physicians' prescribing practices," and

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**

# Arnold&Porter

Stewart Kameen
**April 8, 2020**
Page 3

      2. <u>Are the Medications really unique?  Does Requestor have other products with similar characteristics that would follow the same analysis?</u>

As discussed on our call, the problem of access to prescription drugs under Medicare Part D is not unique to the Medications.  Congress did not design the Part D benefit structure with an eye toward the precision medications that biopharmaceutical companies currently are developing to address rare diseases, oncology, or other special situations.  We expect that the frequency of patient access challenges only will increase in the years to come, with increased pressure on Congress to revise the Part D benefit design.  While the challenge is not isolated, there are numerous features that distinguish the Medications from most others.

We list below the features of the Medications that support a finding that the Programs would not constitute an improper inducement and would present low risk of fraud and abuse.  While the relevant analysis is one that could apply to other, similarly situated products, the Medications are unique among Requestor's commercially-available products and those currently in development by Requestor in that only the Medications present *all* of these features.[2]

- No other medicines approved to treat the disease;[3]
- Orphan disease with small patient population for which Congress has sought to spur drug development through credits, exclusivities and other incentives;[4]
- Disease is capable of objective diagnosis;
- Disease has a devastating impact on quality of life and life expectancy;
- Superior efficacy data from clinical trials (e.g., increase in life expectancy, decrease in hospitalization);

---

which is undermined where, as here, the physicians in question "had already prescribed" the drug in question. *U.S. ex rel Solis v. Millennium Pharmaceuticals*, No. 09-cv-03010 (E.D. Ca. April 1, 2020).

[2] Certain investigational drugs in Requestor's research pipeline may present all or some of the following features.  Requestor always conducts a careful and thorough analysis of the potential fraud and abuse risks of any patient support programs that the Company may choose to offer to patients prescribed Requestor's products.

[3] Even if FDA approves another medicine for the treatment of ATTR-CM, this factor still may be relevant if the Medications demonstrate superior efficacy and safety.

[4] Research and development of mediations for orphan diseases with small patient populations require considerable expense.  If patients with insurance coverage for such medications are unable to afford the out-of-pocket costs for such medications, biopharmaceutical companies may be disincentivized from developing such therapies.

CONFIDENTIAL AND FOIA EXEMPT
CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION

# Arnold&Porter

Stewart Kameen
**April 8, 2020**
Page 4

- A substantial patient cohort has limited options for financial assistance
- List price is lower than the cost of treatment alternatives (including transplant and specialty medications that may be prescribed off-label); and
- Manufacturer offers a generous free drug program, for uninsured (and possibly underinsured patients) who cannot afford the medication.

Because of the unique mix of these features, OIG could write an advisory opinion approving the Programs that would not have broad, if any, application to other products.

3. <u>How does Requestor decide whether to offer free drug to patients under its free drug patient assistance program (PAP)</u>?

Requestor currently offers free drug to eligible patients that demonstrate financial need for almost all of its brand-name pharmaceutical products, at least until generic equivalents of such medications become commercially available.[5]  Requestor's Global Health & Patient Access team ("GHPA") set the income criterion of 500%[6] of the federal poverty limit ("FPL") for patient eligibility to receive the Medications under Requestor's PAP because this is the same income criterion that GHPA applies for Requestor's other rare disease, specialty and oncology medications available through Requestor's PAP.[7] GHPA established this income threshold based on patient ability to afford these categories of medications and industry benchmarking.  GHPA periodically evaluates PAP offerings, including the income criterion.

GHPA operates independently from Requestor's commercial teams.  Requestor's commercial teams, including the brand and sales teams, play no role in setting PAP eligibility criteria, including income requirements.  Moreover, neither GHPA nor any commercial team conducted any financial, return-on-investment analysis when GHPA

---

[5] Requestor may exclude certain medications from the PAP with complicated dispensing requirements that make distribution through the PAP impractical (*e.g.*, REMS requirements or medications scheduled as controlled substances).  Requestor also may choose to stop providing free drug under its PAP to eligible patients when generic alternatives become available, if the cost of such generic equivalents are affordable for PAP-eligible patients.

[6] Patients with household incomes higher than 500% of FPL who are denied participation in the PAP due to income may appeal that decision, providing information about the their eligible household expenses that make them unable to afford their Medication.  GHPA evaluates all appeals on a case-by-case basis, in a uniform and consistent manner.

[7] This income criterion is higher than the criterion that Requestor applies for its primary care and other non-specialty medications available through its PAP.

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**

# Arnold&Porter

Stewart Kameen
**April 8, 2020**
Page 5

established this income criterion, nor did GHPA set this level based on anticipated tax benefits to the Company.

Based on publicly available information, Requestor offers a generous free drug program for the Medications. However, it is neither economically viable nor required for Requestor to provide free product to all patients who cannot afford their out-of-pocket costs under their public or private insurance. This is why Requestor currently offers copay assistance to commercially insured patients and why Requestor desires to offer copay assistance to eligible Medicare patients who cannot afford the significant out-of-pocket costs under the standard Medicare Part D benefit design. Requestor does not intend for the Program to inappropriately shift costs to Part D plans or to the government, rather Requestor desires to redress the inequitable impacts of the Part D drug benefit on poorer patients.

As of the end of February, 1,533 patients qualified and were enrolled in Requestor's PAP to receive free supplies of the Medications, and Pfizer delivered 5,984 30-day prescriptions to patients enrolled in the PAP. Of those patients enrolled in the PAP, 1,011 had household incomes under 300% of FPL, 334 patients had incomes between 300 and 500% of FPL, and 188 patients had incomes above 500% of FPL.[8] This means that, as of the end of February, Requestor was providing free drug to approximately 33% of patients who had been prescribed the Medications.

## B.      Summary of Key Points that Support a Narrowly-Tailored, Favorable Advisory Opinion Related to the Program

As we have described in our prior letters regarding Advisory Opinion Request No. 1225, with respect to Requestor's proposed direct copay assistance program (the "Direct Program"), Requestor would implement the following eligibility criteria and operational structure. Together with the unique features of the Medications that we describe above, these eligibility criteria and operational structure provide the framework for a narrowly-tailored, favorable advisory opinion that would not lead to a proliferation of improper copay assistance programs.

---

[8] The patients with incomes above 500% of FPL either have incomes between 500 and 520% and meet all of the PAP's other eligibility criteria or they have incomes above 520% of FPL and successfully appealed an initial eligibility determination (following a demonstration of financial need to GHPA).

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**

# Arnold&Porter

Stewart Kameen
**April 8, 2020**
Page 6

1.   Patient Eligibility Criteria

- Patient must be enrolled in a Medicare Part D plan that covers the Medications;
- Patient must have been prescribed one of the Medications on-label for the treatment of ATTR-CM;
- Patient must be a U.S. resident; and
- Patient's household income is between 500%[9] and 800% of the FPL.

Requestor would determine patient eligibility in a uniform and consistent manner.

2.   Program Operations

- Requestor would not offer the Direct Program as part of any advertisement or solicitation for the Medications. Requestor's field-based personnel (including sales representatives) would not be permitted to communicate with patients, physicians or any other third-parties about the Direct Program. Requestor would not distribute any written materials to physicians that describe the Direct Program. Additionally, neither Requestor's website for the Medications nor the VyndaLink website would include any information about the Direct Program.[10]

- Requestor would operate the Program through its patient support Hub, VyndaLink. A Medicare patient would learn about the Direct Program from VyndaLink only after such patient has been prescribed one of the Medications, has enrolled in the Hub, and the Hub has verified that the patient has coverage under a Part D plan for the Medication. The Hub would not conduct any proactive outreach to prescribers or their offices about the Direct Program.

