L6mnpfic                          CORRECTED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

PFIZER INC.,

                  Plaintiff,

          v.                            20-CV-4920 (MKV)

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et
al.*,

                  Defendants.           Oral Argument

------------------------------x
                                        New York, N.Y.
                                        June 22, 2021
                                        2:00 p.m.

Before:

                  HON. MARY KAY VYSKOCIL,

                                        District Judge

              APPEARANCES (Via Microsoft Teams)

ROPES & GRAY LLP
        Attorneys for Plaintiff
BY:  DOUGLAS H. HALLWARD-DRIEMEIER
        SAMANTHA BARRETT BADLAM
        JOAN McPHEE
           and
DLA PIPER LLP
        Attorneys for Plaintiff
BY:  ILANA H.EISENSTEIN
        LOREN H. BROWN


AUDREY STRAUSS
        United States Attorney for the
        Southern District of New York
BY:  REBECCA SOL TINIO
        JACOB M. BERGMAN
        JACOB T. LILLYWHITE
        Assistant United States Attorneys

L6mnpfic                      CORRECTED

```
 1              THE COURT:  Good afternoon.  This is Judge Vyskocil.

 2              Would you call the case, please.

 3              THE DEPUTY CLERK:  Good afternoon.  We are here in the

 4   matter of 20 Civ. 4920, Pfizer versus U.S. Department of Health

 5   and Human Services.

 6              Counsel, starting with plaintiff, please state your

 7   name.

 8              MR. HALLWARD-DRIEMEIER:  Doug Hallward-Driemeier from

 9   Ropes & Gray, on behalf of plaintiff Pfizer.

10              THE COURT:  Good afternoon.  I will tell you, Mr. --

11   how do you pronounce your last name?

12              MR. HALLWARD-DRIEMEIER:  Hallward-Driemeier.

13              THE COURT:  I will tell you that I am having a little

14   bit of trouble hearing you.  I don't know if the microphone is

15   too low or what the problem is.

16              MR. HALLWARD-DRIEMEIER:  I will raise the podium.

17              Are you able to hear me better now, your Honor?

18              THE COURT:  That is better, yes.

19              Okay.  Good afternoon.

20              Other appearances?

21              MS. EISENSTEIN:  Good afternoon, your Honor.  Ilana

22   Eisenstein, on behalf of plaintiff, Pfizer Incorporated.

23              THE COURT:  Good afternoon.

24              MS. McPHEE:  Your Honor, Joan McPhee is also here on

25   behalf of Pfizer.
```

L6mnpfic                    CORRECTED

1                THE COURT:  Good afternoon, Ms. McPhee.

2                MR. BROWN:  One more appearance, your Honor.  Loren

3   Brown, on behalf of Pfizer as well.

4                THE COURT:  Good afternoon, Mr. Brown.

5                Those all the Pfizer appearances?

6                MS. EISENSTEIN:  Yes, your Honor.

7                THE COURT:  Then on behalf of the defendants?

8                MR. LILLYWHITE:  Your Honor, good afternoon.  This is

9   Jacob Lillywhite.  I am an assistant U.S. attorney in the

10  Southern District, representing the government.

11               THE COURT:  Good afternoon, Mr. Lillywhite.

12               MR. BERGMAN:  Good afternoon, your Honor.  My name is

13  Jacob Bergman.  I am also an AUSA in the Southern District,

14  also representing the government.

15               THE COURT:  All right.  Good afternoon, Mr. Bergman.

16               MS. TINIO:  Good afternoon, your Honor.  Rebecca

17  Tinio, also for the Southern District of New York, also

18  appearing for the government.

19               THE COURT:  Good afternoon.

20               Are those all the appearances?

21               All right.  We also have a court reporter with us,

22  Mr. Mauro.

23               Are you able to hear me and all counsel clearly?

24               THE COURT REPORTER:  Yes.  Thank you, your Honor.

25               THE COURT:  Thank you, Mr. Mauro.

L6mnpfic                    CORRECTED

1          Before we begin today, I should just note for the

2     record Ms. McPhee, appearing on behalf of Pfizer, and I

3     practiced together many moons ago at Simpson Thacher &

4     Bartlett.  It has been probably it's fair to say a decade or

5     more -- I think it might be close to several decades, now I'm

6     dating both of us -- since we had seen each other, but in the

7     last year or two we have seen each other at Federal Bar Council

8     events, not one on one, but at group events for the Federal Bar

9     Council.

10          In the Court's view, there is nothing about the fact

11     that we both practiced at Simpson Thacher many, many years ago

12     or our interaction at Federal Bar Council events that precludes

13     me from fairly and impartially presiding over this matter, but

14     I do for the sake of good order want to make that disclosure

15     for the record.

16          Ms. McPhee, is there anything you want to add?

17          MS. McPHEE:  No.  I would agree with your

18     observations.

19          Thank you, your Honor.

20          THE COURT:  All right.  Anything from the government?

21          MR. LILLYWHITE:  No, your Honor.

22          MR. BERGMAN:  No, your Honor.

23          THE COURT:  All right.  Thank you.

24          Mr. Mauro, are you able to see who is speaking or do

25     you need counsel to identify themselves for the record?

L6mnpfic                     CORRECTED

1          THE COURT REPORTER:  Your Honor, I have access to the

2    Microsoft Teams video, so I am watching the participants.

3          THE COURT:  All right.  For the sake of good order, if

4    you are not speaking, please mute your line so we don't get

5    background noise or interference.

6          It might be best when you do address the Court if you

7    identify yourself for the record.  It will help me get to know

8    all of you better, and it may help Mr. Mauro as well.

9          We are here today in connection with an action that

10   was commenced by Pfizer.  As the Court understands it,

11   basically Pfizer is seeking in effect the Court's approval or

12   imprimatur that its two proposed programs to assist Medicare

13   patients with copayments for what is apparently a very

14   expensive drug -- tafamidis I believe is how it's pronounced

15   but you'll correct me if I'm wrong -- they want the Court's

16   approval that the two programs do not violate the federal

17   anti-kickback statute and the beneficiary inducement statute.

18         Apparently Pfizer has two programs in mind.  One is a

19   direct copay program in which Pfizer would provide funds

20   directly to patients who are prescribed this drug, and the

21   alternative program is an indirect program in which Pfizer

22   would fund, as the Court understands it, an existing charity

23   which would assist Part D participants with copays for this

24   drug.

25         Now, the Court has read the briefing.  I have an

L6mnpfic                    CORRECTED

1    understanding of the history that went on in front of the OIG.

2    I also am familiar with the four claims that had been made by

3    Pfizer.  There are in front of me, as I understand it, a motion

4    by Pfizer for summary judgment and then a cross-motion by the

5    government.

6            I do have some questions about the structure of the

7    motions that I want to address first.

8            So, as I understand it, the government has cross-moved

9    for dismissal, and alternatively for summary judgment.

10           What is the dismissal motion addressed to?

11           Is the government seeking dismissal of all claims or

12    only certain claims?

13           MR. LILLYWHITE:  Your Honor, this is Jacob Lillywhite.

14    The government is seeking summary judgment with respect to

15    the --

16           THE COURT:  No.  I ask what are you seeking dismissal

17    of, because I would like to address dismissal motions first.

18    If the case is dismissed, I don't get to summary judgment.

19           MR. LILLYWHITE:  My apologies, your Honor.  The

20    government is seeking dismissal of all claims except for

21    Pfizer's APA claim with respect to the advisory opinion that

22    was issued with respect to the direct subsidy program.

23           THE COURT:  Okay.  That's only under the anti-kickback

24    statute?

25           MR. LILLYWHITE:  The claim would be under the APA, but

L6mnpfic                          CORRECTED

1    the advisory opinion found only an issue with respect to the

2    anti-kickback statute, not the beneficiary inducement, yes,

3    your Honor.

4              THE COURT:  All right.  I mean, I have to say that the

5    government's brief in this was a little bit -- you did in your

6    briefing exactly what you just attempted to do when I asked the

7    question.  You are back and forth between dismissal and summary

8    judgment.  You plead them in the alternative or move in the

9    alternative, but you're really not very clear in your briefing

10   which claims you are seeking to dismiss and which claims you

11   were seeking summary judgment on.

12             Basically, the best I could decipher everything is

13   that you want me to rule in your favor, but, respectfully, the

14   standards are different depending on whether you are seeking

15   dismissal or whether you are seeking summary judgment.

16             So when the briefing kind of intertwines the two, you

17   leave me a little bit at sea here.  So the way I would like to

18   proceed today is as follows:  I have set aside an hour for

19   today's proceeding.  It's now roughly 2:15.  So, I don't know

20   if the parties have talked about how you are going to divide up

21   your time, but roughly I will allow a half hour or so for each

22   side.

23             I would like to hear from the government first, only

24   because the government is seeking dismissal and on a Rule 12

25   motion you therefore bear the burden.  You know what the

L6mnpfic                    CORRECTED

1   standard is.  I would like to hear from you about that.  Then

2   you can move into your summary judgment argument if you wish.

3       Pfizer seeks summary judgment on all of its claims, as

4   I understand it, correct?

5       Who's going to speak on behalf of Pfizer?

6       MS. EISENSTEIN:  Your Honor, Mr. Hallward-Driemeier

7   and myself, Ilana Eisenstein, are going to divide the argument.

8   I'm going to address a response to the arguments on the motion

9   to dismiss, and Mr. Hallward-Driemeier is going to address the

10  summary judgment on the merits.

11      THE COURT:  Have the parties talked about how you wish

12  to proceed?

13      Do you wish to deal with dismissal with the government

14  and then your response, or do you want the government to do its

15  entire argument and then you will be heard from?

16      Have the parties had any conversations or no?

17      MR. LILLYWHITE:  The parties had not discussed the

18  order in which to proceed, your Honor.

19      THE COURT:  Counsel, did you have a view?

20      MS. EISENSTEIN:  Your Honor, from Pfizer's

21  perspective, I think it would make sense to separate them out,

22  and my anticipation, given the representation in the letter

23  that was just filed by the government that they concede that

24  there is at least jurisdiction on the APA direct copay front,

25  that hopefully we can deal with the jurisdictional issues in

L6mnpfic                    CORRECTED

1   relatively short order because that is really the core of the

2   dispute before your Honor.

3             THE COURT:  All right.  Are you telling me there was a

4   letter that has just been filed by the government?

5             MR. LILLYWHITE:  Yes, your Honor, in the last hour.

6             THE COURT:  I haven't seen that.

7             MR. LILLYWHITE:  Apologies, your Honor.  It was a

8   letter that was responding to the letter that Pfizer put in

9   late last night.

10            THE COURT:  Okay.  All right.  Who's going to speak

11   for the government on the motion to dismiss?

12            MR. LILLYWHITE:  So, your Honor, this is Jacob

13   Lillywhite.  The government had proposed to have me speak with

14   respect to the APA claim, and so that would primarily be

15   summary judgment in favor of the government, except as to --

16   and I think there's some confusion, at least on our side on

17   this -- the extent to which Pfizer is seeking an APA claim

18   against OIG's denial of the initial request for an advisory

19   opinion that included both the direct subsidy program and the

20   indirect subsidy program.

21            Our understanding from the pleading is that there is

22   no such claim.  There is a footnote, I believe it's footnote 25

23   in Pfizer's reply brief, where they in that footnote suggest

24   that that was erroneous, but nowhere else appear to raise that

25   claim.

1          And so the government's view is that hasn't been

2     properly raised and so therefore dismissal on any claim with

3     respect to the indirect subsidy program would be proper under

4     12(b)(1) because there would be no jurisdiction for the Court,

5     and for the remainder of the constitutional claims and the

6     declaratory judgment claims, my colleague Mr. Bergman was

7     prepared to speak.

8          THE COURT:  All right.  Well, I'm prepared to hear the

9     motion to dismiss.  I mean, I will tell you that the point you

10    just made to me underscores on both sides.