- Eligible patients would be required to enroll in the Direct Program. As part of the enrollment, the prescriber would be required to certify that he/she has diagnosed the patient with ATTR-CM.

---

[9] In its request for advisory opinion, Requestor proposed to set this requirement at 300% of FPL. In the interest of facilitating a favorable advisory opinion, Requestor is willing to increase this to 500%, to remove the overlap with the eligibility requirement for Requestor's free drug PAP.

[10] See Requestor's November 12, 2019 letter (responses to questions 1-3) for more information about the limitations on Requestor's communication about the Direct Program.

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**

# Arnold&Porter

Stewart Kameen
**April 8, 2020**
Page 7

- The Hub would verify patient eligibility and enroll patients in the Direct Program. Requestor would engage a copay program administration vendor to administer certain aspects of the Direct Program.[11]

- Enrolled patients would be able to access the copay assistance from any of the specialty pharmacies within Requestor's defined pharmacy network.

- Enrolled patients would pay $35[12] out of pocket at the point of sale. The Direct Program would cover the balance of the patient's copay obligation.

- Medicare patients would continue to be eligible to participate in Requestor's free drug PAP if they meet that program's eligibility criteria.

With respect to Requestor's proposal to donate funds to an independent charity patient assistance program ("ICPAP") that has a fund that specifically supports only ATTR-CM patients, to our knowledge there are currently no ICPAPs that have developed such a fund. Certain ICPAPs have funds covering amyloidosis, which cover approximately 23-to-57 medications per fund. Unfortunately, none of the other medications that are covered by these funds is approved for the treatment of ATTR-CM patients. Moreover, these funds open and close frequently, leading to uncertainty and access delays for ATTR-CM patients. This in turn impacts treatment efficacy and treatment options.

Requestor would like OIG's authorization to communicate with one or more ICPAPs about creating a more narrowly-defined fund for ATTR-CM patients to help ensure that funds are available for these patients. Such communications would include objective educational information about ATTR-CM and the patient population affected by this disease. If one or more ICPAPs were then to open a fund to support ATTR-CM patients, Requestor would provide donations to the ICPAP in compliance with OIG's 2005 and 2014 guidance on manufacturer donations and interactions with ICPAPs.

Requestor believes that the Direct Program would be more impactful for patients, therefore, Requestor would prefer to implement that program. Nevertheless, Requestor

---

[11] See Requestor's November 12, 2019 letter (responses to question 4) for more information about this process.

[12] Requestor appreciates that patient cost-sharing is intended to make patients conscious of the cost of medications. Requestor does not intend for the Direct Program to make patients insensitive to the costs of the Medications.

CONFIDENTIAL AND FOIA EXEMPT
CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION

# Arnold&Porter

Stewart Kameen
**April 8, 2020**
Page 8

also believes that donations to an ATTR-CM fund would be a viable alternative solution for Medicare patients, and we would be happy to discuss this option in more detail.

As we mentioned during our recent call, Requestor's objective is to improve patient access to the Medications. We believe that the Programs do not implicate the AKS or the BIS and thus are legally compliant. Moreover, we believe that the patient eligibility criteria and structural safeguards mitigate potential risks of fraud and abuse. Nevertheless, we welcome your input into ways that Requestor might further tailor the Programs to differentiate them from potentially problematic copay assistance programs.

\*          \*          \*

We hope this information has been helpful to you. Attached is a certification by Nick Lagunowich, Regional President North America, Rare Disease, attesting that the information provided in this letter is true and correct and represents a complete description of the facts described herein.[13]

Please do not hesitate to contact me if you have any questions or require additional information. We appreciate the OIG's ongoing consideration of this request.

Sincerely,

Jeffrey L. Handwerker

Attachment

---

[13] The certifiers in our prior letters, Richard Nolan Townsend, North American President, Rare Disease Business Unit, and Paul Levesque, Global President, Rare Disease Business Unit, have left the company. Therefore, their successor, Nick Lagunowich, is certifying to the facts set forth in this letter.

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**

## Signed Certification of Requestor

With knowledge of the penalties for false statements provided by 18 U.S.C. § 1001 and with knowledge that this request for an advisory opinion is being submitted to the Department of Health and Human Services, I certify that all of the information provided in this letter is true and correct, to the best of my knowledge and belief. [14]

Dated:  April 8, 2020

Pfizer Inc.

Nick Lagunowich
Regional President North America,
Rare Disease

---

[14] While I am executing this certification on behalf of Requestor, I do not have any involvement with Requestor's free drug patient assistance program or with Requestor's donations to or interactions with ICPAPs.  My certification to the facts related to these programs and activities is based on internal certifications from those Requestor employees responsible for these programs and activities.



DEPARTMENT OF HEALTH AND HUMAN SERVICES

# OFFICE OF INSPECTOR GENERAL

WASHINGTON, DC  20201



OFFICE OF COUNSEL TO THE INSPECTOR GENERAL
330 INDEPENDENCE AVENUE, SW
COHEN BUILDING - ROOM 5527
WASHINGTON, DC  20201

July 31, 2020

VIA EMAIL ONLY
Jeffrey L. Handwerker
Ariane Horn
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
Jeffrey.Handwerker@arnoldporter.com
Ariane.Horn@arnoldporter.com

      Re:    Pfizer Inc.
               Advisory Opinion Request No. R1225

Dear Mr. Handwerker and Ms. Horn:

Pursuant to 42 C.F.R. § 1008.39, we have determined that we need the following additional information to render an informed opinion in connection with the above-referenced request.

- Please confirm that Pfizer Inc. ("Requestor") is a distinct and independent legal entity from VyndaLink.

- Requestor certified that Medicare beneficiaries must use a pharmacy within Requestor's defined specialty pharmacy network (the "Network") for purposes of distribution of the Medications. In some instances, a beneficiary's insurance plan may require the beneficiary to use a pharmacy that is not within Requestor's Network. In those instances, Requestor has explained that it will require the use of a pharmacy within the Network and will address reimbursement issues with the beneficiary's plan. Requestor anticipates that these instances will be "rare" because the Network covers the "majority" of patients whose plans require the use of a specific specialty pharmacy.
  - Is Requestor's Network open to all specialty pharmacies willing to agree to the terms of participation in the Network?

PFE000111

Page 2—Letter to Jeffrey Handwerker and Ariane Horn

- Please provide more information regarding what is required to participate in the Network and the number of existing specialty pharmacies that participate in the Network.
- Does Requestor have a more precise estimate of the number or percentage of beneficiaries whose plans would require use of a specialty pharmacy outside of the Network? If so, please provide such estimates.
- Requestor indicated that, in some cases, a beneficiary may have more than one specialty pharmacy participating in his or her plan. In that case, will there be situations where a beneficiary has specialty pharmacy options within and outside of the Network but must use the Network pharmacy to purchase the Medications? If available, please provide an estimate of the number or percentage of beneficiaries who would face this situation.
- Please confirm that the specialty pharmacy would dispense the Medications directly to the patient for self-administration.
- Please confirm that the "patients would pay $35 out of pocket at the point of sale" to the specialty pharmacy.