11         I mean, I was critical a minute ago of the government,

12    but frankly on both sides I think you have all been a little

13    imprecise and sloppy about exactly what you are seeking from

14    the Court here.  But I think the government introduced some of

15    that confusion by cross-moving to dismiss, which of course you

16    are perfectly entitled to do.  You just weren't really clear

17    about what it was you were seeking to dismiss as opposed to

18    which claims you were seeking judgment on.  So I will hear on

19    the motion to dismiss whoever wishes to be heard.

20         MR. LILLYWHITE:  Sure, your Honor.

21         I can start.  This is Jacob Lillywhite once again.

22    Again, with respect to the APA claim, the only portion of that

23    claim, to the extent it's raised, that the government seeks

24    dismissal of is the portion of that claim with respect to the

25    indirect subsidy program.  Again, the government's read of the

L6mnpfic                    CORRECTED

1    pleadings is that Pfizer does not mean to challenge in its APA

2    claim OIG's initial denial of the request for an advisory

3    opinion which included both programs, the direct subsidy and

4    the indirect subsidy program.

5            However, as I noted a moment ago, your Honor, there is

6    a footnote in Pfizer's brief that is critical of that, and so

7    to the extent Pfizer means to raise that, the government takes

8    the position that Pfizer hasn't made any argument and hasn't

9    really put that before the Court and therefore dismissal would

10   be appropriate.

11           As for the remaining claims, with respect to the

12   constitutional claims and also any claim seeking declaratory

13   judgment, I will pass to it my colleague Mr. Bergman.

14           THE COURT:  Okay.  So, frankly, this is part of what

15   the Court has some confusion about.  As I understand it, the

16   OIG declined to issue any opinion at all with respect to what

17   you're calling the indirect program, what Pfizer calls the

18   charity program, because there is an investigation that's

19   ongoing with respect to a similar type of program, and under

20   the regulations then HHS's view is it should not issue an

21   opinion.

22           Is that accurate?

23           MR. LILLYWHITE:  That's correct, your Honor.

24           THE COURT:  I realize I'm summarizing, but generally

25   accurate?

L6mnpfic                    CORRECTED

1      MR. LILLYWHITE:  That's correct, your Honor.

2      THE COURT:  Is the fact that no opinion was issued

3  part of why you're seeking dismissal, or that's not relevant

4  really?

5      MR. LILLYWHITE:  Well, your Honor, to the extent

6  Pfizer meant to raise an APA claim, the proper scope of that

7  claim would be whether or not that final agency action, that

8  denial of the request for the opinion was appropriate.  So

9  there is a footnote where Pfizer suggests that OIG's

10 interpretation of that statute -- or rather that federal

11 regulation, which is 1008.15, is improper.  Pfizer doesn't

12 explain why, why it believes -- it doesn't suggest that there's

13 any dispute that there is in fact an investigation regarding

14 the same or similar conduct, and in any case that wouldn't be a

15 fact within Pfizer's knowledge.  But that would be the scope of

16 the APA challenge with respect to that piece.

17      And so, with respect to that, the government moves for

18 dismissal, doesn't believe that Pfizer stated a claim to the

19 extent it seeks an APA review with respect to that.  But

20 otherwise, with respect to the APA claim, the government is

21 seeking summary judgment.  That's the APA claim challenging the

22 advisory opinion that was issued.

23      THE COURT:  Okay.  All right.  So, again, I mean, you

24 have the floor.

25      MR. BERGMAN:  Your Honor, this is Jacob Bergman.

L6mnpfic                          CORRECTED

1          Also, with respect to the indirect subsidy program, we

2   believe dismissal is appropriate because Pfizer lacks standing.

3   To the extent that their claim is untethered to an APA action,

4   the Declaratory Judgment Act on its own doesn't provide for any

5   sort of independent jurisdiction.  It appears that --

6          THE COURT:  But aren't they claiming constitutional

7   violations by reason of how you've implemented the statutes.

8          MR. BERGMAN:  Yes, they are.  But there's no sort of

9   concrete or actual or imminent case or controversy here even

10   under, you know, for their constitutional claims.  So,

11   untethered to any actual concrete case or controversy, there's

12   no standing.

13          THE COURT:  Does that really mean there's no standing,

14   or are you arguing prudential ripeness?

15          MR. BERGMAN:  Well, I think --

16          THE COURT:  They are two different concepts, aren't

17   they?

18          MR. BERGMAN:  Absolutely, your Honor.  They're sort of

19   closely joined here.  Because their program, their indirect

20   subsidy program is ill defined.  I don't think that Pfizer can

21   show that there's sort of any live case or controversy which

22   would get to the issue of standing.

23          To the extent that prudential ripeness, sort of

24   whether this issue is best dealt with in an actual enforcement

25   action, that's sort of a separate issue, but also tied to the

1    fact that they really have not defined their indirect subsidy

2    program.  I think they devote in their complaint approximately

3    four sentences to the program.

4           So it's very hard to say what they are actually

5    proposing to do.  And, you know, to have a live case or

6    controversy, there needs to be, you know, an actual -- the

7    cases that they've cited, the plaintiffs have sort of set forth

8    precisely the conduct that they seek to engage in, and then

9    there is a statute or regulation that's proscribing that

10   conduct.  Here, they have not set forth exactly what conduct

11   they seek to engage in or how the statute explicitly prohibits

12   that conduct.

13          So, with respect to standing, there is no live case or

14   controversy, but your Honor is correct that the ill defined

15   nature of their indirect subsidy program also raises

16   substantial prudential ripeness concerns.

17          THE COURT:  All right.  I had understood part of your

18   standing argument to be, at least with respect to the Fifth

19   Amendment claim, that Pfizer was effectively trying to assert

20   the rights of the patients or the third parties who would be

21   receiving the drug, not asserting rights or basing a claim on

22   injury to Pfizer itself.  That's how I understood your standing

23   argument to be framed.

24          MR. BERGMAN:  That is correct, your Honor, with

25   respect to the Fifth Amendment argument.  I was speaking for

L6mnpfic                    CORRECTED

1   the moment about the indirect subsidy program and their

2   arguments with respect to the First Amendment.

3           With respect to the Fifth Amendment, our standing

4   argument is that Pfizer is seeking to step into the shoes of a

5   third party, and that claim is best left to the third party,

6   and Pfizer doesn't have standing to seek redress on their

7   behalf.

8           THE COURT:  Right.  But there certainly are some cases

9   out there that say a drug manufacturer can have standing when

10  refusal to authorize its program causes patients to be unable

11  to obtain the drug, right?

12          MR. BERGMAN:  I understand the line of cases.  I think

13  our position is that there is no standing, but even to the

14  extent that there would be standing, their claim would still

15  fail on the merits.

16          THE COURT:  All right.  But let's not go to the merits

17  yet.  Answer my question on standing.  I mean, do you

18  acknowledge that there are cases that recognize that a drug

19  manufacturer might have standing under similar circumstances

20  where a program that it is proposing is not approved, and

21  therefore third parties are deprived of the benefit of the

22  drug?

23          MR. BERGMAN:  Your Honor, while I recognize that there

24  are cases that do hold that, the government's position

25  nevertheless in this instance is that standing is lacking here.

L6mnpfic                    CORRECTED

This is --

THE COURT:  But I want you to tell me why.  I want you
to distinguish those cases.  It doesn't help me to just keep
saying I recognize there are cases that say that, but, you
know, we say there's no standing.  You need to tell me why.

MR. BERGMAN:  Understood, your Honor.  I think our
position here is that there's not a close enough relationship
between Pfizer and these particular customers that these are,
you know, arm's length customers of Pfizer.  They're retail
customers.  These are not -- you know, that they're not
necessarily patients of Pfizer.  It's a -- you know, it's not
a -- it's simply not a close enough relationship in order to
allow Pfizer to advocate on behalf of the patients.

THE COURT:  All right.  Let me back up to the First
Amendment issues because you're kind of jumping all over the
place here.

On the First Amendment do you concede that making a
contribution to a charity is a form of speech that's entitled
to protection just generically?

MR. BERGMAN:  Generically, I understand that, yes,
that providing money to charities has been ruled speech.

THE COURT:  Okay.  Here we are talking about Pfizer
wanting to contribute money to a charity, so are you contending
there's the same type of a standing issue with respect to the
First Amendment claim?

L6mnpfic                     CORRECTED

1           MR. BERGMAN:  Well, the First Amendment claim, the

2    standing issues I believe are different.  It's that there's no

3    live case or controversy.

4           THE COURT:  Yes.  I understood that point.  But other

5    than that you don't have a separate standing argument?

6           MR. BERGMAN:  No, your Honor.

7           THE COURT:  Okay.

8           Anything else you want to tell me on your motion to

9    dismiss?

10           MR. BERGMAN:  Just to be -- your Honor, we would like

11    to go into sort of the merits from a 12(b)(6) standpoint for

12    our motion to dismiss.

13           THE COURT:  Sure.

14           MR. BERGMAN:  With respect to the merits for 12(b)(6),

15    you know, as a preliminary matter, I would say it is not clear

16    what sort of protected speech Pfizer actually seeks to engage

17    in, much less how that speech is protected by the anti-kickback

18    statute.

19           THE COURT:  Wait, wait, wait, wait.  The speech is not

20    protected by the anti-kickback statute.  The speech is

21    protected --

22           MR. BERGMAN:  I apologize, your Honor.  I misspoke.  I

23    meant to say prohibited by the anti-kickback statute.

24           THE COURT:  Okay.  I don't follow what you are telling

25    me.  I thought I just asked you do you concede that making a

1    contribution to a charity is speech, and you said yes.

2           MR. BERGMAN:  But the speech that Pfizer seeks to

3    engage in is in this instance speech of coordinating with that

4    independent, with that purported independent charity.

5           Pfizer can donate to an independent charity.  The

6    issue comes with the coordination and the speech that goes

7    along with it that changes that donation into a kickback.  So

8    there's no First Amendment right to provide kickbacks --

9           THE COURT:  Right.

10          MR. BERGMAN:  -- to a third-party charity and that's

11   really sort of the heart of the issue.  There's no First

12   Amendment protection to engage in that conduct.

13          Now, the anti-kickback statute doesn't actually limit

14   speech in any way.  I think what Pfizer is arguing is that the

15   guidance, the 2005 and 2014 guidance provides some sort of

16   limitation on their speech.

17          However, that simply is just guidance.  That is not

18   actually any prohibition.  That's HHS OIG's interpretation of

19   the statute.  But -- and you know, I think this was sort of the

20   critical part of the holding in the District of Massachusetts

21   recent opinion in the *Regeneron* action, the Court there held

22   that a pharmaceutical manufacturer has no First Amendment right

23   to pay kickbacks intended to induce the prescriptions and

24   purchases of its drugs.  And that's really what Pfizer is

25   seeking here.

L6mnpfic                    CORRECTED

| | |
|---|---|
| 1 | And I would go on to say what the First Amendment does |
| 2 | not prohibit is the evidentiary use of speech, such as |
| 3 | coordinating with those charities, defining the scope of the |
| 4 | funds, matching up patient data and purchases to donations. |
| 5 | The First Amendment doesn't prohibit the evidentiary use of |
| 6 | speech such as that. |
| 7 | THE COURT:  You are saying the First Amendment doesn't |
| 8 | protect -- |
| 9 | MR. BERGMAN:  Sorry.  I apologize, your Honor.  Yes, |
| 10 | protect. |
| 11 | Doesn't protect speech such as that in order to |
| 12 | demonstrate, you know, Pfizer's intent to use the donations to |
| 13 | impermissibly influence the purchase or prescriptions of its |
| 14 | drugs. |
| 15 | THE COURT:  But you are actually arguing far broader |
| 16 | than you -- well, than the government, I'm not going to say |
| 17 | you -- than the government went thus far, because basically all |
| 18 | you have done so far is say you are not going to render an |
| 19 | opinion.  Now you are basically arguing to me that this program |
| 20 | would violate the statute. |
| 21 | MR. BERGMAN:  Oh, no, your Honor.  I was speaking in |
| 22 | hypotheticals, of ways in which coordination with independent |
| 23 | programs could violate the statute. |
| 24 | THE COURT:  Okay. |
| 25 | MR. BERGMAN:  We simply don't know enough about this |

L6mnpfic                    CORRECTED

1   program to determine whether or not it would violate the

2   statute or the guidance.  It appears that there are portions of

3   the program that might implicate the corporate integrity

4   agreement, the 2018 corporate integrity agreement that

5   Pfizer --

6           THE COURT:  Hold on one second before we go to that,

7   because I do have some other questions about that.  But you are

8   being a little, it seems to me, inconsistent here because you

9   are saying on the one hand we don't know enough about what the

10  program would be, and yet you are telling me the government

11  knew enough to say, we can't render an opinion because it is

12  too similar to the other matter already under investigation,

13  correct?