- Requestor initially set the financial need requirements for this assistance program to include beneficiaries with household incomes between 300 percent of the Federal Poverty Level ("FPL") and 800 percent of the FPL. In correspondence dated April 8, 2020, Requestor altered the financial need criteria to include beneficiaries with household incomes between 500 and 800 percent of the FPL. Please provide an explanation regarding how Requestor determined the appropriate number or percentage for this aspect of the financial need analysis.
  - Does Requestor have an estimate of the number or percentage of Medicare beneficiaries that it expects will qualify for the assistance program according to the current criteria (500-800 percent of the FPL), compared to the total number of Medicare beneficiaries that it anticipates will be prescribed either form of tafamidis? If so, please provide such estimate, and please provide an explanation regarding how Requestor determined the number and percentage requested here.

Additional information should be provided in writing and certified by the same person who certified the initial request to be a true, correct, and complete disclosure of the requested information in a manner equivalent to that described in 42 C.F.R. § 1008.38. See 42 C.F.R. § 1008.39(c). Pursuant to § 1008.39, the time for preparing your advisory opinion will be tolled from the date of this letter until we receive the requested information.

Additionally, pursuant to 42 C.F.R. § 1008.33, on July 6, 2020, we determined that we

PFE000112

Page 3—Letter to Jeffrey Handwerker and Ariane Horn

needed an additional expert opinion from the Centers for Medicare & Medicaid Services to render an opinion in connection with the above-referenced request.  There will be no fees associated with this expert opinion.  Pursuant to 42 C.F.R. § 1008.33(b), the time for preparing your advisory opinion will be tolled from the date of this letter until we receive the expert opinion from the Centers for Medicare & Medicaid Services.

If you have any questions, please feel free to contact me at 202.816.9890 or stewart.kameen@oig.hhs.gov.

Sincerely,

/s/ Stewart W. Kameen

Stewart W. Kameen
Senior Counsel
Industry Guidance Branch

# Arnold & Porter

**Jeffrey L. Handwerker**
+1 202.942.6103 Direct
Jeffrey.Handwerker@arnoldporter.com

August 24, 2020

**VIA E-MAIL**

Stewart Kameen
Senior Counsel, Industry Guidance Branch
Office of Counsel to the Inspector General
U.S. Department of Health and Human Services
Room 5527, Cohen Building
330 Independence Ave, S.W.
Washington, DC 20201

> Re:   Pfizer Inc. ("Requestor")
>       Advisory Opinion Request No. R1225

Dear Mr. Kameen:

I am writing in response to your letter dated July 31, 2020, in which you stated that the OIG Industry Guidance Branch has determined that it needs additional information to render an informed opinion in connection with Advisory Opinion Request No. R.1225.

We were very surprised to receive your letter given that, on May 26, 2020, you informed us that the Industry Guidance Branch had no more questions on this request and you made clear that OIG had made its decision and would prepare an unfavorable written opinion unless Requestor chose to withdraw its request. During that call, you also stated that, after considering all of the information that Requestor had provided (including new information that Requestor presented in a March 2020 meeting and in a follow up letter), OIG's position remained exactly as it had been in December 2019, when you had first informed Requestor that OIG would issue an unfavorable opinion on this request. During our May 26, 2020 telephone call, we asked pointedly whether there was any information Requestor could provide or changes that Requestor could make to the arrangement that might persuade OIG to change its decision. You responded that you could not provide any guidance on the arrangement.

Requestor first filed this request in June 2019, and (in a statutory context providing for a 60-day period to respond to requests) Requestor has waited 14 months to move forward with its proposed copay assistance program. As we have explained previously, Requestor designed the program to help support medically appropriate patient access to the only available FDA-approved therapy for the treatment of ATTR-CM. Requestor seeks to

CONFIDENTIAL AND FOIA EXEMPT
CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION

US 168162951v10                                                                                          **PFE000114**

# Arnold&Porter

Stewart Kameen
August 24, 2020
Page 2

eliminate a serious financial obstacle that currently prevents many Medicare beneficiaries from filling medically appropriate prescriptions.  Patients are suffering from this disease on a daily basis and need help.  Requestor's program would provide such help in a way that would not knowingly and willfully induce or reward prescriptions within the meaning of the Anti-Kickback Statute ("AKS").  Requestor filed its lawsuit because it believes that its position is legally correct and that OIG's final decision to the contrary is detrimental to patients.  The delays in launching this program have had and will continue to have a direct negative impact on patients' lives.

In the spirit of continued cooperation and in the hope that your recent questions suggest that OIG is considering reversing its earlier negative decision, we answer each of your questions below.  But, we do not believe that this information is relevant to the purely legal issues that we raised in our request for an advisory opinion and that are the subject of the pending litigation.  Our suit challenges only OIG's legal determinations under the AKS and the Beneficiary Inducement Statute, not OIG's refusal to exercise enforcement discretion.  By providing the requested information, we are not in any way conceding that the administrative process regarding those legal questions is unfinished.  OIG's decision on those core legal issues was consummated last December, as you related during our call on December 9, 2019.  We sought reconsideration, but OIG reaffirmed that decision during our May 26, 2020 call.  These decisions show that OIG has decided not to exercise enforcement discretion favorable to Requestor's proposed programs.  Although your July 31 information request may be relevant to that discretionary judgment, we do not believe that your acquisition and review of the information you have requested should delay progress of the litigation on the purely legal issues.  Requestor reserves all of its legal positions, including that OIG has made a final decision on this matter and that this matter is already ripe for judicial review.

1. Please confirm that Pfizer Inc. is a distinct and independent legal entity from VyndaLink.

Pfizer Inc. is a distinct legal entity. VyndaLink is Requestor's patient support program for patients that have been prescribed Vyndaqel or Vyndamax (the "Medications").  VyndaLink is not a legal entity.  Requestor has contracted with an independent, third-party vendor to provide the patient support services that are offered through VyndaLink on behalf of Requestor. The following link is to the VyndaLink website https://www.vyndalink.com/.

# Arnold&Porter

Stewart Kameen
August 24, 2020
Page 3

2. <u>Requestor certified that Medicare beneficiaries must use a pharmacy within Requestor's defined specialty pharmacy network (the "Network") for purposes of distribution of the Medications. In some instances, a beneficiary's insurance plan may require the beneficiary to use a pharmacy that is not within Requestor's Network. In those instances, Requestor has explained that it will require the use of a pharmacy within the Network and will address reimbursement issues with the beneficiary's plan. Requestor anticipates that these instances will be "rare" because the Network covers the "majority" of patients whose plans require the use of a specific specialty pharmacy.</u>

As an initial matter, we wish to correct certain facts in your initial statement regarding Requestor's specialty pharmacy network for the Medications (the "Network"). As we explained in our November 12, 2019 letter, if a Medicare Part D plan requires a beneficiary to use a specialty pharmacy outside of Requestor's Network, VyndaLink sends the prescription either to the patient's or the prescribing physician's preferred Network specialty pharmacy. If the patient and prescribing physician have no preference, VyndaLink sends the prescription to the specialty pharmacy with the lowest patient out-of-pocket costs (as determined by solely the Medicare Part D plan). If more than one specialty pharmacy offers the lowest patient out-of-pocket cost or if the patient out-of-pocket costs are the same across all or many Network pharmacies, VyndaLink sends the prescription to one of the Network specialty pharmacies using an objective round-robin process.[1] The recipient specialty pharmacy addresses patient coverage and reimbursement issues once it receives the prescription, not Requestor. This is standard practice for all defined specialty pharmacy networks. Nevertheless, as we explain below, to our knowledge, there have not been any instances where a preferred pharmacy under a beneficiary's Medicare Part D plan was not included in the Network.