14          MR. BERGMAN:  Yes, your Honor.  I don't know if there

15  are -- if it's necessarily inconsistent, though.  I think it's

16  possible that there's another investigation, another --

17  something else that HHS OIG is looking at relating to donations

18  to independent, you know, indirect subsidy programs, because if

19  there is another case out there involving indirect subsidy

20  programs, it is not going to render an opinion on this one.

21  That's not to say that this program would, you know, run afoul

22  of the AKS, would fail to conform with HHS OIG's guidance or

23  the corporate integrity agreement.

24          THE COURT:  So you are not saying that?

25          MR. BERGMAN:  I am not saying that it --

L6mnpfic                    CORRECTED

1          THE COURT:  You are saying you don't know?

2          MR. BERGMAN:  I am saying we don't know.  We simply

3    don't know.

4          THE COURT:  I am going switch over a little.

5          How are you seeking summary judgment then?

6          MR. BERGMAN:  Well, we are seeking -- on the indirect

7    subsidy program?

8          THE COURT:  Yes.

9          MR. BERGMAN:  With respect to the indirect subsidy

10   program, I think the summary judgment -- and I can defer to my

11   colleague Jake Lillywhite -- goes to sort of the thrust of how

12   the anti-kickback statute works.

13         But with respect to the -- I think we are seeking

14   dismissal on the First Amendment claims, and, you know, and any

15   declaratory judgment action on the indirect subsidy program for

16   threshold reasons, and then also for the merits of the First

17   Amendment and Fifth Amendment as well.

18         THE COURT:  Okay.

19         So the final thing I want to ask you before I hear

20   from your colleague, because you are going to run out of

21   time -- is this corporate integrity was it called -- agreement,

22   you started to talk about that.  So go ahead and address that,

23   because I did have some questions about that.

24         MR. BERGMAN:  Certainly, your Honor.  So Pfizer

25   entered into a corporate integrity agreement in I believe 2018

L6mnpfic                    CORRECTED

with HHS OIG, which accompanied a settlement that Pfizer

entered into with the Department of Justice regarding

contributions to a purported independent charity.

         And in entering into that agreement Pfizer, you know,

Pfizer agreed to abide by all HHS OIG guidance, including the

2005 and 2014 guidance and also to refrain from certain

coordination activities with an indirect subsidy program.

         I would highlight -- I think that this goes to sort of

a prudential ripeness point, you know, one of the points of

prudential ripeness is whether something is best dealt with in

a specific enforcement action as opposed to sort of in a, you

know, prior to enforcement.

         To the extent that Pfizer had concerns about the First

Amendment implications of the AKS, about the interpretation of

the AKS with respect to indirect subsidy programs, Pfizer had

an opportunity to do so in 2018 when the facts were fully

developed and instead chose not to and now brings this sort of

collateral action that would, you know, be an end around the

2018 CIA.

         THE COURT:  But you are invoking the agreement, not

Pfizer, right?

         MR. BERGMAN:  Pfizer is not invoking the agreement,

but a ruling that Pfizer can engage in this ill defined

indirect subsidy program and would eviscerate the 2018 CIA

which Pfizer previously entered into.

L6mnpfic                        CORRECTED

1          THE COURT:  That's what I wanted you to address.  Tell

2     me how and why.

3          MR. BERGMAN:  Well, certainly, your Honor.

4          So the indirect subsidy, the CIA provides in one

5     portion that Pfizer can't make suggestions or requests to an

6     independent charity about the establishment of a disease fund.

7     At the same time they also claim that their desire is to

8     develop a copay assistance fund for ATTR-CM patients and to

9     communicate with that independent charity patient assistance

10    program about the scope of the fund and the funding needs.

11         THE COURT:  Are you basically saying this falls within

12    subparagraph (d) of that agreement?

13         MR. BERGMAN:  I think that it may.  Again, it is hard

14    to say because the program is ill defined, but I think there is

15    a substantial risk that it could violate that portion of the

16    CIA.

17         And I would say that this ambiguity about whether or

18    not it violates -- it has the potential to violate the CIA, is

19    also highlighted by Pfizer's own briefing where in their

20    initial motion they note in footnote -- I believe footnote 8 of

21    their initial motion that because of the CIA they can't proceed

22    with the independent subsidy program, absent Court

23    intervention, while at the same time in the reply noting that

24    their independent subsidy program would not run afoul of the

25    CIA and would also comply with OIG guidance.

L6mnpfic                    CORRECTED

1          THE COURT:  I think they're saying that in reply to

2    the government.  It's the government that first raised the CIA,

3    right?

4          MR. BERGMAN:  Well, Pfizer in their initial brief

5    noted, prior to any filings by the government noted that the

6    CIA prevents them from engaging in the indirect subsidy program

7    absent judicial intervention.

8          THE COURT:  Right.  What I am asking you is, is the

9    government seeking dismissal on the basis of the CIA, and if so

10   with respect to which claims?  This only relates to the

11   indirect program, right?

12         Are you seeking dismissal based on the CIA, and, if

13   yes, with respect to which claims?

14         MR. BERGMAN:  We would be seeking dismissal on the

15   basis of the CIA with respect to the claims related to the

16   indirect subsidy program, the claim for a declaratory judgment

17   to engage in the indirect subsidy program and also with respect

18   to the First Amendment arguments.

19         THE COURT:  What about the Fifth Amendment?

20         MR. BERGMAN:  Sorry, your Honor, and the Fifth

21   Amendment programs because the argument --

22         THE COURT:  So it is all claims?  All claims relating

23   to the indirect program?

24         MR. BERGMAN:  Relating to the indirect, yes, not the

25   direct subsidy.

L6mnpfic                    CORRECTED

1          THE COURT:  Okay.

2          MR. BERGMAN:  The indirect on the basis that, because

3     of the potential of conflict between the indirect subsidy

4     program and the CIA, that any ruling from the Court would not

5     provide redress because they would still be bound by all the

6     terms of the CIA.

7          THE COURT:  Oh, okay.

8          All right.  Do you want to speak to the summary

9     judgment aspect of your motion?

10         MR. LILLYWHITE:  Yes, your Honor.

11         THE COURT:  Cross-motion.

12         MR. LILLYWHITE:  Yes, your Honor.

13         So, to be clear, the summary judgment cross-motion

14    from the government is targeted only to a single claim, the APA

15    claim with respect to the advisory opinion that was issued by

16    HHS OIG as to the direct subsidy program.  And there are --

17         THE COURT:  All right.  So let me just understand one

18    thing.  I just want to clarify, but then this will really be a

19    question for Pfizer.

20         That opinion -- well, the opinion as I understand it

21    said the direct program could potentially run afoul of the

22    anti-kickback statute, but not the BIS.

23         MR. LILLYWHITE:  That's correct.

24         THE COURT:  Okay.

25         MR. LILLYWHITE:  Yes.  And, your Honor, I want to

L6mnpfic                    CORRECTED

1    underscore the importance of this issue here.  Pfizer is asking

2    the Court to do something that's unprecedented, to upend

3    decades of settled law and agency guidance in this highly

4    regulated space and bless their program to induce Medicaid --

5    Medicare beneficiaries to purchase what is the most expensive

6    cardiovascular drug ever launched in the United States.

7         THE COURT:  Okay.  But you said in your moving papers,

8    and I think it's true, that it's unclear whether this program

9    is to induce patients to purchase the drug.  And if it wasn't

10   to induce patients to purchase the drug, do you agree there's

11   no violation of the anti-kickback statute?

12        MR. LILLYWHITE:  So, your Honor, I will start with the

13   second question first.  Certainly, if one of the purposes of

14   this program was not to induce the purchase of a pill that was

15   then to be reimbursed by a federal health care program, then,

16   yes, there would not be an issue under the anti-kickback

17   statute.  What the advisory opinion does and what the

18   government did in its brief, your Honor, is to note that first

19   it is clear that the remuneration that Pfizer seeks to provide

20   through the direct subsidy program would be prohibited by the

21   AKS if there was that intent, putting aside for a second that

22   intent, and that's the way OIG does these analyses.  And it

23   then noted that because the program had not yet been

24   implemented, OIG did not feel comfortable saying what the

25   intent would be, but did note in places it seems clear from

L6mnpfic                    CORRECTED

1    Pfizer's own submitted facts and indeed from the pleadings in

2    this case that certainly one of the purposes, if not the

3    primary purpose, is to induce patients who otherwise would not

4    purchase this drug to purchase it and to the extent that --

5            THE COURT:  Let me just ask you something.

6            So is that really true or is it because -- let's talk

7    about the real world.  I mean, the way this would play out, as

8    I understand things, and this is really not from any, you know,

9    particularly informed insight, it is just a common-sense

10   practical question I'm trying to ask you, a doctor would

11   prescribe this drug, right?

12           MR. LILLYWHITE:  Yes, your Honor.

13           THE COURT:  And the doctor is going to prescribe it

14   without regard necessarily to whether a program exists.  And

15   then whether a patient fills a prescription or not might depend

16   on whether there is aid in some form like this program

17   available.

18           MR. LILLYWHITE:  What that means, your Honor -- I

19   would respectfully disagree.  Pfizer certified in connection

20   with the advisory opinion that it certainly is possible that

21   doctors making these prescribing decisions would consider the

22   price --

23           THE COURT:  Is that part of the record?  Hold on.

24   Slow down.

25           MR. LILLYWHITE:  Yes, your Honor.  Sorry, your Honor.

L6mnpfic                    CORRECTED

1          THE COURT:  OK.  So they certified --

2          MR. LILLYWHITE:  That is part of the record, yeah.

3    And, your Honor, you can look in particular at the advisory

4    opinion on page 144.  I think the precise language that Pfizer

5    certified is, quote, there is no question that some physicians

6    may consider drug costs and a patient's out-of-pocket burden

7    when making prescribing judgments.

8          THE COURT:  Okay.

9          MR. LILLYWHITE:  It's page 144, 161 and 163.  And I

10   think in the latter two cites OIG affirmatively finds that in

11   their expert opinion that would be true for at least some, if

12   not many, physicians.

13         THE COURT:  All right.

14         So why, then, does OIG sort of punt and say, you know,

15   if the intent was to induce, you might be afoul of the AKS?

16   Why doesn't it just come out and say it?

17         MR. LILLYWHITE:  Well, there's sort of two parts to

18   that, your Honor.

19         First, I just want to make sure that there's not a

20   confusion here.  It is certainly not the case that whether or

21   not there is an AKS violation turns on whether or not there is

22   an impact on the prescribing decision.  There are a wide --

23         THE COURT:  No, it turns on whether you're intending

24   to induce the patients to use the drug, right?

25         MR. LILLYWHITE:  Right.  Exactly.

1          So certainly there are many cases, including many

2     cases cited by the parties in this case, where there is no

3     allegation by government under the AKS that there is an impact

4     on the prescribing decision, but rather there was a, you know,

5     there were inducements provided sort of to get a referral to a

6     specialty pharmacy or certain testing labs or so on.  And so

7     those certainly are within the AKS.