There are instances where patients may receive the Medications from pharmacies outside of the Network. For example, in April 2020 18% (or 4,207 in aggregate) of prescriptions for the Medications were filled by pharmacies outside of the Network. These non-network pharmacies included Kaiser Permanente, a closed-model health maintenance organization that requires patients to obtain prescription medications from Kaiser's internal pharmacies, 340B covered entity pharmacies, and pharmacies that dispense medications to

---

[1] VyndaLink maintains a list of all Network specialty pharmacies. When a VyndaLink program representative is ready to send an undesignated prescription to a Network specialty pharmacy, the representative selects the next pharmacy on the list. The VyndaLink electronic system tracks each specialty pharmacy that receives a prescription during each business day pursuant to the round robin process to ensure that each new prescription is sent to the next specialty pharmacy on the list.

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**

**PFE000116**

# Arnold&Porter

Stewart Kameen
August 24, 2020
Page 4

veterans, active military personnel and their dependents under Veterans Affairs and Department of Defense benefits.

    a.   <u>Is Requestor's Network open to all specialty pharmacies willing to agree to the terms of participation in the Network</u>?

        Prior to the commercial launch of the Medications, Requestor conducted a request for proposal (RFP) process inviting specialty pharmacies to submit information describing their qualifications to participate in the Network, in accordance with the criteria specified below in the first paragraph of our response to question 2.b.  At the conclusion of the RFP process, Requestor selected nine specialty pharmacies that met Requestor's criteria.  Due to consolidation among these specialty pharmacies after the conclusion of the RFP process, these nine pharmacies became seven and all seven specialty pharmacies agreed to the terms of participation in the Network.  Our response below to question 2.b. describes the current composition of the Network in more detail.

        To date, no other specialty pharmacies have requested to be included in the Network.  If other specialty pharmacies were to ask Requestor to participate in the Network, Requestor would evaluate their qualifications under the same criteria.  Any specialty pharmacy that meets these criteria would be eligible to participate in the Network. Requestor would base its final determination on whether to include other specialty pharmacies in the Network based on:  (i) the ability of the specialty pharmacy to meet the criteria and (ii) whether it is in the best interests of patients to include the additional specialty pharmacies.

    b.   <u>Please provide more information regarding what is required to participate in the Network and the number of existing specialty pharmacies that participate in the Network</u>.

        To be eligible to participate in the Network, a specialty pharmacy must meet the following criteria:

- Be accredited by the Accreditation Commission for Health Care (ACHC) or URAC, both independent, nonprofit accreditation organizations
- Be licensed in all or most of the United States, Washington, DC and Puerto Rico
- Have experience with rare diseases
- Have experience with elderly patient populations
- Have experience working with cardiologists
- Have broad payer contracts and coverage
- Agree to contract with Requestor and comply with all contract terms

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**

    **PFE000117**

# Arnold&Porter

Stewart Kameen
August 24, 2020
Page 5

- Be able to meet certain basic data reporting requirements (such data does not include any patient-identifiable information)

Currently, seven national specialty pharmacies that meet these criteria participate in the Network.

In addition, regional specialty pharmacies that are owned or affiliated with institutions (i.e., hospitals and integrated delivery networks) that (i) have experience with ATTR-CM, including diagnosing and managing patients diagnosed with the disease, (ii) agree to contract with Requestor or Requestor's agent and comply with all contract terms, and (iii) are able to meet certain basic data reporting requirements are eligible to participate in the Network. Requestor identified 32 specialty pharmacies owned by or affiliated with institutions that met these requirements; however, only 25 of these specialty pharmacies chose to participate in the Network.

In May 2020, Requestor decided to extend access to additional institutional specialty pharmacies that (i) are accredited by ACHC or URAC, (ii) are fully integrated with a hospital that treats a minimum number of ATTR-CM patients, (iii) have a therapy management system to help manage patients, (iv) agree to contract with Requestor and comply with all contract terms, and (v) are able to meet certain basic data reporting requirements. Requestor is in the process of contracting with many of these institutional specialty pharmacies and expect to add them to the Network soon.

c. Does Requestor have a more precise estimate of the number or percentage of beneficiaries whose plans would require use of a specialty pharmacy outside of the Network? If so, please provide such estimates.

Medicare Part D plans typically do not mandate that patients use just one specialty pharmacy. These plans typically have a list of preferred pharmacies at which beneficiaries may obtain their medications. According to the vendor that administers VyndaLink, to date there has not been any instance where a preferred pharmacy under a beneficiary's Medicare Part D plan was not included in the Network.

d. Requestor indicated that, in some cases, a beneficiary may have more than one specialty pharmacy participating in his or her plan. In that case, will there be situations where a beneficiary has specialty pharmacy options within and outside of the Network but must use the Network pharmacy to purchase the Medications? If available, please provide an estimate of the number or percentage of beneficiaries who would face this situation.

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**

# Arnold&Porter

Stewart Kameen
August 24, 2020
Page 6

As explained above, Medicare Part D plans typically have a list of preferred pharmacies at which beneficiaries may obtain their medications.  Requestor does not have the information necessary to estimate the number or percentage of patients with more than one pharmacy in the Network.

If a patient or his/her physician does not request to have a specific preferred specialty pharmacy in the Network dispense the Medications, then VyndaLink applies an objective round-robin process to send the patient's prescription to one of the Network specialty pharmacies that is listed as a preferred pharmacy of the applicable Part D plan.

> e.  Please confirm that the specialty pharmacy would dispense the Medications directly to the patient for self-administration.

Yes, the specialty pharmacies would dispense the Medications directly to patients enrolled in the program for self-administration.  The Medications are capsules that patients take orally once daily.

> f.  Please confirm that the "patients would pay $35 out of pocket at the point of sale" to the specialty pharmacy.

Yes, eligible patients who enroll in the program would pay $35 per month out of pocket to the specialty pharmacy that dispenses the Medications to such patients.

> 3.  Requestor initially set the financial need requirements for this assistance program to include beneficiaries with household incomes between 300 percent of the Federal Poverty Limit ("FPL") and 800 percent of the FPL.  In correspondence dated April 8, 2020, Requestor altered the financial need criteria to include beneficiaries with household incomes between 500 and 800 percent of the FPL.  Please provide an explanation regarding how Requestor determined the appropriate number or percentage for this aspect of the financial need analysis.

Requestor's initial advisory opinion request indicated that the proposed co-pay assistance program would be available to all Medicare patients with household incomes between 300%-800% of the FPL.  Requestor established this percentage range based on Requestor's assessment of patient need.  In our letter dated April 8, 2020, we explained that Requestor was willing to increase the FPL requirement from 300% to 500% for its proposed copay assistance program for Medicare beneficiaries in a good faith offer to facilitate a favorable advisory opinion.  The proposed copay assistance program is designed to facilitate access to the prescribed Medications for most middle-income Medicare

CONFIDENTIAL AND FOIA EXEMPT
CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION

# Arnold&Porter

Stewart Kameen
August 24, 2020
Page 7

patients with demonstrated financial need who do not qualify for the other available assistance options.