8          But to your Honor's specific question about why OIG

9     doesn't take the next step to say the intent is there, OIG's

10    position is that until a program is actually implemented it

11    just logically can't say what the intent was because it hasn't

12    happened yet.  But it does say --

13          THE COURT:  Slow down.  Slow down.

14          MR. LILLYWHITE:  I'm sorry your Honor.

15          THE COURT:  If that's the government's position, then

16    doesn't that render the framework where someone can go to OIG

17    and request an advisory opinion completely illusory?

18          If you are saying the government won't make the

19    determination or HHS won't make a determination on the intent

20    element until the program is implemented, how can anyone ever

21    get a, quote, advisory opinion?

22          MR. LILLYWHITE:  Well, your Honor, again, I think

23    there are two different pieces here.  So, first, certainly OIG

24    did offer the opinion that here there would be prohibited

25    remuneration under the AKS.  And as your Honor sees, for

L6mnpfic                    CORRECTED

 1  example, OIG found under the BIS there is no prohibited

 2  remuneration, so --

 3          THE COURT:  Stay with AKS.

 4          MR. LILLYWHITE:  Right.

 5          THE COURT:  Did the opinion say there would be, or did

 6  it say if the intent was to induce, there could be?

 7          MR. LILLYWHITE:  So, again, your Honor, it depends a

 8  little bit on the terminology.  So the way OIG uses the terms,

 9  it said there would be prohibited remuneration under the AKS.

10  That doesn't necessarily mean that there is a violation.  There

11  is only a violation if there also is that intent.

12          And so the way the advisory opinion looked at it, it

13  first looked at, putting intent aside, is there prohibited

14  remuneration here?  The answer is yes.

15          Then it said if, when implemented, one of the purposes

16  would be to induce, there would be an AKS violation, and it did

17  note -- it said, although we can't reach that because it hasn't

18  been implemented yet, we do note that it appears from what

19  Pfizer has put before us that that is one of the purposes.

20          So OIG gave, you know, some pretty strong guidance in

21  that advisory opinion on --

22          THE COURT:  Let me just ask you kind of a preliminary

23  question then.  Given what you're telling me is pretty strong

24  pretty clear guidance, the government isn't taking a position

25  that this isn't ripe for the Court to act because the agency

L6mnpfic                    CORRECTED

1    has not yet finally opined, are you?

2              MR. LILLYWHITE:  No, your Honor.  Certainly.

3              THE COURT:  That's the letter that you submitted --

4              MR. LILLYWHITE:  Well, that --

5              THE COURT:  -- today?

6              MR. LILLYWHITE:  -- was referenced also in that

7    letter, your Honor.

8              But, yes, the reason the government is cross-moving

9    for summary judgment there is because the government agrees

10   that it is ripe for summary judgment on the APA claim there.

11             And, as we understand it, the only challenge Pfizer

12   has raised with respect to that advisory opinion is the

13   interpretation of the AKS, which is in keeping with decades of

14   judicial consensus on this point as well as agency

15   interpretation, including through federal notice-and-comment

16   rulemaking, which would be entitled to *Chevron* deference.

17             So, really the only question, as we understand it,

18   under the APA is, is there some additional element -- once you

19   show that one of the purposes was to induce a covered purchase,

20   do you also have to show there was some sort of corruption or

21   further impropriety as some additional element.

22             Pfizer has pointed to no case in the 44 years since

23   the AKS was amended to include "any remuneration" in 1977, no

24   case where any Court has ever held that.  And, in fact, a

25   number of courts just in the past handful of years have looked

L6mnpfic                    CORRECTED

at very similar situations where there are copay assistance

programs and held without, you know -- you know, much hand

wringing, that clearly that falls within the plain language of

the AKS.

And here that's true in *Regeneron*, that's true in

*Strunck*, it's true in *Goodman*.  It's true in a number of these

cases, your Honor.

I think Judge Posner in *Grenadyor*, which I believe is

the 2014 Seventh Circuit opinion, expressly talks about how

there are some sort of AKS cases where they sort of seem

clearly like bribes or kickbacks, and they jump out and say,

you know, you're paying off the doctor to prescribe something

he or she might not have.

Then there are these other class of cases that to a

lay person may not immediately seem corrupt necessarily, but

where the pharmaceutical company or the health care provider is

providing money to change the purchasing decisions of the

purchaser and trying to lower the price, as in that case, you

know, offering waivers.  And so that way purchases that

wouldn't have happened but for the waiver happened, which then

means that the government picks up the remainder of the tab.

That squarely falls within the AKS, and there is no

Court that Pfizer has pointed us to, and we are aware of none,

that has ever held otherwise.

THE COURT:  Slow down for a minute.  Let's say you

1    have a patient who could afford the copay.  And so they get the

2    drug and the government's going to pay the additional portion

3    of the bill.  The outcome is exactly the same if some other

4    source for that copay is available, correct?

5              MR. LILLYWHITE:  Yes, your Honor.

6              THE COURT:  What is the government interest or policy

7    that is being protected in this kind of a scenario where all

8    that a pharmaceutical company like Pfizer seems to be trying to

9    do is to make a drug that's exceedingly expensive -- I think

10   everyone concedes that point -- available to patients for whom

11   there are not a lot of other options available?

12             MR. LILLYWHITE:  So, your Honor, it's the very same

13   interest that the Court addressed in *Strunck*, which is Pfizer,

14   the very high cost, the $225,000 a year price, that was set by

15   Pfizer.

16             What Pfizer has effectively done, and admits this, is

17   priced itself out of the market.  It has priced the drug so

18   high that most people who are eligible for that drug cannot

19   purchase it.

20             So the problem is, to the -- you know, one of the core

21   reasons there are these cost-sharing obligations under Medicare

22   Part D and the percentages vary up to catastrophic level --

23   which I believe last year was up to $5100, and then five

24   percent going forward.  But even that 5 percent is huge when we

25   are talking about $225,000 a year.

L6mnpfic                         CORRECTED

1        So as soon as for the patient and the physician it

2   appears that the drug is effectively free out of pocket for

3   something like 90 percent of these patients, Pfizer is able to

4   price the drug whatever it wants.  It could say $225,000 this

5   year, and next year it is going to increase it to $500,000, the

6   next year to $2 million.

7        There is no downward pressure on the price from the

8   cost-sharing obligations, because as soon as direct subsidies

9   are allowed to zero those cost-sharing obligations, they are

10   completely gone from the statute.

11        And in this case, OIG has noted in the advisory

12   opinion this drug alone would be expected to increase total

13   spending on Medicare Part D pharmaceuticals by $30 billion.

14   And surely if this is legal for Pfizer, Pfizer will not be the

15   only pharmaceutical company to use this, and there will

16   effectively be a gold rush until Congress amends the statute.

17        THE COURT:  Right.  So I understand your point that

18   there's no downward pressure on the pharmaceutical industry in

19   terms of pricing if they effectively take away the copay.

20        MR. LILLYWHITE:  Yes, your Honor.

21        THE COURT:  But conversely, if this statute really

22   operates the way you're saying it operates, and the cost to the

23   pharmaceutical company of having developed a drug that was

24   arguably expensive to develop, has no competition, no one else

25   has invested to develop a competing drug, the impact of what

L6mnpfic                    CORRECTED

1    you are arguing for is that the patients will be unable to get

2    the drug.

3            MR. LILLYWHITE:  Well, your Honor, respectfully, it is

4    not the case that there are no competitors.  Right now there is

5    another pharmaceutical that is in phase 3 trials --

6            THE COURT:  Yes, I read that.

7            MR. LILLYWHITE:  -- which may be applying for approval

8    this year.  There are also two off-label treatments.

9            But to your Honor's larger point, yes, it is true --

10   and I will also note that Pfizer has not certified anywhere in

11   these papers that the reason it's priced the drug as highly as

12   it has is to recoup R&D expenses.  That is not a fact that

13   Pfizer has put forward.

14           But in any case it is often the case that

15   pharmaceutical companies have to make decisions about how to

16   price drugs based on supply and demand.  And when they are

17   working with ordinary insurance companies that aren't the

18   government, those insurance companies can negotiate with the

19   drug companies and say we are not willing to pay the list

20   price, lower it down.

21           The federal government is not allowed to do that.  And

22   instead the way that there is a lower sort of pressure on these

23   prices is through these cost-sharing obligations.  And while

24   that means that to the extent there are drugs that truly a

25   pharmaceutical company cannot price any lower, the

L6mnpfic                    CORRECTED

1    pharmaceutical company has a number of lawful options:  One --

2    and Pfizer has done this in part here -- for the folks who

3    truly cannot afford that lower price, you can make it free for

4    them.  Two, you can certainly make lawful donations to truly

5    independent charities.  And this is a highly regulated space,

6    where, you know, Pfizer has cited your Court to a number of the

7    guidances, you know, around these donations.  But there is a

8    lot of guidance from OIG about what is and isn't allowed in

9    that space.

10        So if Pfizer you know wanted to truly just help

11   patients and this wasn't about, you know, being able to price

12   the drug as highly as it could, it had other options.

13        THE COURT:  Okay.

14        MR. LILLYWHITE:  But, frankly, your Honor, you know,

15   to the extent that your Honor were to hold that the AKS is

16   limited in this way that no Court has ever held before

17   confronting very similar facts, there would effectively be a

18   gold rush across pharmaceutical manufacturers to price their

19   drugs however they want and then sort of, you know, offset

20   those out-of-pocket expenses with these direct copays, you

21   know, various assistance programs.

22        I just want to make sure that the Court also is sort

23   of focused on the fact that, you know, two of the cases that

24   Pfizer does cite -- because, again, it cites no case that has

25   ever done this, you know, one of them, *United States v. Alfisi*

L6mnpfic                    CORRECTED

concerns an entirely different statute, a bribery statute

concerning public officials.  And the reason the Second Circuit

repeatedly uses the word "corruptly" there is because the word

"corruptly" appears in that statute four times.

Second, in Pfizer's reply brief they repeatedly cite

to *United States v. Zacher*.  And, again, that is a 1978 case I

believe from the Second Circuit, but it's construing the

pre-1977 version of the AKS when the AKS was limited just to

kickbacks, bribes, and rebates.

And, again, Congress very deliberately made a decision

in 1977 to broaden the scope.  And so to the extent Pfizer is

now arguing that when Congress decided to go from rebates,

kickbacks, and bribes to any remuneration, including those

three, it meant to do nothing, it didn't mean to broaden it,

despite the legislative history and the common sense that's to

the contrary, there's simply no support for that.

And, again, you know, OIG guidance, you know, you

know, you know, for example, even in 1991, you know,

notice-and-comment rulemaking sets outs OIG's interpretation of

"remuneration" and "to induce" in the statute.

And so to the extent there was any ambiguity -- and,

again, courts have repeatedly found looking at almost identical

programs -- and to the extent there are differences often the

pharmaceutical manufacturers are less brazen.  So some of the

cases cited there are cases where the pharmaceutical company

L6mnpfic                    CORRECTED

1   didn't try to do a direct program.  Instead it tried to do an

2   indirect program through a charity, recognizing that of course

3   the direct payment would not be appropriate.

4          So, just as courts have repeatedly found, the plain

5   language is sufficient.  But if there were any ambiguity,

6   *Chevron* deference would be appropriate here, and unless the

7   agency interpretation that's been standing for 44 years was

8   held to be unreasonable the Court should defer to it.

9          THE COURT:  All right.  Thank you.

10          Let me hear from Pfizer, please.

11          MS. EISENSTEIN:  Thank you, your Honor.

12          This is Ilana Eisenstein, on behalf of Pfizer.  I am

13   going to address the issues relating to the motion to dismiss,

14   and then I will turn things over to my colleague,

15   Mr. Hallward-Driemeier, with respect to the summary judgment

16   issues.

17          THE COURT:  Thank you.

18          Ms. Eisenstein, just pull the mic down a little bit.

19   Okay?

20          MS. EISENSTEIN:  Thank you, your Honor.

21          Is that better?

22          THE COURT:  Thank you.  That's better.  Yes.  Thank

23   you very much.