Requestor currently makes the Medications available for free under its free drug patient assistance program (PAP) to all eligible patients—including Medicare beneficiaries—who are prescribed the Medications and have annual incomes of up to 500% of the FPL (i.e., $86,200 for a family of two in 2020). For those patients, the Medicare out-of-pocket cost for the Medications alone is more than 15% of their total annual income. However, there remain many Medicare beneficiaries with incomes above this level who have been prescribed one of the Medications but are unable to afford the copay and coinsurance requirements under their Medicare Part D prescription drug benefit, which as previously mentioned may be over $13,000 annually for one of the Medications. These costs are prohibitively expensive even for patients with an annual income of up to 800% of the FPL (i.e., $137,920 for a family of two in 2020), which Requestor estimates as approximately 90% of the Medicare patient population who have been prescribed one of the Medications and seek financial assistance through VyndaLink. For this 90% of the Medicare population, the out-of-pocket cost may be at least 9% of their total annual income, and in many instances even more.

     a.   <u>Does Requestor have an estimate of the number or percentage of Medicare beneficiaries that it expects will qualify for the assistance program according to the current criteria (500-800 percent of the FPL), compared to the total number of Medicare beneficiaries that it anticipates will be prescribed either form of tafamidis? If so, please provide such estimate, and please provide an explanation regarding how Requestor determined the number and percentage requested here</u>.

Based on the number of Medicare beneficiaries who have been prescribed the Medications and have contacted VyndaLink to request financial assistance from the date on which FDA approved the Medications to the present, Requestor estimates that approximately 13% of Medicare beneficiaries would qualify for the proposed copay assistance program (i.e., have household incomes between 500% and 800% of the FPL).

*       *       *

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**

# Arnold&Porter

Stewart Kameen
August 24, 2020
Page 8

Attached is a certification by Nick Lagunowich, Regional President North America, Rare Disease, attesting that the information provided in this letter is true and correct and represents a complete description of the facts described herein.

Sincerely,

Jeffrey L. Handwerker

Attachment

CONFIDENTIAL AND FOIA EXEMPT
CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION

PFE000121

# Arnold&Porter

Stewart Kameen
August 24, 2020
Page 9


### Signed Certification of Requestor

With knowledge of the penalties for false statements provided by 18 U.S.C. § 1001 and with knowledge that this request for an advisory opinion is being submitted to the Department of Health and Human Services, I certify that all of the information provided in this letter is true and correct, to the best of my knowledge and belief.


Dated:  August 24, 2020


Pfizer Inc.


Nick Lagunowich
Regional President North America,
Rare Disease

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**




DEPARTMENT OF HEALTH AND HUMAN SERVICES

# OFFICE OF INSPECTOR GENERAL

WASHINGTON, DC  20201

OFFICE OF COUNSEL TO THE INSPECTOR GENERAL
330 INDEPENDENCE AVENUE, SW
COHEN BUILDING - ROOM 5527
WASHINGTON, DC 20201

September 8, 2020

VIA EMAIL ONLY
Jeffrey L. Handwerker
Ariane Horn
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
Jeffrey.Handwerker@arnoldporter.com
Ariane.Horn@arnoldporter.com

      Re:    Pfizer Inc.
               Advisory Opinion Request No. R1225

Dear Mr. Handwerker and Ms. Horn:

We have identified certain information that we need to have certified pursuant to 42 C.F.R. § 1008.39(c) in order to render an informed opinion in connection with the above-referenced request.  For your convenience, enclosed is a document setting forth certain information that we need to have certified pursuant to 42 C.F.R. § 1008.39(c) in order to render the advisory opinion.  OIG is not seeking certifications for information that Pfizer Inc., the requestor of this advisory opinion, previously certified to in the manner described in 42 C.F.R. § 1008.38 as part of its initial request and supplementary submissions.  Please review the document with Pfizer Inc., the requestor of the opinion, and let us know as soon as possible if Pfizer cannot confirm and certify to any of these statements.  If there are no concerns, please have these statements certified by the requestor in the manner specified below and send the signed certification to our office.

The information should be provided in writing and certified by the same person who certified the initial request and supplementary submissions to be a true, correct, and complete disclosure of the requested information in a manner equivalent to that described in 42 C.F.R. § 1008.38.  See 42 C.F.R. § 1008.39(c).  Pursuant to § 1008.39, the time for preparing your advisory opinion will be tolled from the date of this letter until we receive the requested information.  In order to have sufficient time to finalize the advisory

opinion by September 18, 2020, we need to receive Pfizer's certification of this information by September 15, 2020, at the latest.

If you have any questions or would like to propose any revisions to the enclosed information, please feel free to call me at 202.816.9890.

Sincerely,

/s/ Stewart W. Kameen

Stewart W. Kameen
Senior Counsel
Industry Guidance Branch

Enclosure

**DOCUMENT
SETTING FORTH ADDITIONAL INFORMATION**

**<u>DEFINED TERMS</u>**

"ATTR-CM" or the "Disease" means transthyretin amyloid cardiomyopathy.

"Dispensing Pharmacy" means any specialty pharmacy that Requestor authorizes to dispense the Medications.

"Hub" means VyndaLink, the patient support hub developed by Requestor.

"Medication" means Vyndaqel® or Vyndamax® and "Medications" means Vyndaqel® and Vyndamax®.

"Plan Pharmacy" means any specialty pharmacy that a beneficiary's Part D or MA-PD plan requires the beneficiary to use.

"Proposed Arrangement" means the proposed program to provide cost-sharing assistance directly to Medicare beneficiaries who are prescribed one of the Medications, as described in all of Requestor's certified written submissions.

"Requestor" means Pfizer Inc.

"Subsidy Card" means a physical card, a personal identification number, or both, that the beneficiary would use at the point of sale to receive cost-sharing assistance when purchasing the Medications.

"Subsidy Program" means the proposed cost-sharing assistance program specific to Medicare beneficiaries who are prescribed the Medications.

**<u>FACTS:</u>**

1. Requestor manufactures and markets two forms of tafamidis, Vyndaqel® and Vyndamax®.
2. Requestor set the list price at $225,000 for each one-year course of treatment with the Medications.
3. At a list price of $225,000 and based on cost-sharing requirements in the phases of the standard Medicare Part D benefit (<u>i.e.</u>, deductible, initial coverage, coverage gap, catastrophic), a Medicare beneficiary must pay annually approximately $13,000 in out-of-pocket expenditures for the Medications.
4. To be eligible for financial assistance under the Subsidy Program, the applicant must: (i) be a Medicare beneficiary enrolled in either a Part D plan or a Medicare Advantage

PFE000125

– Part D plan that covers the Medications; (ii) be a United States resident; (iii) meet the Subsidy Program's criteria for financial need, which Requestor would set as a household income between 500 percent and 800 percent of the Federal Poverty Level; and (iv) have been prescribed one of the Medications for an on-label indication.

5. A beneficiary would be eligible to obtain a Subsidy Card regardless of which provider or practitioner prescribes the Medications.

6. The Hub, which is already in place, currently uses the following enrollment process and would employ it in the same manner for purposes of the Subsidy Program. First, to enroll a patient in the Hub, both the prescriber and the patient must complete and sign an enrollment form. If the patient seeks financial assistance, the patient also must provide certain financial information and documentation of annual household income. The prescriber must provide prescription information and must confirm that he or she has prescribed the Medication for the treatment of the Disease. The prescriber also must certify that he or she has made an independent judgment that the Medication is medically necessary for the patient and that all information provided on the form is accurate.

7. The Hub would conduct an individualized, case-by-case income determination based on a uniform measure of financial need and would determine a beneficiary's eligibility for the Subsidy Program in a uniform and consistent manner.

8. Under the Proposed Arrangement, eligible beneficiaries would be able to use the Subsidy Card at any Dispensing Pharmacy.

9. The Subsidy Card would not be conditioned on a beneficiary using a particular Dispensing Pharmacy.

10. Requestor does not own or operate, directly or indirectly, any pharmacies that dispense the Medications.

11. The Subsidy Program would not give preference to any particular Dispensing Pharmacy and is structured such that the beneficiary has the same limited cost-sharing obligation ($35 per monthly fill) regardless of the Dispensing Pharmacy he or she selects to fill the prescription for the Medications.