24          MS. EISENSTEIN:  Great.

25          So I just want to clarify what's at issue here with

L6mnpfic                    CORRECTED

1    respect to the motion to dismiss, because I think that there

2    was a great deal of confusion both about the claim that Pfizer

3    has brought from the government's argument and why it is that

4    this is a justiciable controversy.

5         Pfizer has sought something that is unremarkable and

6    well recognized by Supreme Court precedent from *Abbott Labs*, to

7    *Driehaus*, to *Holder V. Humanitarian Project*.  It is a classic

8    invocation of the court's jurisdiction under the Declaratory

9    Judgment Act and the Administrative Procedure Act to seek a

10   declaration that Pfizer's proposed programs do not violate

11   federal criminal law.

12        This type of pre-enforcement review is something that

13   courts time and again, including in the Second Circuit,

14   recognize as appropriate when, first, as here, the plaintiff

15   has indicated an intent to engage in the course of conduct

16   arguably prohibited by statute, that future conduct is arguably

17   proscribed by the statute and the threat of enforcement is

18   substantial.  That's from *Driehaus*, which is a 2014 Supreme

19   Court decision.

20        The same standard was applied in *Holder v.*

21   *Humanitarian Law Project*, and that dates back to *Abbott Labs v.*

22   *Gardner* in 1967.  So this isn't a remarkable idea that Pfizer

23   is rightfully concerned about an imminent risk of enforcement

24   action if it proceeds with its proposed program.

25        THE COURT:  Are you talking about both programs or

L6mnpfic                    CORRECTED

1    just the direct program right now?

2           MS. EISENSTEIN:  Well, both programs, your Honor.  So

3    the government's conceded that there's a justiciable

4    controversy as to the copay program.

5           THE COURT:  Right.

6           MS. EISENSTEIN:  Although it seeks to limit

7    consideration by this Court to that under the APA, which is

8    Count Four of our complaint.

9           That said, we believe that it is also appropriate, and

10   *Abbott Labs* was such a case, to also consider a declaratory

11   judgment in such a case.

12          THE COURT:  Counsel, slow down again so I can

13   interject when I need to.

14          If the Court granted you the relief you seek on Count

15   Four, why do you need Count One?

16          MS. EISENSTEIN:  Your Honor, I don't think we

17   necessarily do need Count One.  It is the case, though, that

18   there is a declaration of rights that can be apart from a

19   finding that agency action was arbitrary and capricious or in

20   violation of law.  So the standards are somewhat different, and

21   in the Declaratory Judgment Act we are asking the Court to

22   evaluate the anti-kickback statute itself and whether or not

23   Pfizer's proposed course of conduct, which is to assist

24   financially needed ATTR-CM patients to access tafamidis, which

25   is the only FDA-approved treatment, whether that conduct

L6mnpfic                    CORRECTED

violates a federal criminal statute.

THE COURT:  Do I know enough about the terms of the program to render that opinion?

MS. EISENSTEIN:  Absolutely, your Honor.

So let me just start with the direct copay assistance program, which is a pretty straightforward program, and the government concedes that it knows enough about this program.

Pfizer has proposed very specific terms about not only the fact that it wants to provide such copay assistance, the levels and income levels which it seeks to provide that assistance, how the program will operate, and it engaged in an extensive yearlong back and forth with the government on every aspect of that program, at the end of which the government was satisfied it needed no more facts to render its advisory opinion.

And its advisory opinion was far from what the government says as being some kind of ill defined statement of a potential legal question.  It crystallized the legal controversy, which is really around not the intent as we would characterize it, but rather around what constitutes inducement and the relationship between illegal remuneration and inducement under the statute.

And so in the advisory opinion the government says as much, which is, the central inquiry is whether the remuneration would address the patient's inability to pay, and if it would

L6mnpfic                         CORRECTED

1    without question influence, that would influence the patient's

2    purchasing decision.  So it is a finding by the government that

3    our proposed program, by enabling patients to access this

4    critical medication, would violate the remuneration and

5    inducement prongs of the statute.

6         All they leave over is whether or not there's mens

7    rea, the criminal intent.  That isn't the question we are

8    seeking advice from this Court about.  We are seeking an

9    opinion from this Court about a crystallized dispute about the

10   interpretation of the statute as applied to our program.

11        THE COURT:  Yes.  But you are asking me to give you an

12   opinion about certain aspects of the statute and leave aside

13   certain other aspects, like the mens rea.  So how is that not

14   seeking an impermissible advisory opinion from a court?

15        MS. EISENSTEIN:  So, your Honor, the intent is to just

16   knowingly violate the statute.  I think there's some confusion.

17   When the government uses the term intent they combine it and

18   merge it together with intent to induce.  And when we talk

19   about intent there's a separate mens rea of knowingly violating

20   the statute.

21        So we think there's three prongs to the statute.  They

22   think that there's seemingly two.  We would dispute, of course,

23   that if you found, your Honor, that we were permitted to

24   provide such copay assistance and that it would not violate the

25   statute, clearly we wouldn't be violating it knowingly, so

L6mnpfic                    CORRECTED

1    intent in our view of the elements of the statute would not be

2    at issue.

3           And so with the direct copay assistance program I

4    don't think we have a dispute among the parties that there's a

5    justiciable controversy here, though the government does

6    quibble around whether or not the declaratory judgment relief

7    is available.

8           With respect to the indirect subsidy program --

9           THE COURT:  Wait.  Yes.  Go ahead.  Yeah.  I'm sorry.

10   Go ahead.  The questions I have relate to the indirect program.

11          MS. EISENSTEIN:  Right.

12          THE COURT:  Let me ask you some basic questions before

13   you get there, if I can.

14          Does Pfizer know or is it anywhere in the record what

15   percentage of patients who need this drug are Medicaid,

16   Medicare patients?

17          MS. EISENSTEIN:  I don't know the precise answer, your

18   Honor, but because of the nature of the condition it is a

19   condition, ATTR-CM, that affects older individuals, that it is

20   a very high percentage of patients, particularly in what's

21   called the wild-type form, that are -- would be eligible for

22   Medicare.  But with respect to -- and I know my colleague

23   Mr. Hallward-Driemeier will address this further, but just to

24   follow up on it while we are on the point, the government did

25   state something to the effect of, that 90 percent would not pay

L6mnpfic                    CORRECTED

the cost, but also ignored the fact that it is only a small

sliver of that population that would be eligible for our copay

assistance program, which is limited to those between 500 and

800 percent of the federal poverty line.  Those below that

would either benefit from Pfizer's free drug program or from

the low-income subsidy program.

        So 10 percent or so of the amount they cited were

those who were paying entirely out of their own pocket, but a

very large percentage of this population is getting the drug

for free by virtue of the government or Pfizer's own program.

        THE COURT:  So that's part of the question that I

have, though.  These statistics that you are telling me, why

doesn't Pfizer just reduce the cost?  Why are we having this

constitutional and statutory fight when you're telling me it's

such a small percentage of people that will even benefit from

this program and Pfizer clearly has the ability to just reduce

the cost of the drug?

        MS. EISENSTEIN:  So, your Honor, reducing the cost of

the drug in this type of space is not going to solve the

problem that we've posed to your Honor.  Because as we stated

in our complaint and our briefing, even reducing the price by

half would still leave a significant class of people unable to

afford the medication, and so it would be a question of degree.

        THE COURT:  Yes.  So you are hoping to make it up by

some kind of direct or indirect funding.  So instead of doing

1    direct or indirect funding, why don't you just reduce the price

2    by whatever that contribution to the direct or indirect funding

3    would be?

4                MS. EISENSTEIN:  Because, your Honor, by virtue of

5    the --

6                THE COURT:  It is basically the same for you.

7                MS. EISENSTEIN:  It is not a question for us, your

8    Honor.  It's a question of whether patients would then be able

9    to still afford the medication.  So Pfizer's interest is to

10   help patients afford this critical medication that Pfizer

11   innovated and brought to market and --

12               THE COURT:  Yes.  But, counsel, isn't the answer that

13   you just gave me underscoring the point that Mr. Lillywhite

14   made to me at the very end where I said, what's the policy goal

15   behind this?

16               So what you're telling me is that by using one of

17   these two programs people can still afford it because the copay

18   or whatever their obligation would be gets taken care of, and

19   who cares?  The balance of it gets dumped on the federal

20   government.  Whereas if Pfizer -- let me finish -- whereas --

21               MS. EISENSTEIN:  Sorry, your Honor.

22               THE COURT:  If Pfizer were to significantly cut the

23   cost, it's Pfizer that bears the burden instead of the federal

24   government.  Right?

25               MS. EISENSTEIN:  So, your Honor, we would happily do

L6mnpfic                    CORRECTED

1    that if the Medicare program could allow us to reduce the price

2    that way, except the way that Medicare works is that fixed

3    percentage, the coinsurance and copay, still falls on the

4    patients, no matter how low we bring the price.  So we can take

5    it out of on our own hide.  In fact, the proposal is to take

6    this coinsurance amount out of our own hide to give it to these

7    patients who can't afford it in this financial need --

8            THE COURT:  You just flipped.  You say you would take

9    the coinsurance share, and leave the bulk of it instead of I'm

10   suggesting the other way around in effect.  Reduce the --

11           MS. EISENSTEIN:  There's no way -- your Honor, there's

12   no way under the Medicare program to do that.  So if we were to

13   cut our price in half, the burden on the Medicare patient would

14   be cut in half, but it wouldn't be eliminated, so just to

15   give --

16           THE COURT:  I understand that.  But you could cut it

17   by three-quarters.

18           MS. EISENSTEIN:  So that still would leave a

19   substantial percentage of people who aren't able to afford this

20   medication.  So the question we have is a legal question, which

21   is for that, if it's even a reduced population of people and

22   we've already reduced that population significantly by an

23   extraordinary generous free drug program that Pfizer provides,

24   that for that class of people who cannot afford the medication,

25   at whatever price it is set, is it a crime for Pfizer to assist

L6mnpfic                    CORRECTED

1    them in obtaining that medication and being financially able to

2    pay for and fill their prescriptions?

3          So that is a legal question that we have teed up for

4    the Court that is properly before the Court under the

5    Declaratory Judgment Act.  It's properly before the Court under

6    the APA as have exhausted every avenue from both programs with

7    the agency.  We've --

8          THE COURT:  Wait, wait, wait.  Have you exhausted for

9    the indirect program?  I mean, it seems to me that the OIG

10   didn't give you an opinion, so how have you exhausted?

11         MS. EISENSTEIN:  Right.

12         So we sought an advisory opinion.  We issued a request

13   for an advisory opinion.  And as your Honor pointed out

14   earlier, the government evaluated our request and refused to

15   issue an advisory opinion, citing the risk or the similarity

16   between our program and other matters under investigation and

17   enforcement.

18         THE COURT:  Doesn't that just say you have to wait, or

19   does it equate to nonapproval?

20         MS. EISENSTEIN:  Well, it equates to a refusal to

21   grant a favorable advisory opinion.  So that is the end of the

22   process with the agency.  What they say is, yes, what we can do

23   is implement at risk of enforcement.  But that's exactly --

24         THE COURT:  I understand that.  Okay.  I understand

25   that point.  If that's true, you don't have to go further.  I

L6mnpfic                    CORRECTED

1    get it.  Okay.

2              MS. EISENSTEIN:  Right.

3              So what we want to do is go ahead with these programs,

4    and we believe that not only that letter, the refusal to grant

5    an advisory opinion on the force of the similarity to other

6    matters under enforcement demonstrates the imminent and

7    concrete risk of enforcement.

8              THE COURT:  I understand that.

9              MS. EISENSTEIN:  We're ready to go ahead.

10             THE COURT:  Let me just ask you, are you challenging

11   the propriety of OIG's saying there is an investigation and so

12   we can't render an opinion, or are you really just skipping

13   over that now saying you've exhausted everything under the

14   regulatory scheme and so now the question is before the Court?