12. Dispensing Pharmacies are the only pharmacies authorized by Requestor to dispense the Medications to any Medicare beneficiary who wishes to purchase the Medications, regardless of whether the beneficiary is eligible for the Subsidy Program.

13. There has not been any instance where there were no Dispensing Pharmacies included among the preferred pharmacies in a beneficiary's Medicare Part D or MA-PD plan.

14. There may be instances where there is no Plan Pharmacy that is a Dispensing Pharmacy. In such cases, the Hub would send the prescription to the beneficiary's or the prescribing physician's preferred Dispensing Pharmacy. If neither the patient nor the prescribing physician expresses a preference, the Hub would send the prescription to the Dispensing Pharmacy with the lowest patient out-of-pocket costs (as determined by the Part D or MA-PD plan). If more than one Dispensing Pharmacy offers the lowest out-of-pocket costs or if the out-of-pocket costs are the same across all or many Dispensing Pharmacies, the Hub would send the prescription to one of the Dispensing Pharmacies using an objective, "round robin" process. The recipient

pharmacy would then address coverage and reimbursement issues with the beneficiary's plan.

PFE000127

# Arnold&Porter

**Jeffrey L. Handwerker**
+1 202.942.6103 Direct
Jeffrey.Handwerker@arnoldporter.com

September 11, 2020

**VIA E-MAIL**

Stewart Kameen
Senior Counsel, Industry Guidance Branch
Office of Counsel to the Inspector General
U.S. Department of Health and Human Services
Room 5527, Cohen Building
330 Independence Ave, S.W.
Washington, DC 20201

      Re:    Pfizer Inc. ("Requestor")
              Advisory Opinion Request No. R1225

Dear Mr. Kameen:

Thank you for your letter dated September 8, 2020 providing the "additional" factual information that OIG has determined require certification prior to issuing an opinion in connection with Advisory Opinion Request No. R1225. We have reviewed the attachment to your letter, "Document Setting Forth Additional Information," and we have made some edits consistent with our initial request and supplementary submissions. Attached as Exhibit A to this letter is a redline showing these edits. Attached as Exhibit B is a clean version of the final certifications.

You mention in your letter that OIG is not seeking certifications for information to which Requestor previously certified as part of its initial request and supplementary submissions.[1] However, it is unclear from your letter which facts from Requestor's prior submissions OIG plans to include in its written advisory opinion. We request that OIG include in the advisory opinion all material facts that have been certified in Requestor's prior submissions, particularly those facts that (i) are relevant to the determination of whether Requestor intends for the proposed direct copay assistance program to be

---

[1] Most of the factual statements in OIG's Document Setting Forth Additional Information in fact are statements to which Requestor has previously certified. Moreover, OIG requested many of the facts cited in the draft certifications several weeks after OIG had informed Requestor that OIG had decided to issue a negative decision on this advisory opinion request. We continue to question the relevance of these facts to the legal issues raised in this advisory opinion request and their materiality to the decision that OIG had made at a time when those facts were not in the record.

**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Ave, NW | Washington, DC 20001-3743 | **www.arnoldporter.com**

CONFIDENTIAL AND FOIA EXEMPT
CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION

US 168517934v6

PFE000128

# Arnold&Porter

Stewart Kameen
September 11, 2020
Page 2

remuneration offered to induce prescriptions within the meaning of the Anti-Kickback Statute or (ii) relate to the unique features of the Vyndaqel® and Vyndamax.®  Such material facts include, but are not limited to, the following:[2,3]

1. ATTR-CM is a rare, fatal disease.  The precise number of people who suffer from ATTR-CM is unknown.  It is estimated that approximately 100,000 to 150,000 Americans may have the Disease.

2. The majority of ATTR-CM patients are Medicare beneficiaries.

3. ATTR-CM can be objectively diagnosed by heart biopsy or nuclear scintigraphy (an imaging technology).

4. Left untreated, ATTR-CM inevitably progresses to heart failure and death—usually within three-to-five years of diagnosis.

5. The Medications are the first and only medicines approved for treatment of ATTR-CM.

6. Two other medicines are approved by the FDA to treat a different form of amyloidosis, called amyloid transthyretin polyneuropathy ("ATTR-PN").  Neither of these medicines are approved for ATTR-CM.

7. The $225,000 list price for the Medications is half of the $450,000 list price for the two medications approved for ATTR-PN.

8. While not a cure, the Medications offer patients hope for a longer and better life and may provide a bridge to future therapies.  The pivotal phase 3 clinical trial demonstrated that Vyndaqel significantly reduced all-cause mortality (by 30%) and decreased the frequency of cardiovascular-related hospitalizations (by 32%), as compared with placebo.  Extrapolation of the study data also indicates an approximately 18-month increase in median overall survival between patients on

---

[2] For convenience, we have used the defined terms set forth in OIG's Document Setting Forth Additional Information.

[3] We have not included in this list those material facts that relate solely to Requestor's proposal to communicate with one or more independent charity foundations about creating a more narrowly-defined fund for ATTR-CM patients to help ensure that funds are available to those patients.  It is our understanding that OIG's advisory opinion will not address this proposal, because Requestor withdrew that part of the initial request in August 2019 after being informed that OIG would not accept the advisory opinion request if it included the proposal relating to independent charity foundations.  Please let us know if this understanding is incorrect so that we can discuss the material facts relevant to that proposal.

CONFIDENTIAL AND FOIA EXEMPT
CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION

**PFE000129**

# Arnold&Porter

Stewart Kameen
September 11, 2020
Page 3

the Medications versus placebo.  The effect may be more profound for those who are diagnosed and treated early.

9.  Before the Medications, a small number of ATTR-CM patients would undergo dual heart and liver transplants, in hopes of curing the disease, or at least improving their prognosis.  These procedures have had some success, but limited application in practice, because most patients with ATTR-CM are too sick and have too many other medical problems to meet transplant criteria.  Furthermore, the cost of such transplant can be more than $2 million.

10.  Even if Requestor were to cut the list price of the Medications in half, the Part D benefit structure still would result in patient out-of-pocket costs that are unaffordable for a significant number of Medicare beneficiaries. This is because Medicare beneficiaries who need high cost specialty medicines are required to pay for a large share of their medicines' costs, especially before reaching the catastrophic phase of the benefit.

11.  The Medicare Part D population is the only insured segment of the U.S. healthcare system that is not protected by a cap on annual out-of-pocket spending.

12.  There is evidence that at least one quarter of new Medicare Part D prescriptions are abandoned if beneficiaries are asked to pay $50 or more, which often the case for specialty drugs like the Medications.[4]

13.  Requestor would not offer the copay assistance under the Subsidy Program as part of any advertisement or solicitation for the Medications.

14.  A Medicare patient would learn about the Subsidy Program from the Hub only after such patient has been prescribed one of the Medications, has enrolled in the Hub, and the Hub has verified that the patient has coverage under a Medicare Part D or MA-PD plan for the Medication.  The Hub would not conduct any proactive outreach to patients about the Subsidy Program.

15.  A physician would learn about the Subsidy Program from the Hub only if the physician contacts the Hub and requests information about financial support for a

---

[4] *See* Testimony of Dr. Albert Bourla, DVM, Ph.D, Chief Executive Officer, Pfizer, *Drug Pricing in America: A Prescription for Change, Part II*, Before the United States Senate Committee on Finance, February 26, 2019, https://www.finance.senate.gov/imo/media/doc/26FEB2019BOURLA-PFIZER.pdf;   IMS   FIA Dataset, Amundsen Group analysis.