15             MS. EISENSTEIN:  It is the latter, your Honor.  We are

16   not asking them to issue an advisory opinion at this juncture.

17   They've stated their piece.  And, frankly, the core legal issue

18   between the two programs is the same, which is whether

19   ultimately Pfizer, whether directly through copay assistance or

20   indirectly through charitable assistance, is able to support

21   this patient population in affording this essential medication.

22   And we think that that is an imminent controversy under both

23   the Declaratory Judgment Act and the APA.

24             THE COURT:  What about the argument that under the

25   Declaratory Judgment Act there needs to be an independent claim

L6mnpfic                    CORRECTED

1   and a jurisdictional basis?

2          MS. EISENSTEIN:  So, your Honor, *Abbott Labs* said

3   exactly the opposite from that.  *Abbott Labs* discussed exactly

4   that issue and noted that the Declaratory Judgment Act provides

5   an additional remedy to the APA and that it was not intended to

6   be separate from that remedy.

7          And, in addition, court after court has held that

8   where the party seeks to engage in conduct and has a concrete

9   proposal to engage in conduct that would be otherwise violative

10  of federal law that it has the ability to go first into court

11  and to seek a declaration of whether or not its proposed

12  conduct would violate the federal criminal statute and to do

13  that in a pre-enforcement context.  It doesn't require --

14         THE COURT:  You may be stating it a little bit broader

15  than you need to because I am not sure that in all instances

16  somebody can go into court before they act and ask for an

17  opinion from a Court on whether if I do this will I violate a

18  criminal statute.  But I take your point on the facts here.

19         MS. EISENSTEIN:  Your Honor, otherwise it meets the

20  Article 3 requirements for standing, ripeness, and

21  justiciability.

22         I would like to stay just a few words about that on

23  the CIA component, because one of the components of Article III

24  that the government challenges with respect to the charity

25  program, not the direct copay program, is whether or not the

L6mnpfic                    CORRECTED

1    CIA eliminates redressability.

2              It does not.

3              We are not seeking to relitigate the CIA.  We are not

4    asking to relieve us from the promises in the CIA.  We believe

5    that our proposed charitable assistance program would comport

6    with not only the 2005 and 2014 guidance but also the CIA

7    requirements.  Pfizer under --

8              THE COURT:  Are you asking the Court to render an

9    opinion on that issue?

10             MS. EISENSTEIN:  We are not, your Honor.  We think

11   just that that is not a bar under Article III or otherwise to

12   this Court resolving both components of our claim.

13             THE COURT:  Tell me what you mean by both components

14   of your claim.

15             MS. EISENSTEIN:  Both the direct copay assistance and

16   the charity assistance components --

17             THE COURT:  Okay.  So if I were to rule in Pfizer's

18   favor just hypothetically and say either one or both of these

19   two programs don't violate the AKS, and OIG never contended

20   that it violated, at least the direct program violated the BIS,

21   and I don't speak to the CIA -- we have too many acronyms

22   here -- isn't the government free subsequently to challenge

23   based on the CIA?

24             MS. EISENSTEIN:  I suppose so, your Honor, but we are

25   not asking the Court to address that, and we think --

L6mnpfic                      CORRECTED

1           THE COURT:  Okay.

2           MS. EISENSTEIN:  We think that the program will

3   comport with the requirements of the CIA because we are not

4   seeking to influence an independent charity about identifying

5   or establishing particular disease funds.  We would maintain

6   the appropriate separateness with the disease fund.

7           But I will just say this with respect to what it says

8   about the CIA as well as the guidance:  The government is being

9   somewhat disingenuous to point us to the 2005 and 2014 guidance

10  on independent charitable contributions as a viable path

11  forward when at the same time it cites the $900 million in

12  enforcement settlements that it has collected over scores of

13  enforcement actions on similar conduct and refused to give us

14  an -- even opine in an advisory opinion on our program.

15          THE COURT:  So this is still one of the questions,

16  though, that I keep coming back to on the charity program.  I

17  am a little unsettled on how you can be telling me that there

18  is a controversy, that the issue is ripe, that the issue is

19  justiciable, when clearly there is no opinion one way or the

20  other on the propriety of the indirect program.

21          MS. EISENSTEIN:  So, your Honor, in such a case you

22  can look at the concrete risk of enforcement under the AKS

23  itself.  We are not asking whether -- you can't be prosecuted

24  under the guidance or under an advisory opinion.  The

25  prosecution, it comes under federal criminal law.  And the

L6mnpfic                        CORRECTED

1    advisory opinion is just that.  It is an opinion of the agency

2    about how it applies to a particular set of circumstances.

3             THE COURT:  They didn't give you an opinion.  That's

4    my point.

5             MS. EISENSTEIN:  They didn't give us an opinion, but

6    we have a course of conduct we want to engage in, which is to

7    offer to donate to a fund that benefits ATTR-CM patients and to

8    have at least some communication about our interest in funding

9    such a program and to evaluate the needs of patients under that

10   program.

11            THE COURT:  So it sounds to me like --

12            MS. EISENSTEIN:  That's what we seek to do.

13            THE COURT:  -- you are asking me in effect really to

14   direct OIG that they should engage in a dialogue with you

15   rather than saying to me there is a ripe ruling out of an

16   agency that is final and binding and that this Court can opine

17   on?

18            MS. EISENSTEIN:  So, we aren't, your Honor, because

19   this is a -- what's called a self-executing statute and this

20   comes from --

21            THE COURT:  Then why did you ask them in the first

22   place though?  That's what I am not understanding.

23            MS. EISENSTEIN:  So, your Honor, we don't have to get

24   permission from the agency to go forward.  The advisory opinion

25   process --

L6mnpfic                    CORRECTED

1                THE COURT:  Right.

2                MS. EISENSTEIN:   -- is a permissive process.

3                So, for example in the *National Organization for

4    *Marriage v. Walsh*, the government made a similar argument that

5    they had not yet labeled the organization a political

6    committee, so they should wait to be able to see whether they

7    can bring a pre-enforcement challenge.  The Court rejected that

8    because of the risk of enforcement.  It said -- this is the

9    Second Circuit speaking -- it is disingenuous for defendants to

10   insinuate that the state might not enforce the statute against

11   the entity when the statute quite clearly applies to its

12   activities and the state actively regulates the issue.

13               And then the hardship prong of the prudential standing

14   analysis was easy because forcing it to break the law before

15   we'll answer -- in that case it was a constitutional

16   question -- creates a direct and immediate dilemma, and that's

17   the dilemma Pfizer is in.

18               THE COURT:  I know, but here you are saying you would

19   be put in the position of being forced to break the law, and

20   yet you are telling me it wouldn't break the law.  And you

21   basically want me to give you a comfort opinion that you can go

22   ahead and act and you won't be in violation of the law.

23               But I don't even know exactly what it is that you are

24   intending to do here specific enough so that I can render an

25   opinion that wouldn't be purely an advisory opinion.

L6mnpfic                    CORRECTED

1          MS. EISENSTEIN:  So, your Honor, in paragraphs 70 to

2    72 of the complaint it lays out the program, and it is fairly

3    simple and straightforward, which is that Pfizer would offer to

4    fund an independent charity to provide assistance to ATTR-CM

5    patients if it created such a fund.  And so -- and to be able

6    to --

7          THE COURT:  So there isn't a fund in existence right

8    now, in other words.

9          MS. EISENSTEIN:  Not one that is that specifically

10   targeted.  There are amyloidosis funds that cover a very broad

11   range of diseases, disease states, but there's not one that

12   benefits ATTR-CM patients specifically in existence now.

13         THE COURT:  So would the fund be a disease state fund?

14         MS. EISENSTEIN:  That's correct, your Honor.

15         THE COURT:  And would it cover only a single product?

16         MS. EISENSTEIN:  It would not cover only a single

17   product.  It would cover all products that would be treatments

18   for this disease, some of which are symptomatic treatments.

19   There's only one FDA approved product to treat the progress of

20   the disease, which is our product, but there are other

21   medications that these patients need that would also

22   potentially be covered by such a fund.

23         THE COURT:  So the program that you want me to opine

24   on is broader than the one that we have been talking about,

25   which relates to tafamidis?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L6mnpfic                    CORRECTED

1          MS. EISENSTEIN:  Tafamidis.

2          THE COURT:  Sorry, the name?

3          MS. EISENSTEIN:  Tafamidis, your Honor.

4          THE COURT:  Tafamidis.

5          So I don't even have the specifics about what the fund

6     would be.  Let me ask you, too, I mean the fund would cover

7     only the Pfizer product, right?

8          MS. EISENSTEIN:  Not necessarily, your Honor, if it

9     covered the other products that covered the symptoms, those

10    could be --

11         THE COURT:  Not necessarily because it is not yet

12    concrete enough for you to know.

13         MS. EISENSTEIN:  Well, your Honor, what is concrete

14    and at the heart of both issues is whether or not it

15    constitutes an illegal kickback to provide directly to the

16    patients or indirectly through a charity funding that enables

17    patients to obtain this critical medication, and the government

18    has concretely --

19         THE COURT:  Isn't that the exact reason you want to do

20    this?  You want to fund the copay so that patients can afford

21    to get this treatment?

22         MS. EISENSTEIN:  That's exactly right, your Honor, and

23    we believe that is the concrete dispute.

24         THE COURT:  That's what the statute prohibits.  Those

25    are the words you just quoted to me.

L6mnpfic                    CORRECTED

1          MS. EISENSTEIN:  Right.  We think that it does not,

2     the statute does not prohibit that activity, but the concrete

3     dispute is the government has said it does.  And with respect

4     to the charitable program, with respect to the direct copay

5     assistance program, they've said that directly in the advisory

6     opinion.  And with respect to the independent charity, they

7     have engaged in a range of aggressive enforcement activity

8     that's made it clear that we can't go forward without some kind

9     of comfort that we will not face a similar enforcement activity

10    if we move ahead.

11         THE COURT:  Okay.  I think I have your point.

12         All right.  Is there someone else who wishes to be

13    heard.

14         MS. EISENSTEIN:  Yes.  If I may,

15    Mr. Hallward-Driemeier is going to talk about the merits of the

16    case.

17         THE COURT:  Okay.  Thank you very much, counsel.

18         MR. HALLWARD-DRIEMEIER:  Thank you, your Honor.  And I

19    would like focus on the merits of the direct program, as to

20    which the government does not dispute that there is a live

21    controversy given that they have issued an advisory opinion.

22         I want to take issue with the suggestion by the

23    government that this is a position that's taken in the advisory

24    opinion that has been longstanding, because that is not the

25    case.  On pages 15 and 16 of the advisory opinion, and this is

L6mnpfic                    CORRECTED

pages 155 to 156, the government lays out a categorical rule

that the payment of a subsidy which would allow a Medicare

beneficiary to overcome a financial obstacle to obtaining their

life-saving medication constitutes remuneration to induce that

Medicare beneficiary to purchase the drug, and, therefore,

violates or satisfies the substantive element of the statute.

          That is not the position that the government took in

its 2005 guidance that it published and it has pointed to,

because that articulation of the remuneration and inducement

element would apply equally to a charity or to a family member

who was helping a patient to overcome the financial obstacle to

accessing their essential medical care.

          And yet in 2005 the government specifically said that

it supported charity to assist financially needy beneficiaries

as long as the assistance does not run afoul of the AKS.  This

is at 70 Federal Register 70624.  So, in other words, merely

providing a subsidy to allow the financially needy Medicare

beneficiary to obtain their medicine was not in OIG's view in

2005 independently sufficient to violate the AKS.

          THE COURT:  That's not inconsistent with what the

government says here.  That is the very reason that the

opinion, as I understand it, says that's as far as we can go

because we don't know whether the intent here is to induce you

to take a particular drug that you might not otherwise take.