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**

# Arnold&Porter

Stewart Kameen
September 11, 2020
Page 4

Medicare patient enrolled in the Hub.  The Hub would not conduct any proactive outreach to physicians or their offices about the Subsidy Program.

16. Requestor's field-based personnel (including sales representatives) would not be permitted to communicate with patients, physicians or any other third parties about the Subsidy Program.  Requestor would not distribute any written materials to physicians that describe or mention the Subsidy Program.  Neither Requestor's website for the Medications nor the VyndaLink website would include any information about the Subsidy Program.

17. Requestor currently makes the Medications available for free under its free drug patient assistance program (PAP) to all eligible patients—including Medicare beneficiaries—who are prescribed the Medications and have annual incomes of up to 500% of the Federal Poverty Limit.  The free drug PAP is structured to operate outside of a Medicare beneficiary's Part D benefit.  Requestor would continue to provide free drug to eligible patients under the PAP if Requestor were to launch the Subsidy Program.

18. To Requestor's knowledge, there are no independent charity patient assistance programs (ICPAPs) that have developed a fund that specifically supports only ATTR-CM patients.  Certain ICPAPs have funds covering amyloidosis, which cover approximately 25-57 medications per fund.  None of the other medications that are covered by these funds are approved for the treatment of ATTR-CM.  Moreover, these funds open and close frequently, leading to uncertainty and access delays for ATTR-CM patients.

Attached as Exhibit C is a certification by Nick Lagunowich, Regional President North America, Rare Disease, attesting that the information set forth in the final revised certifications set forth in Exhibit B and the material facts set forth above are true and correct.

# Arnold&Porter

Stewart Kameen
September 11, 2020
Page 5


      We appreciate the OIG's attention to this matter.  We would be happy to discuss the full list of material facts that we believe should be included in OIG's opinion at your convenience.

Sincerely,

Jeffrey L. Handwerker

Attachments

CONFIDENTIAL AND FOIA EXEMPT
CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION

PFE000132

# Arnold&Porter

Stewart Kameen
September 11, 2020
Page 6

**Exhibit A**
**Redline of Final Certifications**

**DOCUMENT**
**SETTING FORTH ADDITIONAL INFORMATION**

**<u>DEFINED TERMS</u>**

"ATTR-CM" or the "Disease" means transthyretin amyloid cardiomyopathy.

"Dispensing Pharmacy" means any specialty pharmacy that Requestor authorizes
to dispense the Medications.

"Hub" means VyndaLink, the patient support hub developed by Requestor for patients
who have been prescribed one of the Medications.

"Medication" means Vyndaqel® or Vyndamax® and "Medications" means
Vyndaqel® and Vyndamax®.

"Plan Pharmacy" means any specialty pharmacy that a beneficiary's Part D or
Medicare Advantage prescription drug (MA-PD) plan requires the beneficiary to use.

"Proposed Arrangement" means the proposed program to provide cost-sharing assistance
directly to Medicare beneficiaries who are prescribed one of the Medications, as
described in all of Requestor's certified written submissions.

"Requestor" means Pfizer Inc.

"Subsidy Card" means a physical card, a personal identification number, or both, that the
beneficiary would use at the point of sale to receive cost-sharing assistance when
purchasing the Medications.

"Subsidy Program" means the proposed cost-sharing assistance program specific
to Medicare beneficiaries who are prescribed the Medications.

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**
US 168517934v6                                                          **PFE000133**

# Arnold&Porter

Stewart Kameen
September 11, 2020
Page 7

## FACTS:

1.  Requestor manufactures and markets two forms of tafamidis, Vyndaqel® and Vyndamax®.

2.  Requestor set the list price at $225,000 for each one-year course of treatment with the Medications.

3.  At a list price of $225,000 and based on cost-sharing requirements in the phases of the standard Medicare Part D benefit (i.e., deductible, initial coverage, coverage gap, catastrophic), a Medicare beneficiary must pay annually approximately $13,000 in out-of-pocket expenditures for the Medications.

4.  To be eligible for financial assistance under the Subsidy Program, the applicant must: (i) be a Medicare beneficiary enrolled in either a Part D plan or a MA-PD plan that covers the Medications; (ii) be a United States resident; (iii) meet the Subsidy Program's criteria for financial need, which Requestor would set as a household income between 500 percent and 800 percent of the Federal Poverty Level; and (iv) have been prescribed one of the Medications on-label for an on-label indicationthe treatment of ATTR-CM.

5.  A beneficiary would be eligible to obtain a Subsidy Card regardless of which provider or practitioner prescribes the Medications.

6.  The Hub, which is already in place, currently uses the following enrollment process to provide support to patients prescribed one of the Medications and would employ it the process in the same manner for purposes of enrolling patients in the Subsidy Program. First, to enroll a patient in the Hub, both the prescriber and the patient must complete and sign an patient enrollment form. If the patient seeks financial assistance, the patient also must provide certain financial information and documentation of annual household income.The prescriber must provide prescription information and must confirm that he or she has prescribed the Medication for the treatment of the Disease. The prescriber also must certify that he or she has made an independent judgment that the Medication is medically necessary for the patient and that all information provided on the form is accurate. Under the Subsidy Program, if a Medicare beneficiary were to seek financial assistance to access his/her prescribed Medication, the patient also would be required to provide certain financial information and documentation of annual household income.

7.  The Hub would conduct an individualized, case-by-case income determination based on a uniform measure of financial need and would determine a beneficiary's

CONFIDENTIAL AND FOIA EXEMPT
CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION

# Arnold&Porter

Stewart Kameen
September 11, 2020
Page 8

eligibility for the Subsidy Program in a reasonable, verifiable, uniform and consistent manner.

8.  Under the Proposed Arrangement, eligible beneficiaries would be able to use the Subsidy Card at any Dispensing Pharmacy. As of the date of this letter, the Dispensing Pharmacies include seven national specialty pharmacies and 25 regional specialty pharmacies associated with integrated delivery networks.[5]  To date, no other specialty pharmacies have requested to be included as a Dispensing Pharmacy.

9.  The Subsidy Card would not be conditioned on a beneficiary using a particular Dispensing Pharmacy.

10.  Requestor does not own or operate, directly or indirectly, any pharmacies that dispense the Medications.

11.  The Subsidy Program would not give preference to any particular Dispensing Pharmacy and is structured such that the beneficiary has would have the same limited cost-sharing obligation ($35 per monthly fill) regardless of the Dispensing Pharmacy he or she selects to fill the prescription for the Medications.

12.  Dispensing Pharmacies are the only pharmacies authorized by Requestor to dispense the Medications to any Medicare beneficiary patient prescribed the Medications who wishes to purchase the Medications, including Medicare beneficiaries, regardless of whether a patient is eligible for any company-sponsored financial assistance program.  If Requestor were to launch the Subsidy Program, eligible Medicare beneficiaries enrolled in the Subsidy Program would be able to purchase the Medications from any of the Dispensing Pharmacies regardless of whether the beneficiary is eligible for the Subsidy Program.

13.  Medicare Part D and MA-PD plans typically do not mandate that patients use just one specialty pharmacy.  According to the vendor that administers the Hub, to date, There has not been any instance where there were no Dispensing Pharmacies included among the preferred pharmacies in a beneficiary's Medicare Part D or MA-PD plan.