          So when a charity or a family member says I will pay

1    your copay, the patient presumably already has decided that

2    they need this drug and that's the drug they want to take.  The

3    open element here and the part that I'm struggling with in

4    terms of how can I possibly render a declaratory judgment here

5    is that the OIG has not said there would be a violation.  They

6    have said it looks like there might be, but there's this open

7    question that remains to be seen in terms of whether there

8    would be a violation.

9              MR. HALLWARD-DRIEMEIER:  Well, your Honor, I am

10   quoting from the advisory opinion at 156 of the administrative

11   record --

12             THE COURT:  You are quoting selectively.

13             MR. HALLWARD-DRIEMEIER:  What is that?

14             THE COURT:  You are quoting selectively, and I

15   appreciate so am I.

16             MR. HALLWARD-DRIEMEIER:  I understand that they have

17   said, well, who knows, we are not opining about intent.

18             THE COURT:  You agree they've said that, right?

19             MR. HALLWARD-DRIEMEIER:  They have said that.  Yes,

20   they have your Honor.  But where they specifically state that

21   the proposed arrangements plainly would involve remuneration to

22   an individual to induce that individual to purchase an item,

23   reimbursed by Medicare, that is the substantive violation,

24   because remuneration to induce is the intent that is at issue.

25   Is it an intent to induce.

L6mnpfic                    CORRECTED

1          THE COURT:  That's not what your colleague just said.

2     She told me that the intent that was left open was the mens rea

3     component.

4          MR. HALLWARD-DRIEMEIER:  There is yet another intent

5     element of the requirement, because it must done wilfully,

6     which means an intent to violate the law.  And they are not

7     opining on that.  I agree.

8          But with respect to the substantive element of

9     remuneration to induce, the OIG opinion is clear that merely

10    providing a benefit that allows a beneficiary to overcome a

11    financial impediment to access satisfies the remuneration to

12    induce element, and that is not what they said in 2005, because

13    in 2005 -- and this is a different citation, this is 70627 --

14    they said with respect -- and, again, this is with respect to

15    an independent charity, but they are construing the AKS

16    substantive provisions -- must not impermissibly influence

17    beneficiaries' drug choices.  And that is what we believe the

18    statute applies.

19         Because, as the Second Circuit said in the *Krikheli*

20    case, the terms remuneration and inducement as used in this

21    statute have a particular meaning.  With respect to inducement

22    specifically, *Krikheli* said that to induce means an attempt to

23    gain influence over the judgment, in other words, to skew the

24    decision making.  And again in 2005 OIG said the same thing,

25    impermissibly influence beneficiaries drug choices.  Here there

L6mnpfic                    CORRECTED

1    is no drug choice.

2            THE COURT:  Are you just saying because there is no

3    competing drugs, there's no choice, so you can't be

4    impermissibly influencing it?

5            MR. HALLWARD-DRIEMEIER:  Your Honor, I would think

6    that there would be many instances in which a subsidy would

7    influence drug choices.

8            THE COURT:  That is not what I asked you about,

9    though.  That's not what I asked you.  I want to know are you

10   saying you're not if these programs go forward, influencing

11   drug choice because there is no other choice?

12           MR. HALLWARD-DRIEMEIER:  That's right.  We are not

13   impermissibly influencing their drug choice because there is no

14   other FDA approved drug for this condition, and it is a

15   condition that is debilitating and fatal.  So there is not --

16           THE COURT:  Your cocounsel just told me, I thought,

17   that there were other drugs off-label uses of other drugs and

18   that there were things that could treat symptoms, so you know

19   you're --

20           MR. HALLWARD-DRIEMEIER:  The symptoms issue is

21   different, your Honor.  That's with respect to the independent

22   charity.  A requirement of the OIG guidance is that it treats

23   the disease state and that would mean all aspects of the

24   disease state.  That means other drugs that would treat

25   conditions, you know, including pain and other symptoms.  But

L6mnpfic                    CORRECTED

1    with respect to tafamidis, it's the only drug the FDA has

2    approved to treat the ATTR-CM condition.

3              THE COURT: So, if another drug were approved

4    tomorrow, is your program okay today and not okay tomorrow?

5              MR. HALLWARD-DRIEMEIER: Well, your Honor, I think it

6    would depend, because I think it would depend on whether that

7    drug had been proven as safe and effective and was comparable

8    in price to tafamidis. The one product that is on the market

9    to which the government points is a product that has not been

10   proven safe and effective, it has not been approved by FDA for

11   this, and it is twice the cost.

12             THE COURT: How am I supposed to make those kinds of

13   findings on the record before me in order to declare -- which

14   is what you are asking me to do. You are asking me to declare

15   that the program you want to engage in is fine under the

16   statute. How am I supposed to do that when there are all these

17   factual arguments you are making to me that are wholly outside

18   the record?

19             MR. HALLWARD-DRIEMEIER: Well, your Honor, they are

20   not outside the record. I would point, your Honor, to what I

21   believe is the most succinct statement of the scope of the

22   program, the facts that define it, and the conditions under

23   which we are asking the Court to issue its opinion. They are

24   in an April 8, 2020 letter to OIG, and this is in the

25   administrative record at pages 104 through 109. These include

L6mnpfic                    CORRECTED

1    in bullet form, no other medicines approved to treat the

2    disease, and it is an orphan disease with a small patient

3    population for which Congress has --

4              THE COURT:  These are more representations to the OIG.

5    They are not proven facts that I can accept for purposes of a

6    ruling.

7              MR. HALLWARD-DRIEMEIER:  That is correct, your Honor.

8    And the ruling that we are asking your Honor to give would only

9    protect Pfizer to the extent that those representations were

10   correct.  If it was no longer the case that there were no other

11   medicines that were approved to treat the disease, then your

12   Honor's declaratory judgment would not protect Pfizer to the

13   same extent.

14             Now, to the extent that in the course of so ruling the

15   court agreed that when the Second Circuit said that induce

16   means an attempt to gain influence or control over the judgment

17   of another, means an attempt to skew their choice, then that

18   legal ruling would protect us to the extent that any one of

19   these facts that changed would not ultimately affect that

20   ultimate question of whether the program skewed the choice.

21   But that --

22             THE COURT:  I don't think so.  I think it would give

23   you an argument.  I don't think it would protect you.

24             MR. HALLWARD-DRIEMEIER:  I agree, your Honor.  It

25   would be an argument.  We would be left to argue that, under

L6mnpfic                      CORRECTED

the legal standard as articulated by the court, whatever the

change would be did not affect that ultimate question of

whether the program was skewing the decision making.  But that

notion of skewing the decision making is critical here, and the

government attempts to read it out.  They attempt to read out

numerous words from the statute.  The statute starts by saying

remuneration, including a kickback, a bribe, or rebate --

          THE COURT:  Hold on.  Mr. Hallward-Driemeier, I did

say to you at the outset that, for whatever reason, it's having

trouble picking your voice up.  Try to direct the mic more

closely to your --

          Ms. Dempsey, are you able to mute everyone else?

          THE DEPUTY CLERK:  There are a couple of 202 lines

that are not muted.

          MR. HALLWARD-DRIEMEIER:  I apologize, your Honor, that

the podium is not as tall as I am.  It does create --

          THE COURT:  Nothing you can do about that.

          I'm sorry, go ahead.

          THE DEPUTY CLERK:  I believe he muted himself.

          THE COURT:  You are muted it looks like.  You are not

being picked up.  You are muted for some reason.

          Do you have a control for your microphone?

          MS. McPHEE:  Your Honor, I understand from a message

from one of my colleagues, who is together with Doug

Hallward-Driemeier that someone other than they apparently has

L6mnpfic                    CORRECTED

1   muted one of those 202 numbers, which is the line from which

2   they are connected.

3          THE DEPUTY CLERK:  I didn't mute anyone.

4          THE COURT:  Try again and see.

5          THE DEPUTY CLERK:  Whoever that 202 line is that muted

6   themselves they should unmute themselves.

7          THE COURT:  Not Ms. Dempsey, but who was just

8   speaking?

9          MS. McPHEE:  Excuse me, your Honor.  It's Joan McPhee.

10         THE COURT:  Ms. McPhee, ask them to try the microphone

11  again in the -- I guess that's a DC conference room, right?

12         MS. McPHEE:  That's correct.

13         THE COURT:  No.  It's not working.

14         Is there an IT person?

15         MS. McPHEE:  I am confident there is, your Honor.  I

16  will just check to go make sure they can hear you, even if we

17  can't hear them.

18         THE COURT:  Yes.  I mean, looking at the screen in

19  front of where Mr. Hallward-Driemeier is standing there is a

20  line through the microphone.

21         MS. McPHEE:  I now understand that they are calling

22  back in from a different line to avoid whatever the technical

23  issue is with the muting the line they were previously on.

24         THE COURT:  Okay.  On the participant list the 202

25  numbers are no longer showing that they're muted, but in front

L6mnpfic                    CORRECTED

1    of counsel the microphone does say muted.

2              MR. HALLWARD-DRIEMEIER:  Hello?

3              MS. McPHEE:  Here we go.

4              THE COURT:  I think you're back live,

5    Mr. Hallward-Driemeier.

6              MR. HALLWARD-DRIEMEIER:  We do have our very dear IT

7    person here with us, so I would never try flying this one

8    alone, your Honor.

9              THE COURT:  Very good.

10             MR. HALLWARD-DRIEMEIER:  I was saying, your Honor,

11   that the government interpretation reads words out of the

12   statute.  The statute starts by saying remuneration including a

13   kickback, bribe, or rebate, and yet the government in every

14   summary of the statute simply excludes those words because they

15   are inconvenient to it.  The statute on their view means the

16   same thing with those words or without, but that is

17   inconsistent with the statute.

18             THE COURT:  I don't think that's what counsel argued

19   to me.  Counsel argued that pre-'77, as I understand it, that

20   pre-'77 the statute only said "kickback, bribe, or rebate," and

21   that post-'77 it says "remuneration including," right?

22             MR. HALLWARD-DRIEMEIER:  That's right, your Honor.

23   And yet what the doctrines of statutory construction, *ejusdem*

24   *generis* and *noscitur a sociis*, would say is that the more

25   general concept of remuneration to induce has to be construed

L6mnpfic                              CORRECTED

1    specific with those specific examples that Congress gave.

2          And so what we are suggesting is that remuneration to

3    induce must therefore include some concept of corruption, some

4    concept of improperly influencing the action of the other.

5    That makes sense because, as the government acknowledges, this

6    is a criminal statute that applies not only to the payor of the

7    remuneration because also the recipient, the Medicare

8    beneficiary, on the government's view, commits a felony crime

9    when they accept the payment of any subsidy to help them afford

10   their life-saving medicine.  That is not a construction that

11   Congress would have given.

12         THE COURT:  All right.  But you don't really have

13   standing to argue that to me, do you?  You are really arguing

14   about the impact, and you only have standing to argue about the

15   impact to Pfizer.

16         MR. HALLWARD-DRIEMEIER:  Well, your Honor, as I am

17   saying, the government acknowledges the statute applies to both

18   parties of the transaction.  So it can only apply to Pfizer if

19   it only also applies to the beneficiary.

20         So the statute has to be construed in a way that makes

21   sense of that.  There are many aspects of the structure of the

22   statute that suggest our reading starts with the fact that it

23   is a criminal provision.

24         THE COURT:  Let me interrupt you.

25         What is your reading?

L6mnpfic                    CORRECTED

1          MR. HALLWARD-DRIEMEIER:  Our reading is that the

2     phrase "remuneration to induce the purchase of a product" has

3     to be construed consistent with those words of example,

4     "kickback, bribe or rebate," to connote some kind of corruption

5     or skewing of the decision making.

6          THE COURT:  Okay.

7          MR. HALLWARD-DRIEMEIER:  And we note --

8          THE COURT:  Go ahead.

9          MR. HALLWARD-DRIEMEIER:  We note that even the civil

10    penalty statute that immediately precedes the AKS -- which is

11    only civil, it only applies to the payor, not the recipient,

12    and it only requires influencing, not inducing -- says

13    influencing the choice of provider or supplier.