14.  There may be instances where If a Medicare Part D or MA-PD plan were to require a beneficiary to use a Plan Pharmacy that is there is no Plan Pharmacy that is not a Dispensing Pharmacy. In such cases, the Hub would send the prescription to the beneficiary's or the prescribing physician's preferred Dispensing Pharmacy. If neither the patient nor the prescribing physician expresses a preference, the Hub would send the prescription to the Dispensing Pharmacy with the lowest patient out-

---

[5]  Requestor is in the process of adding 11 additional regional specialty pharmacies that are associated with integrated delivery networks as Dispensing Pharmacies.

# Arnold&Porter

Stewart Kameen
September 11, 2020
Page 9

of-pocket costs (as determined by the Part D or MA-PD plan). If more than one
Dispensing Pharmacy offers the lowest out-of-pocket costs or if the out-of-pocket
costs are the same across all or many Dispensing Pharmacies, the Hub would send
the prescription to one of the Dispensing Pharmacies using an objective, "round
robin" process. The recipient pharmacy would then address coverage and
reimbursement issues with the beneficiary's plan.

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**

**PFE000136**

# Arnold&Porter

Stewart Kameen
September 11, 2020
Page 10

**Exhibit B**
**Final Certifications**

**DOCUMENT**
**SETTING FORTH ADDITIONAL INFORMATION**

## DEFINED TERMS

"ATTR-CM" or the "Disease" means transthyretin amyloid cardiomyopathy.

"Dispensing Pharmacy" means any specialty pharmacy that Requestor authorizes
to dispense the Medications.

"Hub" means VyndaLink, the patient support hub developed by Requestor for patients
who have been prescribed one of the Medications.

"Medication" means Vyndaqel® or Vyndamax® and "Medications" means
Vyndaqel® and Vyndamax®.

"Plan Pharmacy" means any specialty pharmacy that a beneficiary's Part D or
Medicare Advantage prescription drug (MA-PD) plan requires the beneficiary to use.

"Proposed Arrangement" means the proposed program to provide cost-sharing assistance
directly to Medicare beneficiaries who are prescribed one of the Medications, as
described in all of Requestor's certified written submissions.

"Requestor" means Pfizer Inc.

"Subsidy Card" means a physical card, a personal identification number, or both, that the
beneficiary would use at the point of sale to receive cost-sharing assistance when
purchasing the Medications.

"Subsidy Program" means the proposed cost-sharing assistance program specific
to Medicare beneficiaries who are prescribed the Medications.

**Arnold&Porter**

Stewart Kameen
September 11, 2020
Page 11

## FACTS:

1. Requestor manufactures and markets two forms of tafamidis, Vyndaqel® and Vyndamax®.

2. Requestor set the list price at $225,000 for each one-year course of treatment with the Medications.

3. At a list price of $225,000 and based on cost-sharing requirements in the phases of the standard Medicare Part D benefit (i.e., deductible, initial coverage, coverage gap, catastrophic), a Medicare beneficiary must pay annually approximately $13,000 in out-of-pocket expenditures for the Medications.

4. To be eligible for financial assistance under the Subsidy Program, the applicant must: (i) be a Medicare beneficiary enrolled in either a Part D plan or a MA-PD plan that covers the Medications; (ii) be a United States resident; (iii) meet the Subsidy Program's criteria for financial need, which Requestor would set as a household income between 500 percent and 800 percent of the Federal Poverty Level; and (iv) have been prescribed one of the Medications on-label for the treatment of ATTR-CM.

5. A beneficiary would be eligible to obtain a Subsidy Card regardless of which provider or practitioner prescribes the Medications.

6. The Hub, which is already in place, currently uses the following enrollment process to provide support to patients prescribed one of the Medications and would employ the process in the same manner for purposes of enrolling patients in the Subsidy Program. First, to enroll a patient in the Hub, both the prescriber and the patient must complete and sign a patient enrollment form. The prescriber must provide prescription information and must confirm that he or she has prescribed the Medication for the treatment of the Disease. The prescriber also must certify that he or she has made an independent judgment that the Medication is medically necessary for the patient and that all information provided on the form is accurate. Under the Subsidy Program, if a Medicare beneficiary were to seek financial assistance to access his/her prescribed Medication, the patient also would be required to provide certain financial information and documentation of annual household income.

7. The Hub would conduct an individualized, case-by-case income determination based on a uniform measure of financial need and would determine a beneficiary's eligibility for the Subsidy Program in a reasonable, verifiable, uniform and consistent manner.

8. Under the Proposed Arrangement, eligible beneficiaries would be able to use the Subsidy Card at any Dispensing Pharmacy. As of the date of this letter,

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**

PFE000138

# Arnold&Porter

Stewart Kameen
September 11, 2020
Page 12

the Dispensing Pharmacies include seven national specialty pharmacies and 25 regional specialty pharmacies associated with integrated delivery networks.[6]  To date, no other specialty pharmacies have requested to be included as a Dispensing Pharmacy.

9.   The Subsidy Card would not be conditioned on a beneficiary using a particular Dispensing Pharmacy.

10.  Requestor does not own or operate, directly or indirectly, any pharmacies that dispense the Medications.

11.  The Subsidy Program would not give preference to any particular Dispensing Pharmacy and is structured such that the beneficiary would have the same limited cost-sharing obligation ($35 per monthly fill) regardless of the Dispensing Pharmacy he or she selects to fill the prescription for the Medications.

12.  Dispensing Pharmacies are the only pharmacies authorized by Requestor to dispense the Medications to any patient prescribed the Medications who wishes to purchase the Medications, including Medicare beneficiaries, regardless of whether a patient is eligible for any company-sponsored financial assistance program.  If Requestor were to launch the Subsidy Program, eligible Medicare beneficiaries enrolled in the Subsidy Program would be able to purchase the Medications from any of the Dispensing Pharmacies.

13.  Medicare Part D and MA-PD plans typically do not mandate that patients use just one specialty pharmacy.  According to the vendor that administers the Hub, to date, there has not been any instance where there were no Dispensing Pharmacies included among the preferred pharmacies in a beneficiary's Medicare Part D or MA-PD plan.

14.  If a Medicare Part D or MA-PD plan were to require a beneficiary to use a Plan Pharmacy that is not a Dispensing Pharmacy, the Hub would send the prescription to the beneficiary's or the prescribing physician's preferred Dispensing Pharmacy. If neither the patient nor the prescribing physician expresses a preference, the Hub would send the prescription to the Dispensing Pharmacy with the lowest patient out-of-pocket costs (as determined by the Part D or MA-PD plan). If more than one Dispensing Pharmacy offers the lowest out-of-pocket costs or if the out-of-pocket costs are the same across all or many Dispensing Pharmacies, the Hub would send the prescription to one of the Dispensing Pharmacies using an objective, "round robin" process. The recipient pharmacy would then address coverage and reimbursement issues with the beneficiary's plan.

---

[6]  Requestor is in the process of adding 11 additional regional specialty pharmacies that are associated with integrated delivery networks as Dispensing Pharmacies.

**Exhibit C**
**Signed Certification of Requestor**

With knowledge of the penalties for false statements provided by 18 U.S.C. § 1001 and with knowledge that this request for an advisory opinion is being submitted to the Department of Health and Human Services, I certify that all of the information provided is true and correct, to the best of my knowledge and belief.

Dated:  September 11, 2020

Pfizer Inc.

Nick Lagunowich
Regional President North America,
Rare Disease

**CONFIDENTIAL AND FOIA EXEMPT**
**CONTAINS COMMERCIAL AND BUSINESS PROPRIETARY INFORMATION**