14          So, in other words, it explicitly states this notion

15    of inducing the choice among options.  And that is present also

16    in the AKS.  And that's what the Second Circuit held in

17    *Krikheli* when they said that to induce means to obtain control

18    or exercise influence over the judgment or decision making of

19    another.  It is to improperly skew their decision making.

20          They also refer to remuneration in that case as a quid

21    pro quo, and a quid pro quo is quite common to the Court, that

22    concept, and it is common in other statutes involving

23    kickbacks, bribes, or rebate as it relates to the AKS.  It

24    involves that giving over of one's decision making to another.

25          The beneficiary who says my choice among options is

L6mnpfic                          CORRECTED

1    for sale is clearly committing a crime and ought to be

2    prosecuted.  A financially needy patient who says there is only

3    one medication, my doctor has already prescribed it, I am

4    unable to afford it, would you help me pay my copay, is not

5    committing a crime.

6          That's the sum and substance of our argument, your

7    Honor.  It is one of statutory construction.  The broad reading

8    that the government gives this has been rejected over and over

9    again by the Supreme Court in the *Skilling* case, in the

10   *McDonnell* case, in the *Van Buren* case just earlier this month.

11         THE COURT:  Hold on.

12         What is the reading you are saying that they are

13   seeking that has been disapproved?

14         MR. HALLWARD-DRIEMEIER:  Where they read the statute

15   as merely requiring anything of value, which would of course

16   include the subsidy, that allows a Medicare beneficiary to

17   overcome a financial impediment, and this is at page 156 and

18   155 of the executive record.  I guess it's probably 155 in the

19   footnote, when they say the remuneration would address the

20   Medicare beneficiary's inability to pay.

21         That would without question influence the patient's

22   purchasing decision.  Merely addressing their inability to pay,

23   the generous aunt addresses their inability to pay, the

24   independent charity addresses their inability to pay.

25         THE COURT:  Maybe.  Maybe.  Depending on the facts.

L6mnpfic                    CORRECTED

1        MR. HALLWARD-DRIEMEIER:  Well, on these facts, if this

2   same patient prescribed tafamidis with a $13,000 out of pocket

3   copayment can't afford it, and their aunt says, I will help you

4   with that because it's important to me, and gives them the

5   $13,000 to be able to afford the copay and access the drug that

6   has been prescribed, all of those facts are the same as in

7   Pfizer's program.

8        THE COURT:  They are not the same, and you are asking

9   me -- this is the problem I'm having with the ruling that you

10   are asking me to make.  You are asking me to declare basically

11   in a vacuum and in support of the argument you want me to

12   adopt.

13        You're piecing all kinds of other hypotheticals that

14   aren't even before me.  I know nothing about this hypothetical

15   aunt who may or may not pay the copay for a relative, and I

16   know nothing about what the government's position would be.

17   You are purely speculating here and asking me, based on that

18   speculation, to rule in your favor here.

19        MR. HALLWARD-DRIEMEIER:  The government, your Honor --

20   I'm not asking you to speculate, because I am relying on the

21   government's own words at administrative record 155, where they

22   say where a Medicare beneficiary otherwise may be unwilling or

23   unable to purchase the medications due to his or her

24   cost-sharing obligation.  And then it says -- which is

25   gratuitous, I believe -- which are driven by the list price of

L6mnpfic                    CORRECTED

1    the medication.

2              THE COURT:  Counsel, the very fact that you just said

3    that that it's gratuitous is part of the problem I am having.

4    Tell me exactly what it is -- you are asking for a declaratory

5    relief.  Tell me exactly what the declaration is that you want.

6              MR. HALLWARD-DRIEMEIER:  The declaration is that the

7    program, which as my cocounsel said, was sufficiently precise

8    for OIG to render an opinion, and I believe that the --

9              THE COURT:  You think I am going to put all that in

10   the declaration?  I asked you to tell me what the declaration

11   is that you want.

12             MR. HALLWARD-DRIEMEIER:  That the program that was

13   identified in our submissions --

14             THE COURT:  The submissions to me or to OIG.

15             MR. HALLWARD-DRIEMEIER:  To OIG.  So these were at

16   administrative record 104 to 109, that program would not

17   violate the anti-kickback statute.

18             THE COURT:  Okay.  So that's your claim one, right?

19             MR. HALLWARD-DRIEMEIER:  Yes, your Honor.

20             THE COURT:  And, by the way, your claim asked for a

21   declaration under both the AKS and the BIS, but you concede

22   that the government hasn't said it would be violative of the

23   BIS, correct?

24             MR. HALLWARD-DRIEMEIER:  Recall, your Honor, that we

25   filed the complaint before the government --

L6mnpfic                    CORRECTED

1                THE COURT:  That is a yes or a no.

2                MR. HALLWARD-DRIEMEIER:  Yes, we do ask that.

3                THE COURT:  Okay.

4                MR. HALLWARD-DRIEMEIER:  I was merely trying to

5       explain the history of why that was the claim --

6                THE COURT:  I understand.  You filed it before the

7       final opinion came out.

8                All I am asking you is do you concede that now that

9       claim is moot --

10               MR. HALLWARD-DRIEMEIER:  Yes, your Honor.

11               THE COURT:  -- with respect to BIS?

12               MR. HALLWARD-DRIEMEIER:  Yes, your Honor.

13               THE COURT:  Okay.  Thank you.

14               Okay.  Anything else you want to tell me?

15               MR. HALLWARD-DRIEMEIER:  Your Honor, I just want

16      briefly to address the policy arguments, and I believe they

17      were policy arguments the government was making with respect to

18      price.

19               The price of this drug is a red herring for several

20      reasons, the first of which is that if the government felt that

21      this treatment, that this drug was not one that Medicare should

22      pay for, it could exclude it from Medicare coverage.  But that

23      would mean it was --

24               THE COURT:  The price isn't a red herring because the

25      price is the whole reason you want to do this whole program.

L6mnpfic                          CORRECTED

1          MR. HALLWARD-DRIEMEIER:  Your Honor, the price -- as

2    my friend said, the question arises whether the price, the

3    current price or half that price, or a third of that price,

4    because there will be a group of patients for whom this type of

5    breakthrough therapy for a rare disease designated under the

6    orphan drug statute, which comes with it certain statutory

7    benefits, Congress specifically provided that a drug that was

8    approved under the orphan drug statute for a rare disease gets

9    exclusivity for an extra period of time, specifically in order

10   to allow the company to charge a higher price.

11         This drug is for a rare disease.  It is a breakthrough

12   therapy, and it has incredible benefits for the individuals who

13   suffer from this debilitating disease.  By the time the next

14   drug even might be approved to address this condition, it will

15   be at least three and a half years from which Pfizer's drug was

16   approved.  In that time patients will have died, your Honor.

17         THE COURT:  Counsel, you are accusing the government

18   of introducing all kinds of red herrings and extraneous facts.

19   But as laudable as what you are telling me your motivation is,

20   this argument that you are making to me about this being an

21   orphan drug and having this exclusivity period, that's all

22   irrelevant too.  Either your program violates the AKS or it

23   doesn't.

24         MR. HALLWARD-DRIEMEIER:  To that extent, your Honor, I

25   guess I am in agreement, because I think the government's

L6mnpfic                    CORRECTED

argument about price is a red herring.  The government pays the
price, $200,000, but only if you are wealthy enough to fork out
the $13,000 on your own.  If you are less well off than that,
the government says, so sorry.  That is an equal protection
violation under *Griffin*.

          THE COURT:  How do you possibly have standing to raise
the equal protection violation of the patients?

          MR. HALLWARD-DRIEMEIER:  Because we are talking about
the statute as applied to us for helping a patient in a
situation in which the government acknowledges that the
treatment is the proper treatment.

          THE COURT:  But the violation, if there is one, is not
a violation your rights.  It is a violation of the rights of
the patient.  Pfizer does not have standing to protect the
rights of every patient out there.

          MR. HALLWARD-DRIEMEIER:  No, your Honor, where the
interests are as closely aligned as this, we do have standing
because this is --

          THE COURT:  How are they closely aligned?  You are
just stating the conclusion without telling me how and why.

          MR. HALLWARD-DRIEMEIER:  We are seeking to provide
them assistance so that they may buy the product.  The
government is saying that that transaction is a criminal
violation by us.

          THE COURT:  I don't think that they've said that.

L6mnpfic                    CORRECTED

 1          MR. HALLWARD-DRIEMEIER:  Your Honor, they have come as

 2   close as they possibly can without saying those words as

 3   clearly as that.

 4          THE COURT:  You need to wrap up.  We've gone way

 5   beyond the time allotment I told you I had.

 6          MR. HALLWARD-DRIEMEIER:  To your Honor's point, we

 7   believe that the core question is one of statutory

 8   construction.  The fact that Congress placed the AKS in a

 9   statutory provision with a number of other felonies, that it

10   provided in the False Claims Act that an AKS violation per se

11   constitutes a basis for liability under the False Claims Act

12   because, the government has explained to numerous courts, the

13   AKS violation necessarily means that the doctor's decision

14   making has been corrupted.  We think the fact that this

15   criminal statute sits beside a civil statute that would, under

16   the government's view, be even narrower than the criminal

17   statute --

18          THE COURT:  Counsel, I am not getting what all of

19   these points go to.

20          MR. HALLWARD-DRIEMEIER:  All of these are canons of

21   statutory construction, your Honor, that support the reading

22   that gives effect to all of the words; that the words kickback,

23   bribe, rebate mean something when Congress left them in the

24   statute.

25          THE COURT:  And you are reading out the word

L6mnpfic                    CORRECTED

1    "including"?

2             MR. HALLWARD-DRIEMEIER:  No, your Honor.  Again, under

3    the doctrine of *noscitur a sociis* and *ejusdem generis*, what it

4    means is that the general, which is this concept of

5    remuneration to induce, has to be read consistent with the

6    specific examples.

7             THE COURT:  All right.  I understand your point on

8    that.  So all the rest of this that you are telling me is in

9    support of that construction of the statute?

10            MR. HALLWARD-DRIEMEIER:  Yes, your Honor.

11            THE COURT:  All right.

12            MR. HALLWARD-DRIEMEIER:  It is in fact what the

13   government itself said in 2005.

14            THE COURT:  Don't start repeating, please.  Don't

15   repeat.

16            MR. HALLWARD-DRIEMEIER:  It was a question of

17   impermissibly influencing, your Honor, and I think that's the

18   core of our argument.

19            Thank you, your Honor.

20            THE COURT:  All right.  Thank you.

21            All right.  Unless there is something that the

22   government has that is new based on the argument of Pfizer, I

23   think I have everybody's positions here.

24            MR. LILLYWHITE:  We are happy to rest, your Honor.

25            THE COURT:  All right.

L6mnpfic                          CORRECTED

1          Mr. Bergman, are you turning on your mic?

2          MR. BERGMAN:  It was just to reiterate the same point

3    Mr. Lillywhite made.

4          THE COURT:  All right.

5          Counsel, are you thinking you are going to get another

6    bite?

7          MS. EISENSTEIN:  No, your Honor.

8          THE COURT:  All right.

9          So the Court will get an opinion issued as promptly as

10   I can.  In connection with doing that, I assume the parties are

11   planning to order a copy of this transcript?

12         MR. LILLYWHITE:  Yes, your Honor.

13         MS. EISENSTEIN:  Yes, your Honor.

14         THE COURT:  I would like for someone please to provide

15   it to the Court as soon as possible.  That means you need to be

16   in touch with Mr. Mauro and make whatever arrangements you need

17   to make to get a copy of the transcript, and as soon as we get

18   that we will promptly work to get an opinion on the books.

19         All right.  Thank you all very much for a very

20   spirited but helpful argument.

21         Thank you.  We stand adjourned.

22         Thank you, Mr. Mauro.

23         (Adjourned)

24

25